# Exhibit 2

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - LAW DIVISION**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) THE PEOPLE OF UNION COUNTY, and ) COUNTY of UNION, ) ) Plaintiffs, ) ) v. ) ) PURDUE PHARMA L.P.; PURDUE PHARMA, ) INC.; THE PURDUE FREDERICK COMPANY, ) INC.; TEVA PHARMACEUTICAL ) INDUSTRIES, LTD.; TEVA ) PHARMACEUTICALS USA, INC.; ) CEPHALON, INC.; JOHNSON & JOHNSON; ) JANSSEN PHARMACEUTICALS, INC.; ) ORTHO-MCNEIL-JANSSEN ) PHARMACEUTICALS, INC. n/k/a JANSSEN ) PHARMACEUTICALS, INC.; JANSSEN ) PHARMACEUTICA INC. n/k/a JANSSEN ) PHARMACEUTICALS, INC.; NORAMCO, ) INC.; ENDO HEALTH SOLUTIONS INC.; ) ENDO PHARMACEUTICALS, INC.; PAR ) PHARMACEUTICAL, INC.; PAR ) PHARMACEUTICAL COMPANIES, INC.; ) ALLERGAN PLC f/k/a ACTAVIS PLC; ) ALLERGAN FINANCE, LLC f/k/a ACTAVIS, ) INC. f/k/a WATSON PHARMACEUTICALS, ) INC.; WATSON LABORATORIES, INC.; ) ACTAVIS LLC; ACTAVIS PHARMA, INC. ) f/k/a WATSON PHARMA, INC.; INSYS ) THERAPEUTICS, INC.; MALLINCKRODT ) PLC; MALLINCKRODT LLC; SPECGX LLC; ) AMERISOURCEBERGEN DRUG ) CORPORATION; CARDINAL HEALTH, INC.; ) McKESSON CORPORATION; H.D. SMITH ) WHOLESALE DRUG CO.; H.D. SMITH, LLC; ) CVS HEALTH CORPORATION, Individually ) and d/b/a CVS PHARMACY, INC.; CVS ) INDIANA, LLC; WALGREENS BOOTS ) ALLIANCE, INC.; WALGREEN CO., ) Individually and d/b/a WALGREENS; THE ) KROGER CO.; KROGER LIMITED ) | **Case No.: 2018-L-003909** <br><br><br><br> **FIRST AMENDED COMPLAINT** <br><br> Complaint for Public Nuisance; Illinois Narcotics Profit Forfeiture Act, 725 ILCS 175/1 *et seq.*; Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*; Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*; Negligence and Negligent Misrepresentation; Negligence Per Se; Civil Conspiracy; and Fraud and Fraudulent Misrepresentation |

PARTNERSHIP II; WALMART INC. f/k/a  )
WAL-MART STORES, INC.; and WAL-MART  )
STORES EAST, LP, Individually and d/b/a  )
WAL-MART PHARMACY WAREHOUSES,  )
  )
                        Defendants.  )
  )
  )  **<u>JURY TRIAL DEMANDED AND</u>**
  )  **<u>ENDORSED HEREON</u>**
  )

**TABLE OF CONTENTS**

I.  INTRODUCTION……………………………………………………………………2

II.  PARTIES………………... .................................................................................... 3

    A. PLAINTIFFS ....................................................................................................3

    B. DEFENDANTS ..................................................................................................6

        1.  Manufacturer Defendants.......................................................................6

            a.  Purdue Entities .......................................................................6

            b.  Cephalon Entities ...................................................................8

            c.  Janssen Entities .....................................................................9

            d.  Endo Entities........................................................................12

            e.  Actavis Entities ...................................................................13

            f.  Insys Therapeutics, Inc. ......................................................15

            g.  Mallinckrodt Entities ...........................................................15

        2.  Distributor Defendants...........................................................................18

            a.  McKesson Corporation .......................................................18

            b.  Cardinal Health, Inc. ...........................................................19

            c.  AmerisourceBergen Drug Corporation...........................................19

            d.  H.D. Smith Entities .............................................................20

            e.  CVS Entities.........................................................................20

            f.  Walgreens Entities ...............................................................21

            g.  Kroger Entities .....................................................................22

            h.  Walmart Entities ..................................................................22

        3.  Agency and Authority.............................................................................23

III. JURISDICTION & VENUE…........................................................................... 24

IV. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS............................. 25

i

A. OPIOIDS AND THEIR EFFECTS .................................................25

B. THE RESURGENCE OF OPIOID USE IN THE UNITED STATES..............29

    1.  The Sackler Family Integrated Advertising and Medicine. .......................29

    2.  Purdue Developed and Aggressively Promoted OxyContin......................31

    3.  Other Manufacturer Defendants Leapt at the Opioid Opportunity. ...........35

C. DEFENDANTS' CONDUCT CREATED AN ABATABLE PUBLIC
    NUISANCE. ........................................................................38

D. THE MANUFACTURER DEFENDANTS' MULTI-PRONGED
    SCHEME TO CHANGE PRESCRIBER HABITS AND PUBLIC
    PERCEPTION AND INCREASE DEMAND FOR OPIOIDS .....................39

    1.  The Manufacturer Defendants Promoted Multiple Falsehoods
        About Opioids. .........................................................................40

        a.  Falsehood #1: The risk of addiction from chronic opioid
            therapy is low ....................................................................41

            i.  Purdue's misrepresentations regarding addiction risk ............ 42

            ii.  Endo's misrepresentations regarding addiction risk ............... 49

            iii.  Janssen's misrepresentations regarding addiction risk ........... 51

            iv.  Cephalon's misrepresentations regarding addiction risk. ....... 52

            v.  Actavis's misrepresentations regarding addiction risk ........... 53

            vi.  Mallinckrodt's misrepresentations regarding addiction risk... 54

        b.  Falsehood #2: To the extent there is a risk of addiction, it can
            be easily identified and managed ...................................................56

        c.  Falsehood #3: Signs of addictive behavior are
            "pseudoaddiction," requiring more opioids .................................58

        d.  Falsehood #4: Opioid withdrawal can be avoided by tapering
            ....................................................................................61

        e.  Falsehood #5: Opioid doses can be increased without limit
            or greater risks..................................................................62

        f.  Falsehood #6: Long-term opioid use improves functioning ..........65

ii

g.   Falsehood #7: Alternative forms of pain relief pose greater risks than opioids ........................................................................70

h.   Falsehood #8: OxyContin provides twelve hours of pain relief ........................................................................................73

i.   Falsehood #9: New formulations of certain opioids successfully deter abuse ............................................................78

  i.   Purdue's deceptive marketing of reformulated OxyContin and Hysingla ER ................................................................. 79

  ii.   Endo's deceptive marketing of reformulated Opana ER ........ 82

  iii.   Other Manufacturer Defendants' misrepresentations regarding abuse deterrence ................................................................. 88

2.   The Manufacturer Defendants Disseminated Their Misleading Messages About Opioids Through Multiple Channels ............................90

a.   The Manufacturer Defendants Directed Front Groups to Deceptively Promote Opioid Use ....................................................90

  i.   American Pain Foundation ...................................................... 92

  ii.   American Academy of Pain Medicine and the American Pain Society ..................................................................................... 95

  iii.   The Federation of State Medical Boards ................................ 98

  iv.   The Alliance for Patient Access ........................................... 100

  v.   The U.S. Pain Foundation ..................................................... 104

  vi.   American Geriatrics Society ................................................. 104

b.   The Manufacturer Defendants Paid Key Opinion Leaders to Deceptively Promote Opioid Use ................................................106

i.   Dr. Russell Portenoy ............................................................ 108

ii.  Dr. Lynn Webster................................................................. 110

iii. Dr. Perry Fine...................................................................... 112

iv.  Dr. Scott Fishman ............................................................... 115

c.   The Manufacturer Defendants Disseminated Their
     Misrepresentations Through Continuing Medical Education
     Programs ...........................................................................116

d.   The Manufacturer Defendants Used "Branded" Advertising
     to Promote Their Products to Doctors and Consumers...............120

e.   The Manufacturer Defendants Used "Unbranded"
     Advertising to Promote Opioid Use for Chronic Pain
     Without FDA Review .................................................120

f.   The Manufacturer Defendants Funded, Edited and
     Distributed Publications that Supported Their
     Misrepresentations ......................................................121

g.   The Manufacturer Defendants Used Detailing to Directly
     Disseminate Their Misrepresentations to Prescribers.................123

h.   Manufacturer Defendants Used Speakers' Bureaus and
     Programs to Spread Their Deceptive Messages..........................127

3.   The Manufacturer Defendants Targeted Vulnerable Populations. ..........128

4.   Insys Employed Fraudulent, Illegal, and Misleading Marketing
     Schemes to Promote Subsys. ..................................................129

5.   The Manufacturer Defendants' Scheme Succeeded, Creating a
     Public Health Epidemic. .........................................................134

     a.   Manufacturer Defendants Dramatically Expanded Opioid
          Prescribing and Use ....................................................134

     b.   Manufacturer Defendants' Deception in Expanding Their
          Market Created and Fueled the Opioid Epidemic.......................137

E. THE DISTRIBUTOR DEFENDANTS AND OTHER DEFENDANTS
   THROUGHOUT THE SUPPLY CHAIN DELIBERATELY
   DISREGARDED THEIR DUTIES TO MAINTAIN EFFECTIVE
   CONTROLS TO PREVENT DIVERSION AND TO IDENTIFY,
   REPORT, AND TAKE STEPS TO HALT SUSPICIOUS ORDERS..........138

1. All Defendants Have a Duty to Provide Effective Controls and Procedures to Guard Against Theft and Diversion, and to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions. ...................................................140

2. Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders. ..........................................................................146

3. Defendants Worked Together to Inflate the Quotas of Opioids They Could Distribute.................................................................................149

4. Defendants Kept Careful Track of Prescribing Data and Knew About Diversion and Suspicious Orders and Prescribers. ......................158

5. Defendants Failed to Report Suspicious Orders or Otherwise Act to Prevent Diversion. .................................................................................165

6. Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement. ......................................................168

7. The National Retail Pharmacies Were on Notice of and Contriubted to Illegal Diversion of Prescription Opioids. ......................173

    a. The National Retail Pharmacies Have a Duty to Prevent Diversion.................................................................................173

    b. Multiple Enforcement Actions Against the National Retail Pharmacies Confirms Their Compliance Failures ......................177

        i. CVS.................................................................................... 177

        ii. Walgreens ......................................................................... 181

F. THE OPIOIDS THE DEFENDANTS SOLD MIGRATED INTO OTHER JURISDICTIONS ...........................................................................184

G. ILLINOIS SPECIFIC FACTS.....................................................................188

H. COUNTY SPECIFIC FACTS.....................................................................189

I. THE DEFENDANTS CONSPIRED TO ENGAGE IN THE WRONGFUL CONDUCT COMPLAINED OF HEREIN AND INTENDED TO BENEFIT BOTH INDEPENDENTLY AND JOINTLY FROM THEIR CONSPIRACY....................................................194

1. Conspiracy Among Manufacturer Defendants. .......................................194

2. Conspiracy Among All Defendants. ........................................................197

J. STATUTES OF LIMITATIONS ARE TOLLED AND DEFENDANTS ARE ESTOPPED FROM ASSERTING STATUTES OF LIMITATIONS AS DEFENSES ................................................. 198

    1. Continuing Conduct. ................................................................ 198

    2. Equitable Estoppel and Fraudulent Concealment. ................... 199

K. FACTS PERTAINING TO CIVIL PENALTIES AND PUNITIVE DAMAGES ................................................................................. 201

    1. The Manufacturer Defendants Persisted in Their Fraudulent Scheme Despite Repeated Admonitions, Warning, and Prosecutions. ............................................................................ 202

        a. FDA Warnings to Janssen Failed to Deter Janssen's Misleading Promotion of Duragesic .............................. 202

        b. Governmental Action, Including Large Monetary Fines, Failed to Stop Cephalon from Falsely Marketing Actiq for Off-Label Uses ......................................................... 203

        c. FDA Warnings Did Not Prevent Cephalon from Continuing False and Off-Label Marketing of Fentora ................. 203

        d. A Guilty Plea and a Large Fine Did Not Deter Purdue from Continuing Its Fraudulent Marketing of OxyContin ................. 204

    2. Repeated Admonishments and Fines Did Not Stop Defendants from Ignoring Their Obligations to Control the Supply Chain and Prevent Diversion. ..................................................................... 205

V. LEGAL CAUSES OF ACTION ................................................................. 211

COUNT I – PUBLIC NUISANCE – ILLINOIS COMMON LAW (Against All Defendants) ............................................................................... 211

COUNT II – NARCOTICS PROFIT FORFEITURE ACT – 725 ILCS 175/1 *et seq.* (Against All Defendants) .................................................... 223

COUNT III – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT – 815 ILCS 505/1 *et seq.* (Against Manufacturer Defendants for Deceptive Business Practices) ................................. 226

COUNT IV – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT – 815 ILCS 505/1 *et seq.* (Against Distributor Defendants for Deceptive Business Practices) ................................. 231

COUNT V – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT – 815 ILCS 505/1 *et seq.* (Against Manufacturer Defendants for Unfair Acts and Practices) ............................................................234

COUNT VI – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT – 815 ILCS 505/1 *et seq.* (Against Distributor Defendants for Unfair Acts and Practices) ............................................................239

COUNT VII – UNIFORM DECEPTIVE TRADE PRACTICES ACT – 815 ILCS 510/1 *et seq.* (Against All Defendants) ............................................................243

COUNT VIII – NEGLIGENCE AND NEGLIGENT MISREPRESENTATION – ILLINOIS COMMON LAW (Against All Defendants) ............................................................245

COUNT IX – NEGLIGENCE PER SE (Against All Defendants)........................249

COUNT X – CIVIL CONSPIRACY (Against All Defendants) ............................251

COUNT XI – FRAUD AND FRAUDULENT MISREPRESENTATION (Against All Defendants) ............................................................257

PUNITIVE DAMAGES ............................................................259

PRAYER FOR RELIEF ............................................................260

Plaintiffs, THE PEOPLE OF THE STATE OF ILLINOIS, THE PEOPLE OF UNION COUNTY, and COUNTY of UNION, by Tyler R. Edmonds, the State's Attorney of Union County, (collectively "Plaintiffs") and undersigned attorneys, bring this action against Defendants, Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Teva Pharmaceutical Industries, LTD.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Par Pharmaceutical, Inc.; Par Pharmaceutical Companies, Inc.; Allergan plc f/k/a Actavis plc; Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Insys Therapeutics, Inc.; Mallinckrodt plc; Mallinckrodt LLC; SpecGx, LLC; AmerisourceBergen Drug Corporation; Cardinal Health, Inc.; McKesson Corporation; H.D. Smith Wholesale Drug Co.; H.D. Smith, LLC; CVS Health Corporation, Individually and d/b/a CVS Pharmacy, Inc.; CVS Indiana, LLC; Walgreens Boots Alliance, Inc.; Walgreen Co., Individually and d/b/a Walgreens; The Krorger Co.; Kroger Limited Partnership II; Walmart Inc. f/k/a Wal-Mart Stores, Inc.; and Wal-Mart Stores East, LP, Individually and d/b/a Wal-Mart Pharmacy Warehouses (collectively "Defendants") for public nuisance; for violations of the Illinois Narcotics Profit Forfeiture Act, 725 ILCS 175/1 *et seq*.; for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.; for violations of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq*.; for negligence and negligent misrepresentation; for negligence per se; for civil conspiracy; and for fraud and fraudulent misrepresentation.

1

Plaintiffs allege that Defendants **unlawfully** sold or caused to be sold millions of prescription opioids into Union County, Illinois ("The County"). Plaintiffs assert that such unlawful conduct resulted in the **foreseeable**, widespread diversion of prescription opioids into the illicit market, 1970 U.S.C.C.A.N. §§ 4566, 4571-72; 720 ILCS 570/201, creating a serious public health and safety crisis in the State and The County involving opioid abuse, addiction, morbidity and mortality, and is a public nuisance.

Plaintiffs allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs bring this civil action to eliminate the hazard to public health and safety caused by the opioid epidemic, to abate the nuisance caused thereby, and to recoup monies that have been spent because of Defendants' false, deceptive and unfair marketing and/or unlawful diversion of prescription opioids.[1] Such economic damages were foreseeable to Defendants and were sustained because of Defendants' intentional and/or unlawful actions and omissions.

2.    Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid overdose deaths and addictions.[2]

3.    The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[3]

4.    Plaintiffs bring this suit against the manufacturers of prescription opioids. The manufacturers aggressively pushed highly addictive, dangerous opioids, falsely representing to doctors that patients would only rarely succumb to drug addiction. These pharmaceutical

---

[1] As used herein, the term "opioid" refers to the entire family of opiate drugs including natural, synthetic and semi-synthetic opiates.

[2] See Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*,  374 N. Eng. J. Med. 1253 (2016).

[3] See Robert M. Califf et al., A Proactive Response to Prescription Opioid Abuse, 374 N. Eng. J. Med. 1480 (2016).

companies aggressively advertised to and persuaded doctors to prescribe highly addictive, dangerous opioids, turned patients into drug addicts for their own corporate profit. Such actions were intentional and/or unlawful.

5.      Plaintiffs also bring this suit against wholesale distributors, including national retail pharmacy distributors, of these highly addictive drugs. The distributors and manufacturers intentionally and/or unlawfully breached their legal duties under federal and state law to provide effective controls and procedures to guard against diversion of opioid drugs, and failed to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates.

## II.      PARTIES

### A. PLAINTIFFS

6.      Plaintiffs, THE PEOPLE OF THE STATE OF ILLINOIS ("People of the State"), THE PEOPLE OF UNION COUNTY ("People of The County"), and COUNTY of UNION ("The County"), by Tyler R. Edmonds, the State's Attorney of Union County ("State's Attorney"), are authorized to enforce the causes of action brought herein. The County is a body politic and corporate, organized and existing under the laws of the State of Illinois, which may sue in any court having subject-matter jurisdiction. 55 ILCS 5/5-1001.

7.      The County Board of Union County, Illinois ("County Board"), has declared, *inter alia*, that opioid abuse, addiction, morbidity and mortality has created a serious public health and safety crisis in the State and the County, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

8.      The County Board has further declared and resolved that there is a substantial need for legal services, that these services cannot be adequately performed or provided solely by the attorneys and supporting personnel salaried through The County and/or State treasury, and that to

3

fulfill the duties of both the County Board and the State's Attorney, experienced undersigned counsel have been retained.

9.      The distribution and diversion of opioids into the State and The County (collectively, "Plaintiffs' Community") created the foreseeable opioid crisis and opioid public nuisance for which Plaintiffs here seek relief.

10.     Plaintiffs directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiffs seek relief. Categories of past and continuing sustained damages include, *inter alia*,: (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) and costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation. These damages have been suffered, and continue to be suffered directly, by the Plaintiffs.

11.     Plaintiffs also seek the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct. Plaintiffs are authorized by law to abate any nuisance and prosecute in any court of competent jurisdiction any person who creates, continues, contributes to, or suffers such nuisance to exist and prevent injury and annoyance from such nuisance. 55 ILCS 5/5-1001; 55 ILCS 5/3-9005; 55 ILCS 5/1-6003.

12.     The State's Attorney is empowered to bring this action, and the Counts in this action, on behalf of Plaintiffs pursuant to the powers and duties vested to the position by 55 ILCS 5/3-9005 and the doctrine of *parens patriae*. *See also* 55 ILCS 5/1-6003.

13.     Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, have standing to bring this public nuisance action for damages and to abate the public nuisance in The County. 55 ILCS 5/5-1001; 55 ILCS 5/3-9005; 55 ILCS 5/1-6003.

14.     Plaintiffs The County, People of The County, and People of the State have standing to bring claims for civil relief under the Narcotics Profit Forfeiture Act. 725 ILCS 175/3(c) ("'Person' includes any individual or entity capable of holding a legal or beneficial interest in property."); 725 ILCS 175/6(c) (person injured has standing).

15.     The State's Attorney believes this action to be in the public interest of the Plaintiffs, The County, the People of The County, and the People of the State. The State's Attorney brings this action pursuant to Section 7 of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(a).

16.     The Plaintiffs, The County, the People of The County, and the People of the State, are "government[s] or governmental subdivision[s]" and are therefore "person[s]" with standing to bring this action under the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1(5).

17.     Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, have standing to bring a common law action for negligence and negligent misrepresentation. 55 ILCS 5/5-1001; 55 ILCS 5/3-9005; 55 ILCS 5/1-6003.

18.     Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, have standing to bring an action for negligence per se. 55 ILCS 5/5-1001; 55 ILCS 5/3-9005; 55 ILCS 5/1-6003.

19.     Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, have standing to bring a common law action for civil conspiracy. 55 ILCS 5/5-1001; 55 ILCS 5/3-9005; 55 ILCS 5/1-6003.

20.     Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, have standing to bring a common law action for fraud and fraudulent misrepresentation. 55 ILCS 5/5-1001; 55 ILCS 5/3-9005; 55 ILCS 5/1-6003.

**B. DEFENDANTS**

**1.     Manufacturer Defendants.**

21.     The Manufacturer Defendants are defined below. At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.  The Manufacturer Defendants, which are also encompassed by the definitions of "wholesale drug distributor" and "wholesale distributor" under Illinois law (*see* 225 ILCS 120/15; Ill. Admin. Code Title 68, § 1510.10), have, at all times, manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders. *See, e.g.,* 720 ILCS 570/201(h); 21 C.F.R. § 1301.74; 21 USCA § 823(a)(1).

**a.     Purdue Entities**

22.     Defendant Purdue Pharma L.P. ("PPL") is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut.

23.     Defendant Purdue Pharma Inc. ("PPI") is a New York corporation with its principal place of business in Stamford, Connecticut.

24.     Defendant The Purdue Frederick Company, Inc. ("PFC") is a New York corporation with its principal place of business in Stamford, Connecticut.

25.     PPL, PPI, and PFC, together with their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Purdue"), are engaged in the manufacture, promotion, distribution, and sale of opioids nationally, and in Plaintiffs' Community, including the following:

| Product Name | Chemical Name | Schedule[4] |
|---|---|---|
| OxyContin | Oxycodone hydrochloride, extended release | Schedule II |
| MS Contin | Morphine sulfate, extended release | Schedule II |
| Dilaudid | Hydromorphone hydrochloride | Schedule II |
| Dilaudid-HP | Hydromorphone hydrochloride | Schedule II |
| Butrans | Buprenorphine | Schedule III |
| Hysingla ER | Hydrocodone bitrate | Schedule II |
| Targiniq ER | Oxycodone hydrochloride and naloxone hydrochloride | Schedule II |

26.     Purdue made thousands of payments to physicians nationwide, including in Illinois, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

27.     OxyContin is Purdue's largest-selling opioid.  Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $3.1 billion, up four-fold from 2006 sales of $800 million.  OxyContin constitutes roughly 30% of the entire market for analgesic drugs

---

[4] Since passage of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801 et seq. ("CSA" or "Controlled Substances Act") in 1970, opioids have been regulated as controlled substances. As controlled substances, they are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the most dangerous.  The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety.  Opioids generally had been categorized as Schedule II or Schedule III drugs; hydrocodone and tapentadol were recently reclassified from Schedule III to Schedule II. Schedule II drugs have a high potential for abuse, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence.

(*i.e.*, painkillers).  Sales of OxyContin (launched in 1996) went from a mere $49 million in its first full year on the market to $1.6 billion in 2002.

28.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million – at the time, one of the largest settlements with a drug company for marketing misconduct.  None of this stopped Purdue.  In fact, Purdue continued to create the false perception that opioids were safe and effective for long term use, even after being caught, by using unbranded marketing methods to circumvent the system.  In short, Purdue paid the fine when caught and then continued business as usual, deceptively marketing and selling billions of dollars of opioids each year.

**b.     Cephalon Entities**

29.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009.  Teva USA is a wholly-owned subsidiary of Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation (collectively "Teva").

30.     Defendant Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  In 2011, Teva Ltd. acquired Cephalon, Inc.

31.     Teva USA and Cephalon, Inc., together with their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Cephalon"), work together to manufacture, promote, distribute and sell brand name and generic versions of opioids nationally, and in Plaintiffs' Community, including the following:

| **Product Name** | **Chemical Name** | **Schedule** |
|---|---|---|
| Actiq | Fentanyl citrate | Schedule II |
| Fentora | Fentanyl buccal | Schedule II |

8

32.     From 2000 forward, Cephalon has made thousands of payments to physicians nationwide, including in Illinois, many of whom were not oncologists and did not treat cancer pain, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, many of whom were not oncologists and did not treat cancer pain, but in fact to deceptively promote and maximize the use of opioids.

33.     In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay $425 million.[5]

### c.     Janssen Entities

34.     Defendant Johnson & Johnson ("Johnson & Johnson") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

35.     Defendant Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals") is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of Johnson & Johnson.  Johnson & Johnson corresponds with the FDA regarding Janssen's products.  Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.

36.     Defendant Noramco, Inc. ("Noramco") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of Johnson & Johnson and its

---

[5]  Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing (Sept. 29, 2008), https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html.

manufacturer of active pharmaceutical ingredients until July 2016 when Johnson & Johnson sold its interests to SK Capital.

37.     Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

38.     Defendant Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica"), now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

39.     Johnson & Johnson, Janssen Pharmaceuticals, OMP, and Janssen Pharmaceutica, together with their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Janssen"), are or have been engaged in the manufacture, promotion, distribution, and sale of opioids nationally, and in Plaintiffs' Community. Among the drugs Janssen manufactures or manufactured are the following:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Duragesic | Fentanyl | Schedule II |
| Nucynta[6] | Tapentadol hydrochloride, immediate release | Schedule II |
| Nucynta ER | Tapentadol hydrochloride, extended release | Schedule II |

40.     Janssen made thousands of payments to physicians nationwide, including, upon information and belief, in Illinois, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.  Together, Nucynta

---

[6] Depomed, Inc. acquired the rights to Nucynta and Nucynta ER from Janssen in 2015.

and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

41.     Information from the U.S. Department of Justice's Office of the Inspector General shows that Johnson & Johnson made payments to prescribers but does not indicate which drug was being promoted when Johnson & Johnson made these payments.  At least one prescriber who previously served on Janssen's speaker's bureau received payment for speaking fees, meals, and travel from Johnson & Johnson. Upon information and belief, Johnson & Johnson would have similarly made payments to other participants in Janssen's speaker's bureau.

42.     Janssen, like many other companies, has a corporate code of conduct, which clarifies the organization's mission, values and principles.  Janssen's employees are required to read, understand and follow its Code of Conduct for Health Care Compliance.  Johnson & Johnson imposes this code of conduct on Janssen as a pharmaceutical subsidiary of Johnson & Johnson. Documents posted on Johnson & Johnson's and Janssen's websites confirm Johnson & Johnson's control of the development and marketing of opioids by Janssen.  Janssen's website "Ethical Code for the Conduct of Research and Development," names only Johnson & Johnson and does not mention Janssen anywhere within the document.  The "Ethical Code for the Conduct of Research and Development" posted on the Janssen website is Johnson & Johnson's company-wide Ethical Code, which it requires all of its subsidiaries to follow.

43.     The "Every Day Health Care Compliance Code of Conduct" posted on Janssen's website is a Johnson & Johnson company-wide document that describes Janssen as one of the "Pharmaceutical Companies of Johnson & Johnson" and as one of the "Johnson & Johnson Pharmaceutical Affiliates."   It governs how "[a]ll employees of Johnson & Johnson Pharmaceutical Affiliates," including those of Janssen, "market, sell, promote, research, develop,

inform and advertise Johnson & Johnson Pharmaceutical Affiliates' products."  All Janssen officers, directors, employees, sales associates must certify that they have "read, understood and will abide by" the code.  The code governs all of the forms of marketing at issue in this case.

### d.    Endo Entities

44.    Defendant Endo Health Solutions Inc. ("EHS") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

45.    Defendant Endo Pharmaceuticals, Inc. ("EPI") is a wholly-owned subsidiary of EHS and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

46.    Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant Par Pharmaceutical Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc. (collectively, "Par Pharmaceutical") was acquired by Endo International plc in September 2015 and is an operating company of Endo International plc.

47.    EHS, EPI, and Par Pharmaceutical, together with their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Endo"), manufacture opioids sold nationally, and in Plaintiffs' Community. Among the drugs Endo manufactures or manufactured are the following:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Opana ER | Oxymorphone hydrochloride, extended release | Schedule II |
| Opana | Oxymorphone hydrochloride | Schedule II |
| Percodan | Oxymorphone hydrochloride and aspirin | Schedule II |
| Percocet | Oxymorphone hydrochloride and acetaminophen | Schedule II |

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Generic | Oxycodone | Schedule II |
| Generic | Oxymorphone | Schedule II |
| Generic | Hydromorphone | Schedule II |
| Generic | Hydrocodone | Schedule II |

48.     Endo made thousands of payments to physicians nationwide, including in Illinois, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

49.     Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012, accounting for over 10% of Endo's total revenue; Opana ER yielded revenue of $1.15 billion from 2010 to 2013.  Endo also manufactures and sells generic opioids, both directly and through its subsidiary, Qualitest Pharmaceuticals, Inc., including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products.

50.     The Food and Drug Administration requested that Endo remove Opana ER from the market in June 2017.  The FDA relied on post-marketing data in reaching its conclusion based on risk of abuse.[7]

e.     **Actavis Entities**

51.     Allergan plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.  Actavis plc acquired Allergan plc in March 2015, and the combined company changed its name to Allergan plc in January 2015. Defendant Actavis, Inc. was acquired by Watson Pharmaceuticals, Inc. in October 2012, and the combined company

---

[7] Press Release, U.S. Food and Drug Admin. FDA Requests Removal of Opana ER for Risks Related to Abuse, (June 8, 2017).

13

changed its name to Actavis, Inc. in or around January 2013, and then Actavis plc in October 2013. Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan plc (Allergan Finance LLC, f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). Defendant Actavis Pharma, Inc. was previously registered to do business with the Illinois Secretary of State as a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc. Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants and entities is owned by Defendant Allergan plc, which uses them to market and sell its drugs in the United States. Collectively, these defendants and entities, together with their DEA and Illinois registrant and licensee subsidiaries and affiliates, which manufacture, promote, distribute, and sell prescription opioids, are referred to herein as "Actavis."

52. Actavis manufactures or has manufactured the following drugs as well as generic[8] versions of Kadian, Duragesic, and Opana in the United States and in Plaintiffs' Community:

| Product Name | Chemical Name | Schedule |
| --- | --- | --- |
| Kadian | Morphine sulfate, extended release | Schedule II |
| Norco | Hydrocodone bitartrate and acetaminophen | Schedule II |

53. Actavis made thousands of payments to physicians nationwide, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in

---

[8] In August 2016 Actavis' global generics business was acquired by Teva Pharmaceutical Industries Ltd. Allergan plc, Annual Report (Form 10-K), 3 (Feb. 16, 2018), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459018002345/agn-10k_20171231.htm.

post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

### f.    Insys Therapeutics, Inc.

54.    Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.  Insys's principal product and source of revenue is Subsys:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Subsys | Fentanyl | Schedule II |

55.    Insys made thousands of payments to physicians nationwide, including in Illinois, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

56.    Subsys is a transmucosal immediate-release formulation (TIRF) of fentanyl, contained in a single-dose spray device intended for oral, under-the-tongue administration.  Subsys was approved by the FDA solely for the treatment of breakthrough cancer pain.

57.    In 2016, Insys made approximately $330 million in net revenue from Subsys.  Insys promotes, sells, and distributes Subsys throughout the United States, and in Plaintiffs' Community.

58.    Insys's founder and owner was recently arrested and charged, along with other Insys executives, with multiple felonies in connection with an alleged conspiracy to bribe practitioners to prescribe Subsys and defraud insurance companies. Other Insys executives and managers were previously indicted.

### g.    Mallinckrodt Entities

59.    Defendant Mallinckrodt plc is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom.  Mallinckrodt plc was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien plc, which was fully

transferred to Mallinckrodt plc in June of that year. Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its United States headquarters in Hazelwood, Missouri. Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly owned subsidiary of Mallinckrodt plc. Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC, together with their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Mallinckrodt"), manufacture, market, sell and distribute pharmaceutical drugs throughout the United States, and in Plaintiffs' Community. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

60.    Mallinckrodt manufactures and markets two branded opioids:  Exalgo, which is extended-release hydromorphone, sold in 8, 12, 16, and 32 mg dosage strengths, and Roxicodone, which is oxycodone, sold in 15 and 30 mg dosage strengths.  In 2009, Mallinckrodt Inc., a subsidiary of Covidien plc, acquired the U.S. rights to Exalgo.  The FDA approved Exalgo for treatment of chronic pain in 2012.  Mallinckrodt further expanded its branded opioid portfolio in 2012 by purchasing Roxicodone from Xanodyne Pharmaceuticals.  In addition, Mallinckrodt developed Xartemis XR, an extended-release combination of oxycodone and acetaminophen, which the FDA approved in March 2014, and which Mallinckrodt has since discontinued. Mallinckrodt promoted its branded opioid products with its own direct sales force.

61.    While it has sought to develop its branded opioid products, Mallinckrodt has long been a leading manufacturer of generic opioids.  Mallinckrodt estimated that in 2015 it received approximately 25% of the U.S. Drug Enforcement Administration's ("DEA") entire annual quota for controlled substances that it manufactures.  Mallinckrodt also estimated, based on IMS Health

data for the same period, that its generics claimed an approximately 23% market share of DEA Schedules II and III opioid and oral solid dose medications.[9]

62.     Mallinckrodt operates a vertically integrated business in the United States: (1) importing raw opioid materials, (2) manufacturing generic opioid products, primarily at its facility in Hobart, New York, and (3) marketing and selling its products to drug distributors, specialty pharmaceutical distributors, retail pharmacy chains, pharmaceutical benefit managers that have mail-order pharmacies, and hospital buying groups.

63.     Among the drugs Mallinckrodt manufactures or has manufactured are the following:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Exalgo | Hydromorphone hydrochloride, extended release | Schedule II |
| Roxicodone | Oxycodone hydrochloride | Schedule II |
| Xartemis XR | Oxycodone hydrochloride and acetaminophen | Schedule II |
| Methadose | Methadone hydrochloride | Schedule II |
| Generic | Morphine sulfate, extended release | Schedule II |
| Generic | Morphine sulfate oral solution | Schedule II |
| Generic | Fentanyl transdermal system | Schedule II |
| Generic | Oral transmucosal fentanyl citrate | Schedule II |
| Generic | Oxycodone and acetaminophen | Schedule II |
| Generic | Hydrocodone bitartrate and acetaminophen | Schedule II |
| Generic | Hydromorphone hydrochloride | Schedule II |
| Generic | Hydromorphone hydrochloride, extended release | Schedule II |
| Generic | Naltrexone hydrochloride | unscheduled |
| Generic | Oxymorphone hydrochloride | Schedule II |
| Generic | Methadone hydrochloride | Schedule II |

---

[9]     Mallinckrodt plc 2016, Annual Report (Form 10-K), at 5 (Nov. 29, 2016), https://www.sec.gov/Archives/edgar/data/1567892/000156789216000098/0001567892-16-000098-index.htm.

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Generic | Oxycodone hydrochloride | Schedule II |
| Generic | Buprenorphine and naloxone | Schedule III |

64.    Mallinckrodt made thousands of payments to physicians nationwide, including in Illinois, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

65.    Collectively, Purdue, Cephalon, Janssen, Endo, Actavis, Insys, and Mallinckrodt are referred to herein as the "Manufacturer Defendants."

### 2.    Distributor Defendants.

66.    The Distributor Defendants are defined below. At all relevant times, the Distributor Defendants have distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duties of wholesale drug distributors to provide effective controls and procedures to guard against diversion of opioid drugs, and to further detect and warn of diversion of dangerous drugs for non-medical purposes. The Distributor Distributors universally failed to comply with the federal and state law that set forth these duties. The Distributor Defendants are engaged in "wholesale distribution," as defined under state and federal law.  Plaintiffs allege that the unlawful conduct by the Distributor Defendants is responsible for the volume of prescription opioids plaguing the State and The County.

### a.    McKesson Corporation

67.    Defendant McKesson Corporation is fifth on the list of Fortune 500 companies, ranking immediately after Apple and ExxonMobil, with annual revenue of $191 billion in 2016. McKesson Corporation, together with and through its DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "McKesson"), is a wholesaler of pharmaceutical drugs that

distributes opioids throughout the country, including in Plaintiffs' Community. McKesson, at all relevant times, operated as a licensed distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation. McKesson is incorporated in Delaware, with its principal place of business is in San Francisco, California.

68.     In January 2017, McKesson paid a record $150 million to resolve an investigation by the U.S. Department of Justice ("DOJ") for failing to report suspicious orders of certain drugs, including opioids.  In addition to the monetary penalty, the DOJ required McKesson to suspend sales of controlled substances from distribution centers in Ohio, Florida, Michigan and Colorado. The DOJ described these "staged suspensions" as "among the most severe sanctions ever agreed to by a [Drug Enforcement Administration] registered distributor."

### b.     Cardinal Health, Inc.

69.     Defendant Cardinal Health, Inc. describes itself as a "global, integrated health care services and products company," and is the fifteenth largest company by revenue in the U.S., with annual revenue of $121 billion in 2016. Cardinal Health, Inc., together with and through its DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Cardinal"), distributes pharmaceutical drugs, including opioids, throughout the country, including in Plaintiffs' Community. Cardinal is an Ohio corporation and is headquartered in Dublin, Ohio. Cardinal has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation. Based on Defendant Cardinal's own estimates, one of every six pharmaceutical products dispensed to United States patients travels through the Cardinal Health network.

### c.     AmerisourceBergen Drug Corporation

70.     Defendant AmerisourceBergen Drug Corporation, together with and through its DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively,

"AmerisourceBergen"), is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country, including in Plaintiffs' Community. AmerisourceBergen is the eleventh largest company by revenue in the United States, with annual revenue of $147 billion in 2016. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania, and it is incorporated in Delaware. AmerisourceBergen has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation.

### d. H.D. Smith Entities

71.      Defendant H.D. Smith Wholesale Drug Co. is a Delaware corporation with its principal place of business in Springfield, Illinois. Defendant H.D. Smith, LLC is a limited liability company organized in Delaware and maintains the assumed names of H.D. Smith and H.D. Smith Wholesale Drug Co through its filing with the Illinois Secretary of State. Located in the State of Illinois, H.D. Smith Wholesale Drug Co. and H.D. Smith, LLC, together with and through their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "H.D. Smith"), are wholesalers of pharmaceutical drugs and distribute opioid drugs throughout the county, including in Plaintiffs' Community.  H.D. Smith has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation. H.D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic and specialty pharmaceuticals. At all times relevant, H.D. Smith distributed prescription opioids throughout the United States, including in Illinois.

### e. CVS Entities

72.      Defendant CVS Health Corporation ("CVS HC") is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. Defendant CVS Pharmacy, Inc.

("CVS Pharmacy") is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.  CVS Pharmacy is a subsidiary of CVS HC.

73.     Defendant CVS Indiana, LLC ("CVS Indiana") is a limited liability company organized in Indiana with its principal place of business in Rhode Island and is managed by CVS Pharmacy.

74.     CVS HC, CVS Pharmacy and CVS Indiana, together with and through their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "CVS"), are wholesalers of pharmaceutical drugs and distribute opioid drugs throughout the county, including in Plaintiffs' Community. CVS has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation.

### f.     **Walgreens Entities**

75.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporations with its principal place of business in Illinois.

76.     Defendant Walgreen Co. is an Illinois corporation with its principal place of business in Deerfield, IL. Walgreen Co. is a subsidiary of Walgreens Boots Alliance, Inc. and does business under the trade name Walgreens, including business conducted through its Walgreens Warehouses.

77.     Walgreens Boots Alliance, Inc. and Walgreen Co., together with and through their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectiviely, "Walgreens"), are wholesalers of prescription opioid drugs and distribute opioids thoughout the country, including in Illinois. Walgreens has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation.

### g.    Kroger Entities

78.    Defendant The Kroger Co. is an Ohio corporation with headquarters located in Cincinnati, OH. The Kroger Co. operates approximates 2,268 pharmacies in the United States, including in Illinois.

79.    Defendant Kroger Limited Partnership II is an Ohio limited partnership and a subsidiary of The Kroger Co.

80.    The Kroger Co. and Kroger Limited Partnership II, together with and through their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Kroger"), are wholesalers of prescription opioid drugs and distribute opioids throught the country, including in Illinois. Kroger has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation.

### h.    Walmart Entities

81.    Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

82.    Defendant Wal-Mart Stores East, LP is a Delaware limited partnership with its principal office located in Bentonville, Arkansas, doing business as Wal-Mart Pharmacy Warehouse and is a licensed wholesale drug distributor with the Illinois Department of Financial and Professional Regulation. Wal-Mart Stores East, LP, through various Wal-Mart distribution centers and Wal-Mart Pharmacy Warehouses, including those located in Rogers, AK, Crawfordsville, IN and Orlando, FL, conducts business as a licensed wholesale drug distributor in the the State of Illinois.

83.    Walmart Inc. and Wal-Mart Stores East, LP, together with and through their DEA and Illinois registrant and licensee subsidiaries and affiliates (collectively, "Walmart"), are

wholesalers of prescription opioid drugs and distribute opioids thoughout the country, including in Plaintiffs' Community. Walmart has, at all relevant times, operated as a licensed wholesale drug distributor in Illinois, including through its license with the Illinois Department of Financial and Professional Regulation.

84.     Collectively, Defendants CVS, Walgreens, Kroger and Walmart are referred to as "National Retail Pharmacies." Under Illinois law specifically, retail pharmacies that conduct wholesale distribution are included under the definitions of "wholesale drug distributor" and "wholesale distributor." *See* 225 ILCS 120/15; Ill. Admin. Code Title 68, § 1510.10. The National Retail Pharmacies are held to the same licensing requirements as the other drug distributor defendants named herein (*see, e.g.,* 225 ILCS 120/25), and are also governed by the same duties to provide effective controls and procedures to guard against the theft and diversion of opioid drugs. *See* 720 ILCS 570/201(h); Ill. Admin. Code Title 68, § 1510.50(b)(3).

85.     Collectively, McKesson, Cardinal, AmerisourceBergen, H.D. Smith, and the National Retail Pharmicies are referred to herein as the "Distributor Defendants."

86.     "Defendants" include the above referenced entities, as well as their predecessors, successors, affiliates, subsidiaries, partnerships, and divisions, to the extent that they are engaged in the manufacture, promotion, distribution sale and/or dispensing of opioids.

**3.     Agency and Authority.**

87.     All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

### III.   JURISDICTION & VENUE

88.     Pursuant to the Illinois Constitution art. VI, § 9, this Court has subject matter jurisdiction over the causes of action alleged herein.

89.     This Court has personal jurisdiction over Defendants pursuant to 735 ILCS § 5/2-209 because Defendants conduct a continuous and systematic part of their general business in Illinois, have transacted substantial business with Illinois entities and residents, and have caused harm in Illinois as a result of the specific business activities complained of herein.

90.     Venue as to each Defendant is proper under 735 ILCS § 5/2-101, because the various transactions and occurrences giving rise to this action occurred in Union County, Illinois.

91.     There is no federal court diversity jurisdiction in that there is not complete diversity of citizenship. Specifically, Defendants H.D. Smith, LLC and Walgreens Boots Alliance, Inc. are citizens of the State of Illinois, and the County is also a citizen of the State of Illinois.  Additionally, the People of the State of Illinois are bringing this Complaint, making the State a real party in interest. Under federal case law, there can be no diversity jurisdiction when the State is a real party in interest.

92.     There is also no federal question jurisdiction. All of the causes of action pleaded herein are brought pursuant to Illinois statute or Illinois common law. While the Complaint contains reference to the federal Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, and Code of Federal Regulations, there is no cause of action brought pursuant to federal law.

93.     There is similarly no federal jurisdiction over Plaintiffs' state law claims, because there is not a federal issue that is necessarily raised, actually disputed, substantial, and capable of resolution in federal court without disrupting the federal-state balance approved by Congress. For every cause of action pleaded herein, Plaintiffs allege, independent and exclusive of federal law or regulation, underlying theories of liability predicated upon breaches of duty derived from Illinois

State laws and regulations, or upon violations of Illinois State laws and regulations, including, *inter alia*, the Illinois Controlled Substances Act (720 ILCS 570/100, *et seq.*), the Illinois Wholesale Drug Distribution Licensing Act (225 ILCS 120/1, *et seq.*), Part 1510 of Title 68 of the Illinois Administrative Code, the Illinois Consumer Fraud and Deceptive Businesses Practices Act (815 ILCS 505/1, *et seq.*), the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/1, *et seq.*), and the Illinois Narcotics Profit Forfeiture Act (725 ILCS 175/1 *et seq.*).

## IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS[10]

### A. Opioids and Their Effects

94.     Opioids are a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

95.     The medicinal properties of opioids have been recognized for millennia—as has their potential for abuse and addiction. The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine. Early use of opium in Western medicine was with a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today. Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

96.     In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine. During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with

---

[10] The allegations in this Complaint are made upon facts, as well as upon information and belief. Plaintiffs reserve the right to seek leave to amend or correct this Complaint based upon analysis of DEA data or other discovery, including, upon analysis of the ARCOS, IMS Health, and other date and upon further investigation and discovery.

morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent. Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."[11]

97.     Pharmaceutical companies tried to develop substitutes for opium and morphine that would provide the same analgesic effects without the addictive properties. In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

98.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

99.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970.

---

[11] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago*, The Wash. Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in-the-world-an-american-opioid-crisis-in-1908/?utm_term=.7832633fd7ca.

100.    Throughout the twentieth century, pharmaceutical companies continued to develop prescription opioids like Percodan, Percocet, and Vicodin, but these opioids were generally produced in combination with other drugs, with relatively low opioid content.

101.    In contrast, OxyContin, the product whose launch in 1996 ushered in the modern opioid epidemic, is pure oxycodone. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg.  The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered sixteen times that.

102.    Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME"). According to the CDC, doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

103.    Different opioids provide varying levels of MMEs. For example, just 33 mg of oxycodone provides 50 MME. Thus, at OxyContin's twice-daily dosing, the 50 MME/day threshold is nearly reached by a prescription of 15 mg twice daily. One 160 mg tablet of OxyContin, which Purdue took off the market in 2001, delivered 240 MME.

104.    The wide variation in the MME strength of prescription opioids renders misleading any effort to capture "market share" by the number of pills or prescriptions attributed to Purdue or other manufacturers.  Purdue, in particular, focuses its business on branded, highly potent pills, causing it to be responsible for a significant percent of the total amount of MME in circulation, even though it currently claims to have a small percentage of the market share in terms of pills or prescriptions.

27

105.     Fentanyl is a synthetic opioid that is 100 times stronger than morphine and 50 times stronger than heroin. First developed in 1959, fentanyl is showing up more and more often in the market for opioids created by Manufacturer Defendants' promotion, with particularly lethal consequences.

106.     The effects of opioids vary by duration.  Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, 12 hours.  Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately 4 to 6 hours.  Still other short-term opioids, such as Insys's Subsys, are designed to be taken in addition to long-acting opioids to specifically address breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer.  The Manufacturer Defendants promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

107.     Patients develop tolerance to the analgesic effect of opioids relatively quickly.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction.  The same is true of the euphoric effects of opioids—the "high."  However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether.  At higher doses, the effects of withdrawal are more severe.  Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

108.    Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms.  These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

109.    As a leading pain specialist doctor put it, the widespread, long-term use of opioids "was a *de* facto experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected until they started gathering death statistics."

## B. The Resurgence of Opioid Use in the United States

### 1.    The Sackler Family Integrated Advertising and Medicine.

110.    Given the history of opioid abuse in the U.S. and the medical profession's resulting wariness, the commercial success of the Manufacturer Defendants' prescription opioids would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.

111.    As it turned out, Purdue Pharma was uniquely positioned to execute just such a maneuver, thanks to the legacy of a man named Arthur Sackler. The Sackler family is the sole owner of Purdue and one of the wealthiest families in America, with a net worth of $13 billion as of 2016.  All of the company's profits go to Sackler family trusts and entities.[12] Yet the Sacklers have avoided publicly associating themselves with Purdue, letting others serve as the spokespeople for the company.

112.    The Sackler brothers—Arthur, Mortimer, and Raymond—purchased a small patent-medicine company called the Purdue Frederick Company in 1952. It was Arthur Sackler

---

[12] David Armstrong, *The Man at the Center of the Secret OxyContin Files*, STAT News (May 12, 2016), https://www.statnews.com/2016/05/12/man-center-secret-oxycontin-files/.

who created the pharmaceutical advertising industry as we know it, laying the groundwork for the OxyContin promotion that would make the Sacklers billionaires.

113.    Arthur Sackler was both a psychiatrist and a marketing executive.  He pioneered both print advertising in medical journals and promotion through physician "education" in the form of seminars and continuing medical education courses. He also understood the persuasive power of recommendations from fellow physicians, and did not hesitate to manipulate information when necessary. For example, one promotional brochure produced by his firm for Pfizer showed business cards of physicians from various cities as if they were testimonials for the drug, but when a journalist tried to contact these doctors, he discovered that they did not exist.[13]

114.    It was Arthur Sackler who, in the 1960s, made Valium into the first $100-million drug, so popular it became known as "Mother's Little Helper."  When Arthur's client, Roche, developed Valium, it already had a similar drug, Librium, another benzodiazepine, on the market for treatment of anxiety. So Arthur invented a condition he called "psychic tension"—essentially stress—and pitched Valium as the solution.[14] The campaign, for which Arthur was compensated based on volume of pills sold,[15] was a remarkable success.

115.    Arthur Sackler created not only the advertising for his clients but also the vehicle to bring their advertisements to doctors—a biweekly newspaper called the *Medical Tribune*, which was distributed for free to doctors nationwide. Arthur also conceived a company now called IMS Health Holdings Inc., which monitors prescribing practices of every doctor in the U.S and sells

---

[13] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (Rodale 2003) (hereinafter "Meier"), at 204.

[14] *Id.* at 202; *see also One Family Reaped Billions From Opioids*, WBUR On Point (Oct. 23, 2017), http://www.wbur.org/onpoint/2017/10/23/one-family-reaped-billions-from-opioids.

[15] Meier, *supra,* at 201-203.

30

this valuable data to pharmaceutical companies like Manufacturer Defendants, who utilize it to target and tailor their sales pitches to individual physicians.

### 2. Purdue Developed and Aggressively Promoted OxyContin.

116.  After the Sackler brothers acquired the Purdue Frederick Company in 1952, Purdue sold products ranging from earwax remover to antiseptic, and it became a profitable business.  As an advertising executive, Arthur Sackler was not involved, on paper at least, in running Purdue, which would have been a conflict of interest.  Raymond Sackler became Purdue's head executive, while Mortimer Sackler ran Purdue's UK affiliate.

117.  In the 1980s, Purdue, through its UK affiliate, acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine.  Purdue marketed this extended-release morphine as MS Contin, and it quickly became Purdue's bestseller.  As the patent expiration for MS Contin loomed, Purdue searched for a drug to replace it.  Around that time, Raymond's oldest son, Richard Sackler, who was also a trained physician, became more involved in the management of the company.  Richard had grand ambitions for the company; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean *really* big."[16] Richard believed Purdue should develop another use for its "Contin" timed-release system.

118.  In 1990, Purdue's vice president of clinical research, Robert Kaiko, sent a memo to Richard and other executives recommending that the company work on a pill containing oxycodone.  At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, a relatively weak oxycodone-acetaminophen combination pill.  MS Contin was not only approaching patent expiration but had always been

---

[16] Christopher Glazek, *The Secretive Family Making Billions from the Opioid Crisis*, Esquire (Oct. 16, 2017), http://www.esquire.com/news-politics/a12775932/sackler-family-oxycontin/.

limited by the stigma associated with morphine.  Oxycodone did not have that problem, and what's

more, it was sometimes mistakenly called "oxycodeine," which also contributed to the perception

of relatively lower potency, because codeine is weaker than morphine.  Purdue acknowledged

using this to its advantage when it later pled guilty to criminal charges of "misbranding" in 2007,

admitting that it was "well aware of the incorrect view held by many physicians that oxycodone

was weaker than morphine" and "did not want to do anything 'to make physicians think that

oxycodone was stronger or equal to morphine' or to 'take any steps . . . that would affect the unique

position that OxyContin'" held among physicians.[17]

119.    For Purdue and OxyContin to be "*really* big," Purdue needed to both distance its

new product from the traditional view of narcotic addiction risk, and broaden the drug's uses

beyond cancer pain and hospice care.  A marketing memo sent to Purdue's top sales executives in

March 1995 recommended that if Purdue could show that the risk of abuse was lower with

OxyContin than with traditional immediate-release narcotics, sales would increase.[18] As discussed

below, Purdue did not find or generate any such evidence, but this did not stop Purdue from making

that claim regardless.

120.    Armed with this and other misrepresentations about the risks and benefits of its new

drug, Purdue was able to open an enormous untapped market:  patients with non-end-of-life, non-

acute, everyday aches and pains.  As Dr. David Haddox, a Senior Medical Director at Purdue,

declared on the Early Show, a CBS morning talk program, "There are 50 million patients in this

---

[17] *Id.*

[18] Meier, *supra*, at 269.

country who have chronic pain that's not being managed appropriately every single day. OxyContin is one of the choices that doctors have available to them to treat that."[19]

121.    In pursuit of these 50 million potential customers, Purdue poured resources into OxyContin's sales force and advertising, particularly to a far broader audience of primary care physicians who treated patients with chronic pain complaints.  The graph below shows how promotional spending in the first six years following OxyContin's launch dwarfed Purdue's spending on MS Contin or Defendant Janssen's spending on Duragesic: [20]



122.    Prior to Purdue's launch of OxyContin, no drug company had ever promoted such a pure, high-strength Schedule II narcotic to so wide an audience of general practitioners.

---

[19] *Id.*, at 156.

[20] U.S. General Accounting, *OxyContin Abuse and Diversion and Efforts to Address the Problem*, Office Report to Congressional Requesters at 22 (Dec. 2003), http://www.gao.gov/new.items/d04110.pdf.

123.    In the two decades following OxyContin's launch, Purdue continued to devote substantial resources to its promotional efforts.

124.    Purdue has generated estimated sales of more than $35 billion from opioids since 1996, raking in more than $3 billion in 2015 alone. Remarkably, its opioid sales continued to climb even after a period of media attention and government inquiries regarding OxyContin abuse in the early 2000s and a criminal investigation culminating in guilty pleas in 2007. Purdue proved itself skilled at evading full responsibility and continuing to sell through the controversy. The company's annual opioid sales of $3 billion in 2015 represent a four-fold increase from its 2006 sales of $800 million.

125.    One might imagine that Richard Sackler's ambitions have been realized. But in the best tradition of family patriarch Arthur Sackler, Purdue has its eyes on even greater profits. Under the name of Mundipharma, the Sacklers are looking to new markets for their opioids—employing the exact same playbook in South America, China, and India as they did in the United States.

126.    In May 2017, a dozen members of Congress sent a letter to the World Health Organization, warning it of the deceptive practices Purdue is unleashing on the rest of the world through Mundipharma:

> We write to warn the international community of the deceptive and dangerous practices of Mundipharma International—an arm of Purdue Pharmaceuticals. The greed and recklessness of one company and its partners helped spark a public health crisis in the United States that will take generations to fully repair. We urge the World Health Organization (WHO) to do everything in its power to avoid allowing the same people to begin a worldwide opioid epidemic. Please learn from our experience and do not allow Mundipharma to carry on Purdue's deadly legacy on a global stage. . . .
> Internal documents revealed in court proceedings now tell us that since the early development of OxyContin, Purdue was aware of the high risk of addiction it carried. Combined with the misleading and aggressive marketing of the drug by its partner, Abbott Laboratories,

> Purdue began the opioid crisis that has devastated American
> communities since the end of the 1990s. Today, Mundipharma is
> using many of the same deceptive and reckless practices to sell
> OxyContin abroad. . . .
>
> In response to the growing scrutiny and diminished U.S. sales, the
> Sacklers have simply moved on. On December 18, the Los Angeles
> Times published an extremely troubling report detailing how in spite
> of the scores of lawsuits against Purdue for its role in the U.S. opioid
> crisis, and tens of thousands of overdose deaths, Mundipharma now
> aggressively markets OxyContin internationally. In fact,
> Mundipharma uses many of the same tactics that caused the opioid
> epidemic to flourish in the U.S., though now in countries with far
> fewer resources to devote to the fallout.[21]

127.    With the opioid epidemic in the United States now a national public health emergency, Purdue announced on February 9, 2018, that it had reduced its sales force and would no longer promote opioids directly to prescribers. Under this new policy, sales representatives will no longer visit doctors' offices to discuss opioid products. Despite its new policy, however, Purdue continues to use the same aggressive sales tactics to push opioids in other countries. Purdue's recent pivot to untapped markets—after extracting substantial profits from American communities and leaving local governments to address the devastating and still growing damage the company caused—only serves to underscore that Purdue's actions have been knowing, intentional, and motivated by profits throughout this entire story.

### 3.    Other Manufacturer Defendants Leapt at the Opioid Opportunity.

128.    Purdue created a market for the use of opioids for a range of common aches and pains by misrepresenting the risks and benefits of its opioids, but it was not alone.  The other Manufacturer Defendants—already manufacturers of prescription opioids—positioned themselves to take advantage of the opportunity Purdue created, developing both branded and generic opioids

---

[21] Letter from Members of Congress to Dr. Margaret Chan, Director-General, World Health Organization (May 3, 2017),   http://katherineclark.house.gov/_cache/files/a577bd3c-29ec-4bb9-bdba-1ca71c784113/mundipharma-letter-signatures.pdf.

to compete with OxyContin, while, together with Purdue and each other, misrepresenting the safety and efficacy of their products. These misrepresentations are described in greater detail below.

129.    Endo, which already sold Percocet and Percodan, was the first to submit an application for a generic extended-release oxycodone to compete with OxyContin.  At the same time, Endo sought FDA approval for another potent opioid, immediate-release and extended-release oxymorphone, branded as Opana and Opana ER.  Oxymorphone, like OxyContin's active ingredient oxycodone, is not a new drug; it was first synthesized in Germany in 1914 and sold in the U.S. by Endo beginning in 1959 under the trade name Numorphan.  But Numorphan tablets proved highly susceptible to abuse. Called "blues" after the light blue color of the 10 mg pills, Numorphan provoked, according to some users, a more euphoric high than heroin.  As the National Institute on Drug Abuse observed in its 1974 report, "Drugs and Addict Lifestyle," Numorphan was extremely popular among addicts for its quick and sustained effect.[22] Endo withdrew oral Numorphan from the market in 1979.[23]

130.    Two decades later, however, as communities around the U.S. were first sounding the alarm about prescription opioids and Purdue executives were being called to testify before Congress about the risks of OxyContin, Endo essentially reached back into its inventory, dusted off a product it had previously shelved after widespread abuse, and pushed it into the marketplace with a new trade name, Opana.

131.    The clinical trials submitted with Endo's first application for approval of Opana were insufficient to demonstrate efficacy, and some subjects in the trials overdosed and had to be

[22] John Fauber & Kristina Fiore, *Abandoned Painkiller Makes a Comeback*, MedPage Today (May 10, 2015), https://www.medpagetoday.com/psychiatry/addictions/51448.

[23] *Id.*

36

revived with naloxone. Endo then submitted new "enriched enrollment" clinical trials, in which trial subjects who do not respond to the drug are excluded from the trial, and obtained approval. Endo began marketing Opana and Opana ER in 2006.

132.    Like Numorphan, Opana ER was highly susceptible to abuse. On June 8, 2017, the FDA sought removal of Opana ER. In its press release, the FDA indicated that this is the first time the agency has taken steps to remove a currently marketed opioid pain medication from sale due to the public health consequences of abuse."[24] On July 6, 2017, Endo agreed to withdraw Opana ER from the market.[25]

133.    Janssen, which already marketed the Duragesic (fentanyl) patch for severe pain, also joined Purdue in pursuit of the broader chronic pain market.  It sought to expand the use of Duragesic through, for example, advertisements proclaiming, "It's not just for end stage cancer anymore!"  This claim earned Janssen a warning letter from the FDA, for representing that Duragesic was "more useful in a broader range of conditions or patients than has been demonstrated by substantial evidence."[26]

134.    Janssen also developed a new opioid compound called tapentadol in 2009, marketed as Nucynta for the treatment of moderate to severe pain. Janssen launched the extended-release version, Nucynta ER, for treatment of chronic pain in 2011.

---

[24] Press Release, U.S. Food & Drug Administration, *FDA Requests Removal of Opana ER for Risks Related to Abuse* (June 8, 2017), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

[25] *Endo Pulls Opioid as U.S. Seeks to Tackle Abuse Epidemic*, Reuters (July 6, 2017, 9:59am), https://www.reuters.com/article/us-endo-intl-opana-idUSKBN19R2II.

[26] Letter from FDA to Jansen (March 30, 2000), http://wayback.archive-it.org/7993/20170112070823/http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM165395.pdf.

135.     By adding additional opioids or expanding the use of their existing opioid products, the other Manufacturer Defendants took advantage of the market created by Purdue's aggressive promotion of OxyContin and reaped enormous profits. For example, Opana ER alone generated more than $1 billion in revenue for Endo in 2010 and again in 2013. Janssen also passed the $1 billion mark in sales of Duragesic in 2009.

**C. Defendants' Conduct Created an Abatable Public Nuisance.**

136.     As alleged throughout this Complaint, Defendants' conduct created a public health crisis and a public nuisance.

137.     The public nuisance—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated by, *inter alia*, (a) educating prescribers (especially primary care physicians and the most prolific prescribers of opioids) and patients regarding the true risks and benefits of opioids, including the risk of addiction, in order to prevent the next cycle of addiction; (b) providing addiction treatment to patients who are already addicted to opioids; and (c) making naloxone widely available so that overdoses are less frequently fatal.

138.     Defendants have the ability to act to abate the public nuisance, and the law recognizes that they are uniquely well positioned to do so.  It is the manufacturer of a drug that has primary responsibility to assure the safety, efficacy, and appropriateness of a drug's labeling, marketing, and promotion. And, all companies in the supply chain of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and dispensed to appropriate patients and not diverted. These responsibilities exist independent of any FDA or DEA regulation, to ensure that their products and practices meet both federal and state consumer protection laws and regulations.  As registered manufacturers and distributors of controlled substances, Defendants

are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a first line of defense.

### D. The Manufacturer Defendants' Multi-Pronged Scheme to Change Prescriber Habits and Public Perception and Increase Demand for Opioids

139.    In order to accomplish the fundamental shift in perception that was key to successfully marketing their opioids, the Manufacturer Defendants designed and implemented a sophisticated and deceptive marketing strategy.  Lacking legitimate scientific research to support their claims, the Manufacturer Defendants turned to the marketing techniques first pioneered by Arthur Sackler to create a series of misperceptions in the medical community and ultimately reverse the long-settled understanding of the relative risks and benefits of opioids.

140.    The Manufacturer Defendants promoted, and profited from, their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their marketing was false and misleading.  The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes.  The FDA and other regulators warned Manufacturer Defendants of these risks.  The Manufacturer Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers.  More recently, the FDA and CDC issued pronouncements based on existing medical evidence that conclusively expose the known falsity of these Defendants' misrepresentations.

141.    The deceptive marketing to increase opioid prescriptions centered around nine categories of misrepresentations, which are discussed in detail below. The Manufacturer Defendants disseminated these misrepresentations through various channels, including through

advertising, sales representatives, purportedly independent organizations these defendants funded and controlled, "Front Groups," so-called industry "Key Opinion Leaders," and Continuing Medical Education ("CME") programs discussed subsequently below.

> **1.    The Manufacturer Defendants Promoted Multiple Falsehoods About Opioids.**

142.    The Manufacturer Defendants' misrepresentations fall into the following nine categories:

   a.   The risk of addiction from chronic opioid therapy is low

   b.   To the extent there is a risk of addiction, it can be easily identified and managed

   c.   Signs of addictive behavior are "pseudoaddiction," requiring more opioids

   d.   Opioid withdrawal can be avoided by tapering

   e.   Opioid doses can be increased without limit or greater risks

   f.   Long-term opioid use improves functioning

   g.   Alternative forms of pain relief pose greater risks than opioids

   h.   OxyContin provides twelve hours of pain relief

   i.   New formulations of certain opioids successfully deter abuse

143.    Each of these propositions was false.  The Manufacturer Defendants knew this, but they nonetheless set out to convince physicians, patients, and the public at large of the truth of each of these propositions in order to expand the market for their opioids.

144.    The categories of misrepresentations are offered to organize the numerous statements the Manufacturer Defendants made and to explain their role in the overall marketing effort, not as a checklist for assessing each Manufacturing Defendant's liability.  While each Manufacturer Defendant deceptively promoted their opioids specifically, and, together with other Manufacturer Defendants, opioids generally, not every Manufacturer Defendant propagated (or

needed to propagate) each misrepresentation. Each Manufacturing Defendant's conduct, and each misrepresentation, contributed to an overall narrative that aimed to—and did—mislead doctors, patients, and payors about the risk and benefits of opioids. While this Complaint endeavors to document examples of each Manufacturing Defendant's misrepresentations and the manner in which they were disseminated, they are just that—examples. The Complaint is not, especially prior to discovery, an exhaustive catalog of the nature and manner of each deceptive statement by each Manufacturing Defendant.

### a. Falsehood #1: The risk of addiction from chronic opioid therapy is low

145. Central to the Manufacturer Defendants' promotional scheme was the misrepresentation that opioids are rarely addictive when taken for chronic pain. Through their marketing efforts, the Manufacturer Defendants advanced the idea that the risk of addiction is low when opioids are taken as prescribed by "legitimate" pain patients. That, in turn, directly led to the expected and intended result that doctors prescribed more opioids to more patients—thereby enriching the Manufacturer Defendants and substantially contributing to the opioid epidemic.

146. Each of the Manufacturer Defendants claimed that the potential for addiction from its opioids was relatively small or non-existent, even though there was no scientific evidence to support those claims. None of them have acknowledged, retracted, or corrected their false statements.

147. In fact, studies have shown that a substantial percentage of long-term users of opioids experience addiction. Addiction can result from the use of any opioid, "even at

41

recommended dose,"[27] and the risk substantially increases with more than three months of use.[28] As the CDC Guideline states, "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).[29]

### i.  Purdue's misrepresentations regarding addiction risk

148.    When it launched OxyContin, Purdue knew it would need data to overcome decades of wariness regarding opioid use. It needed some sort of research to back up its messaging. But Purdue had not conducted any studies about abuse potential or addiction risk as part of its application for FDA approval for OxyContin. Purdue (and, later, the other Defendants) found this "research" in the form of a one-paragraph letter to the editor published in the *New England Journal of Medicine* (NEJM) in 1980.

149.    This letter, by Dr. Hershel Jick and Jane Porter, declared the incidence of addiction "rare" for patients treated with opioids.[30] They had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. Porter and Jick considered a patient not addicted if there was no sign of addiction noted in patients' records.

---

[27] *FDA Announces Safety Labeling Changes and Postmarket Study Requirements For Extended-Release and Long-Acting Opioid Analgesics*, MagMutual (Aug. 18, 2016), https://www.magmutual.com/learning/article/fda-announces-safety-labeling-changes-and-postmarket-study-requirements-opioids; *see also* Press Release, U.S. Food & Drug Admin., *Announces Enhanced Warnings For Immediate-Release Opioid Pain Medications Related to Risks of Misuse, Abuse, Addiction, Overdose and Death*, FDA (Mar. 22, 2016), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm491739.htm

[28] Deborah Dowell, M.D. et. al. , *CDC Guideline for Prescribing Opioids for Chronic Pain – United States 2016,* 65(1) Morbidity & Mortality Wkly. Rep. 1, 21 (Mar. 18, 2016) (hereinafter "CDC Guideline").

[29] *Id.* at 2.

[30] Jane Porter & Herschel Jick, MD, *Addiction Rare in Patients Treated with Narcotics*, 302(2) New Eng. J. Med. 123 (Jan. 10, 1980), http://www.nejm.org/doi/pdf/10.1056/NEJM198001103020221.

**ADDICTION RARE IN PATIENTS TREATED
WITH NARCOTICS**

*To the Editor:* Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients[1] who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well documented addiction in patients who had no history of addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients,[2] Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.

JANE PORTER
HERSHEL JICK, M.D.
Boston Collaborative Drug
Surveillance Program
Waltham, MA 02154          Boston University Medical Center

1. Jick H, Miettinen OS, Shapiro S, Lewis GP, Siskind Y, Slone D. Comprehensive drug surveillance. JAMA. 1970; 213:1455-60.
2. Miller RR, Jick H. Clinical effects of meperidine in hospitalized medical patients. J Clin Pharmacol. 1978; 18:180-8.

150.    As Dr. Jick explained to a journalist years later, he submitted the statistics to NEJM as a letter because the data were not robust enough to be published as a study.[31]

151.    Purdue nonetheless began repeatedly citing this letter in promotional and educational materials as evidence of the low risk of addiction, while failing to disclose that its source was a letter to the editor, not a peer-reviewed paper.[32]  Citation of the letter, which was largely ignored for more than a decade, significantly increased after the introduction of OxyContin. While first Purdue and then other Manufacturer Defendants used it to assert that their opioids were not addictive, "that's not in any shape or form what we suggested in our letter," according to Dr. Jick.

152.    Purdue specifically used the Porter and Jick letter in its 1998 promotional video "I got my life back," in which Dr. Alan Spanos says "In fact, the rate of addiction amongst pain

---

[31] Meier, *supra*, at 174.

[32] J. Porter & H. Jick, *Addiction Rare in Patients Treated with Narcotics*, *supra*.

43

patients who are treated by doctors *is much less than 1%*."[33]   Purdue trained its sales representatives to tell prescribers that fewer than 1% of patients who took OxyContin became addicted.  (In 1999, a Purdue-funded study of patients who used OxyContin for headaches found that the addiction rate was thirteen per cent.)"[34]

153.    Other Manufacturer Defendants relied on and disseminated the same distorted messaging. The enormous impact of Manufacturer Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and in some cases "grossly misrepresented." In particular, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy . . .[35]

154.    "It's difficult to overstate the role of this letter," said Dr. David Juurlink of the University of Toronto, who led the analysis. "It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern."[36]

155.    Alongside its use of the Porter and Jick letter, Purdue also crafted its own materials and spread its deceptive message through numerous additional channels.  In its 1996 press release

---

[33] *Our Amazing World, Purdue Pharma OxyContin Commercial*, https://www.youtube.com/watch?v=Er78Dj5hyeI.

[34] Patrick R. Keefe, *The Family That Built an Empire of Pain*, The New Yorker (Oct. 30, 2017) (hereinafter, "Keefe, *Empire of Pain*").

[35] Pamela T.M. Leung, B.Sc. Pharm., *et al.*,  *A 1980 Letter on the Risk of Opioid Addiction*, 376 New Eng. J. Med. 2194-95 (June 1, 2017), http://www.nejm.org/doi/full/10.1056/NEJMc1700150.

[36] Marilynn Marchione, Assoc. Press, *Painful Words: How a 1980 Letter Fueled the Opioid Epidemic*, STAT News (May 31, 2017), https://www.statnews.com/2017/05/31/opioid-epidemic-nejm-letter/.

announcing the release of OxyContin, for example, Purdue declared, "The fear of addiction is exaggerated."[37]

156.    At a hearing before the House of Representatives' Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce in August 2001, Purdue emphasized "legitimate" treatment, dismissing cases of overdose and death as something that would not befall "legitimate" patients: "Virtually all of these reports involve people who are abusing the medication, not patients with legitimate medical needs under the treatment of a healthcare professional."[38]

157.    Purdue spun this baseless "legitimate use" distinction out even further in a patient brochure about OxyContin, called "A Guide to Your New Pain Medicine and How to Become a Partner Against Pain." In response to the question "Aren't opioid pain medications like OxyContin Tablets 'addicting'?," Purdue claimed that there was no need to worry about addiction if taking opioids for legitimate, "medical" purposes:

> Drug addiction means using a drug to get "high" rather than to relieve pain. You are taking opioid pain medication for medical purposes. The medical purposes are clear and the effects are beneficial, not harmful.[39]

---

[37] Press Release, Purdue Pharma L.P., *New Hope for Millions of Americans Suffering from Persistent Pain: Long-Acting OxyContin Tablets Now Available to Relieve Pain* (May 31, 1996, 3:47pm), http://documents.latimes.com/oxycontin-press-release-1996/.

[38] *Oxycontin: Its Use and Abuse: Hearing Before the House Subcomm. on Oversight and Investigations of the Comm. on Energy and Commerce*, 107th Cong. 1 (Aug. 28, 2001) (Statement of Michael Friedman, Executive Vice President, Chief Operating Officer, Purdue Pharma, L.P.), https://www.gpo.gov/fdsys/pkg/CHRG-107hhrg75754/html/CHRG-107hhrg75754.htm.

[39] *Partners Against Pain* consists of both a website, styled as an "advocacy community" for better pain care, and a set of medical education resources distributed to prescribers by sales representatives.  It has existed since at least the early 2000s and has been a vehicle for Purdue to downplay the risks of addiction from long-term opioid use.  One early pamphlet, for example, answered concerns about OxyContin's addictiveness by claiming: "Drug addiction means using a drug to get 'high' rather than to relieve pain.  You are taking opioid pain medication for medical purposes. The medical purposes are clear and the effects are beneficial, not harmful."

158.    Sales representatives marketed OxyContin as a product "'to start with and to stay with.'"[40]   Sales representatives also received training in overcoming doctors' concerns about addiction with talking points they knew to be untrue about the drug's abuse potential. One of Purdue's early training memos compared doctor visits to "firing at a target," declaring that "[a]s you prepare to fire your 'message,' you need to know where to aim and what you want to hit!"[41] According to the memo, the target is physician resistance based on concern about addiction: "The physician wants pain relief for these patients without addicting them to an opioid."[42]

159.    Purdue, through its unbranded website *Partners Against Pain*, stated the following: "Current Myth: Opioid addiction (psychological dependence) is an important clinical problem in patients with moderate to severe pain treated with opioids.  Fact:  Fears about psychological dependence are exaggerated when treating appropriate pain patients with opioids."  "Addiction risk also appears to be low when opioids are dosed properly for chronic, noncancer pain."

160.    Former sales representative Steven May, who worked for Purdue from 1999 to 2005, explained to a journalist how he and his coworkers were trained to overcome doctors' objections to prescribing opioids. The most common objection he heard about prescribing OxyContin was that "it's just too addictive."[43] May and his coworkers were trained to "refocus" doctors on "legitimate" pain patients, and to represent that "legitimate" patients would not become addicted. In addition, they were trained to say that the 12-hour dosing made the extended-release opioids less "habit-forming" than painkillers that need to be taken every four hours.

---

[40] Keefe, *Empire of Pain,* supra.

[41] Meier, *supra,* at 102.

[42] *Id*.

[43] David Remnick, *How OxyContin Was Sold to the Masses* (Steven May interview with Patrick Radden Keefe), The New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the-masses.

161.     According to interviews with prescribers and former Purdue sales representatives, Purdue has continued to distort or omit the risk of addiction while failing to correct its earlier misrepresentations, leaving many doctors with the false impression that pain patients will only rarely become addicted to opioids.

162.     With regard to addiction, Purdue's label for OxyContin has not sufficiently disclosed the true risks to, and experience of, its patients.  Until 2014, the OxyContin label stated in a black-box warning that opioids have "abuse potential" and that the "risk of abuse is increased in patients with a personal or family history of substance abuse."

163.     However, the FDA made clear to Purdue as early as 2001 that the disclosures in its OxyContin label were insufficient. Senior FDA officials met with Purdue on April 23, 2001, to "provide comments and suggestions on a Risk Management program for OxyContin."  Among other issues, the FDA noted that Purdue should add a black-box warning for overdose, abuse, and death to OxyContin's label.  Purdue acknowledged that it was aware of abuse of OxyContin orally (without tampering), as well as by snorting or injecting.  It was not, the FDA explained, a matter of changing a few words in OxyContin's label; Dr. Cynthia McCormick, then director of the FDA division overseeing pain medication, declared that "'major overhaul is my message.'  The prescribing of OxyContin is creeping into a whole population of people where it doesn't belong. Just rewriting the abuse and dependence section won't help much, that part of the insert is not a pivot point."

164.     Another FDA participant asked that Purdue "refocus our promotional materials and make the risks of abuse and diversion more prominent."  In short, the FDA advised Purdue "that the information put in the label back at the time of product approval did not adequately address the risks associated with this product and this needs to be corrected."

165.    In 2001, Purdue revised the indication and warnings for OxyContin, but did not go nearly as far as the FDA recommended or the known risks of the product demanded.  In the United States, Purdue ceased distributing the 160 mg tablet of OxyContin.  While Purdue agreed to "consider" changes to its label, it also expressed a reluctance to make significant changes not required for other prescription opioids.  Dr. McCormick noted that the issues discussed at the meeting were specific to OxyContin and that, while the Agency would talk with Purdue's competitors, "'we have a problem here and now with OxyContin.' In due time other manufacturers will be contacted but the first problem is this product."

166.    In the end, Purdue narrowed the recommended use of OxyContin to situations when "a continuous, around-the-clock analgesic is needed for an extended period of time" and added a warning that "[t]aking broken, chewed, or crushed OxyContin tablets" could lead to a "potentially fatal dose."  However, Purdue did not, until 2014, change the label, to indicate that OxyContin should not be the first therapy, or even the first opioid, used, and did not disclose the incidence or risk of overdose and death even when OxyContin was not abused.  Purdue announced the label changes in a letter to health care providers but did not, as the FDA suggested, issue "a Medguide for patients on the risks of overdose and the abuse of opioids as well as risks for use by others than those for whom it was prescribed" or undertake the recommended promotional effort to educate patients about the potentially fatal risks of OxyContin.

167.    The FDA also informed Purdue what Purdue already knew, as noted above—that "there is a perception that oxycodone is safer than morphine."  A representative from the FDA's Division of Drug Marketing, Advertising and Communications echoed this, calling for an "extensive educational effort to consumers and health care practitioners" to "correct a

misconception that [OxyContin] is different than morphine."    Upon information and belief, Purdue never undertook that effort.

             **ii.**          **Endo's misrepresentations regarding addiction risk**

168.    Endo also falsely represented that addiction is rare in patients who are prescribed opioids.

169.    Until April 2012, Endo's website for Opana, *www.opana.com*, stated that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

170.    Upon information and belief, Endo improperly instructed its sales representatives to diminish and distort the risk of addiction associated with Opana ER.  Endo's training materials for its sales representatives in 2011 also prompted sales representatives to answer "true" to the statement that addiction to opioids is not common.

171.    One of the Front Groups with which Endo worked most closely was the American Pain Foundation ("APF"), described more fully below.  Endo provided substantial assistance to, and exercised editorial control, over the deceptive and misleading messages that APF conveyed through its National Initiative on Pain Control ("NIPC")[44] and its website *www.painknowledge.com*, which claimed that "[p]eople who take opioids as prescribed usually do not become addicted."

---

[44] Endo was one of the APF's biggest financial supporters, providing more than half of the $10 million APF received from opioid manufacturers during its lifespan.  Endo was the sole funder of NIPC and selected APF to manage NIPC. Internal Endo documents indicate that Endo was responsible for NIPC curriculum development, web posting, and workshops, developed and reviewed NIPC content, and took a substantial role in distributing NIPC and APF materials. Endo projected that it would be able to reach tens of thousands of prescribers nationwide through the distribution of NIPC materials.

172.    Another Endo website, www.*PainAction.com*, stated: "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

173.    A brochure available on www.*painknowledge.com* titled "*Pain: Opioid Facts*," Endo-sponsored NIPC stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."  In numerous patient education pamphlets, Endo repeated this deceptive message.

- In a patient education pamphlet titled "*Understanding Your Pain: Taking Oral Opioid Analgesics*," Endo answers the hypothetical patient question—"What should I know about opioids and addiction?"—by focusing on explaining what addiction is ("a chronic brain disease") and is not ("Taking opioids for pain relief"). It goes on to explain that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems. Taking opioids as prescribed for pain relief is not addiction." This publication is still available online.

174.    An Endo publication, *Living with Someone with Chronic Pain*, stated, "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website, www.opana.com, until at least April 2012.

175.    In addition, a 2009 patient education publication, *Pain: Opioid Therapy*, funded by Endo and posted on www.p*ainknowledge.com*, omitted addiction from the "common risks" of opioids, as shown below:

> **As with any medication, there are some side effects that are associated with opioid therapy. The most common side effects that occur with opioid use include the following:**
>
> ‣ Constipation
> ‣ Drowsiness
> ‣ Confusion
> ‣ Nausea
> ‣ Itching
> ‣ Dizziness
> ‣ Shortness of breath
>
> Your healthcare provider can help to address and, in some cases, prevent side effects that may occur as a result of opioid treatment. Less severe side effects, including nausea, itching, or drowsiness, typically go away within a few days without the need for further treatment. If you experience any side effects, you should let your healthcare provider know immediately.

### iii.     Janssen's misrepresentations regarding addiction risk

176.    Janssen likewise misrepresented the addiction risk of opioids on its websites and print materials. One website, *Let's Talk Pain*, states, among other things, that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding about addiction." (Although Janssen described the website internally as an unbranded third-party program, it carried Janssen's trademark and copy approved by Janssen.)

177.    The *Let's Talk Pain* website also perpetuated the concept of pseudoaddiction, associating patient behaviors such as "drug seeking," "clock watching," and "even illicit drug use or deception" with undertreated pain which can be resolved with "effective pain management."

178.    A Janssen unbranded website, *PrescribeResponsibly.com*, states that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."[45]

179.    Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults*, which, as seen below, described as

---

[45] Keith Candiotti, M.D., *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, http://www.prescriberesponsibly.com/articles/opioid-pain-management.

"myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain." Until recently, this guide was still available online.



180.    Janssen's website for Duragesic included a section addressing "Your Right to Pain Relief" and a hypothetical patient's fear that "I'm afraid I'll become a drug addict."  The website's response: "Addiction is relatively rare when patients take opioids appropriately."

### iv.    Cephalon's misrepresentations regarding addiction risk.

181.    Cephalon sponsored and facilitated the development of a guidebook, *Opioid Medications and REMS: A Patient's Guide*, which included claims that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." Similarly, Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining opioids from multiple sources, or theft.

182.    For example, a 2003 Cephalon-sponsored CME presentation titled *Pharmacologic Management of Breakthrough or Incident Pain*, posted on Medscape in February 2003, teaches:

> [C]hronic pain is often undertreated, particularly in the noncancer
> patient population. . . . The continued stigmatization of opioids and
> their prescription, coupled with often unfounded and self-imposed

physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[46]

### v.      Actavis's misrepresentations regarding addiction risk

183.    Through its "Learn More about customized pain control with Kadian," material, Actavis claimed that it is possible to become addicted to morphine-based drugs like Kadian, but that it is "less likely" to happen in those who "have never had an addiction problem."  The piece goes on to advise that a need for a "dose adjustment" is the result of tolerance, and "not addiction."

184.    Training for Actavis sales representatives deceptively minimizes the risk of addiction by: (i) attributing addiction to "predisposing factors" like family history of addiction or psychiatric disorders; (ii) repeatedly emphasizing the difference between substance dependence and substance abuse; and (iii) using the term pseudoaddiction, which, as described below, dismisses evidence of addiction as the undertreatment of pain and, dangerously, counsels doctors to respond to its signs with more opioids.

185.    Actavis conducted a market study on takeaways from prescribers' interactions with Kadian sales representatives.  The doctors had a strong recollection of the sales representatives' discussion of the low-abuse potential. Actavis' sales representatives' misstatements on the low-abuse potential was considered an important factor to doctors, and was most likely repeated and

---

[46] Michael J. Brennan, et al., Pharmacologic Management of Breakthrough or Incident Pain, Medscape, http://www.medscape.org/viewarticle/449803 (behind paywall).

reinforced to their patients.  Additionally, doctors reviewed visual aids that the Kadian sales representatives use during the visits, and Actavis noted that doctors associate Kadian with less abuse and no highs, in comparison to other opioids.  Numerous marketing surveys of doctors in 2010 and 2012, for example, confirmed Actavis's messaging about Kadian's purported low addiction potential, and that it had less abuse potential than other similar opioids.

186.    A guide for prescribers under Actavis's copyright deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids.  The guide includes the following statements: 1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and 2) KADIAN may be less likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state." These statements convey both that (1) Kadian does not cause euphoria and therefore is less addictive and that (2) Kadian is less prone to tampering and abuse, even though Kadian was not approved by the FDA as abuse deterrent, and, upon information and belief, Actavis had no studies to suggest it was.

### vi.        Mallinckrodt's misrepresentations regarding addiction risk

187.    As described below, Mallinckrodt promoted its branded opioids Exalgo and Xartemis XR, and opioids generally, in a campaign that consistently mischaracterized the risk of addiction.  Mallinckrodt did so through its website and sales force, as well as through unbranded communications distributed through the "C.A.R.E.S. Alliance" it created and led.

188.    Mallinckrodt in 2010 created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, which it describes as "a coalition of national patient safety, provider and drug diversion organizations that are focused on reducing opioid pain

medication abuse and increasing responsible prescribing habits."  The "C.A.R.E.S. Alliance" itself is a service mark of Mallinckrodt LLC (and was previously a service mark of Mallinckrodt, Inc.) copyrighted and registered as a trademark by Covidien, its former parent company.  Materials distributed by the C.A.R.E.S. Alliance, however, include unbranded publications that do not disclose a link to Mallinckrodt.

189.    By 2012, Mallinckrodt, through the C.A.R.E.S. Alliance, was promoting a book titled *Defeat Chronic Pain Now!*  This book is still available online.  The false claims and misrepresentations in this book include the following statements:

- "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

- "It is currently recommended that every chronic pain patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy."

- "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

- "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

- "**The bottom line:** Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction."

- "Here are the facts.  It is very uncommon for a person with chronic pain to become 'addicted' to narcotics IF (1) he doesn't have a prior history of any addiction and (2) he only takes the medication to treat pain."

- "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."

190.    In a 2013 *Mallinckrodt Pharmaceuticals Policy Statement Regarding the Treatment of Pain and Control of Opioid Abuse*, which is still available online, Mallinckrodt stated

that, "[s]adly, even today, pain frequently remains undiagnosed and either untreated or undertreated" and cites to a report that concludes that "the majority of people with pain use their prescription drugs properly, are not a source of misuse, and should not be stigmatized or denied access because of the misdeeds or carelessness of others."

191.    Manufacturer Defendants' suggestions that the opioid epidemic is the result of bad patients who manipulate doctors to obtain opioids illicitly helped further their marketing scheme, but is at odds with the facts.  While there are certainly patients who unlawfully obtain opioids, they are a small minority. For example, patients who "doctor-shop"—i.e., visit multiple prescribers to obtain opioid prescriptions—are responsible for roughly 2% of opioid prescriptions. The epidemic of opioid addiction and abuse is overwhelmingly a problem of false marketing (and unconstrained distribution) of the drugs, not problem patients.

   **b.**  **Falsehood #2: To the extent there is a risk of addiction, it can be easily identified and managed**

192.    While continuing to maintain that most patients can safely take opioids long-term for chronic pain without becoming addicted, the Manufacturer Defendants assert that to the extent that *some* patients are at risk of opioid addiction, doctors can effectively identify and manage that risk by using screening tools or questionnaires. In materials they produced, sponsored, or controlled, Defendants instructed patients and prescribers that screening tools can identify patients predisposed to addiction, thus making doctors feel more comfortable prescribing opioids to their patients and patients more comfortable starting opioid therapy for chronic pain. These tools, they say, identify those with higher addiction risks (stemming from personal or family histories of substance use, mental illness, trauma, or abuse) so that doctors can then more closely monitor those patients.

56

193.    Purdue shared its *Partners Against Pain* "Pain Management Kit," which contains several screening tools and catalogues of Purdue materials, which included these tools, with prescribers.  Janssen, on its website PrescribeResponsibly.com, states that the risk of opioid addiction "can usually be managed" through tools such as opioid agreements between patients and doctors.[47]  The website, which directly provides screening tools to prescribers for risk assessments,[48] includes a "[f]our question screener" to purportedly help physicians identify and address possible opioid misuse.[49]

194.    Purdue and Cephalon sponsored the APF's *Treatment Options: A Guide for People Living with Pain* (2007), which also falsely reassured patients that opioid agreements between doctors and patients can "ensure that you take the opioid as prescribed."

195.    Purdue sponsored a 2011 webinar taught by Dr. Webster, entitled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This publication misleadingly taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths."

196.    Purdue sponsored a 2011 CME program titled *Managing Patient's Opioid Use: Balancing the Need and Risk*. This presentation deceptively instructed prescribers that screening tools, patient agreements, and urine tests prevented "overuse of prescriptions" and "overdose deaths."

---

[47] Howard A. Heit, MD, FACP, FASAM and Douglas L. Gourlay, MD, MSc, FRCPC, FASAM, *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, http://www.prescriberesponsibly.com/articles/before-prescribing-opioids# (last modified July 2, 2015).

[48] *Risk Assessment Resources,* Prescribe Responsibly,  http://www.prescriberesponsibly.com/risk-assessment-resources (last modified July 2, 3015).

[49] *Id.*

197.    Purdue also funded a 2012 CME program called *Chronic Pain Management and Opioid Use: Easing Fears, Managing Risks, and Improving Outcomes*. The presentation deceptively instructed doctors that, through the use of screening tools, more frequent refills, and other techniques, even high-risk patients showing signs of addiction could be treated with opioids.

198.    Endo paid for a 2007 supplement available for continuing education credit in the *Journal of Family Practice* written by a doctor who became a member of Endo's speaker's bureau in 2010. This publication, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, (i) recommended screening patients using tools like (a) the *Opioid Risk Tool* created by Dr. Webster and linked to Janssen or (b) the *Screener and Opioid Assessment for Patients with Pain*, and (ii) taught that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts. The ORT was linked to by Endo-supported websites, as well.

199.    There are three fundamental flaws in the Manufacturer Defendants' representations that doctors can consistently identify and manage the risk of addiction. First, there is no reliable scientific evidence that doctors can depend on the screening tools currently available to materially limit the risk of addiction.  Second, there is no reliable scientific evidence that high-risk patients identified through screening can take opioids long-term without triggering addiction, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients who are not identified through such screening can take opioids long-term without significant danger of addiction.

c.    **Falsehood #3: Signs of addictive behavior are "pseudoaddiction,"
        requiring more opioids**

200.    The Manufacturer Defendants instructed patients and prescribers that signs of addiction are actually indications of untreated pain, such that the appropriate response is to

prescribe even more opioids. Dr. David Haddox, who later became a Senior Medical Director for Purdue, published a study in 1989 coining the term "pseudoaddiction," which he characterized as "the iatrogenic syndrome of abnormal behavior developing as a direct consequence of inadequate pain management."[50]  In other words, people on prescription opioids who exhibited classic signs of addiction— for example, asking for more and higher doses of opioids, self-escalating their doses, or claiming to have lost prescriptions in order to get more opioids—were not addicted, but rather simply suffering from undertreatment of their pain.

201.    In the materials and outreach they produced, sponsored, or controlled, Manufacturer Defendants made each of these misrepresentations and omissions, and have never acknowledged, retracted, or corrected them.

202.    Cephalon, Endo, and Purdue sponsored the Federation of State Medical Boards' ("FSMB") *Responsible Opioid Prescribing* (2007) written by Dr. Fishman and discussed in more detail below, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, which are signs of genuine addiction, are all really signs of "pseudoaddiction."

203.    Purdue posted an unbranded pamphlet entitled *Clinical Issues in Opioid Prescribing* on its unbranded website, *PartnersAgainstPain.com*, in 2005, and circulated this pamphlet through at least 2007 and on its website through at least 2013. The pamphlet listed conduct including "illicit drug use and deception" that it claimed was not evidence of true addiction but "pseudoaddiction" caused by untreated pain.

---

[50] David E. Weissman & J. David Haddox, *Opioid Pseudoaddiction – An Iatrogenic Syndrome*, 36(3) Pain 363-66 (Mar. 1989), https://www.ncbi.nlm.nih.gov/pubmed/2710565.  ("Iatrogenic" describes a condition induced by medical treatment.).

204.    According to documents provided by a former Purdue detailer, sales representatives were trained and tested on the meaning of pseudoaddiction, from which it can be inferred that sales representatives were directed to, and did, describe pseudoaddiction to prescribers.  Purdue's Pain Management Kit is another example of publication used by Purdue's sales force that endorses pseudoaddiction by claiming that "pain-relief seeking behavior can be mistaken for drug-seeking behavior." Upon information and belief, the kit was in use from roughly 2011 through at least June 2016.

205.    Similarly, internal documents show that Endo trained its sales representatives to promote the concept of pseudoaddiction.  A training module taught sales representatives that addiction and pseudoaddiction were commonly confused.  The module went on to state that: "The physician can differentiate addiction from pseudoaddiction by speaking to the patient about his/her pain and increasing the patient's opioid dose to increase pain relief."

206.    Endo also sponsored a NIPC CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction and listed "[d]ifferentiation among states of physical dependence, tolerance, pseudoaddiction, and addiction" as an element to be considered in awarding grants to CME providers.

207.    Upon information and belief, Endo itself has repudiated the concept of pseudoaddiction. In finding that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents," the New York Attorney General, in a 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in

60

distinguishing "between addiction and 'pseudoaddiction.'"[51] Endo thereafter agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.

208. Janssen sponsored, funded, and edited a website called *Let's Talk Pain*, which in 2009 stated "pseudoaddiction . . . refers to patient behaviors that may occur when *pain is undertreated* . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management." This website was accessible online until at least May 2012.

209. Janssen also currently runs a website, *Prescriberesponsibly.com*, which claims that concerns about opioid addiction are "overestimated," and describes pseudoaddiction as "a syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically, when the pain is treated appropriately the inappropriate behavior ceases."[52]

210. The CDC Guideline nowhere recommends attempting to provide more opioids to patients exhibiting symptoms of addiction. Dr. Lynn Webster, a so-called "key opinion leader" (KOL) discussed below, admitted that pseudoaddiction "is already something we are debunking as a concept" and became "too much of an excuse to give patients more medication. It led us down a path that caused harm."

d. **Falsehood #4: Opioid withdrawal can be avoided by tapering**

211. In an effort to underplay the risk and impact of addiction, the Manufacturer Defendants falsely claimed that, while patients become physically dependent on opioids, physical

---

[51] Attorney General of the State of New York, In the Matter of Endo Health Solutions Inc. & Endo Pharmaceuticals Inc., Assurance No.:15-228, Assurance of Discontinuance Under Executive Law Section 63. Subdivision 15 at 7., https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf

[52] Heit & Gourlay, *supra*.

dependence is not the same as addiction and can be easily addressed, if and when pain relief is no longer desired, by gradually tapering patients' dose to avoid withdrawal. Manufacturer Defendants failed to disclose the extremely difficult and painful effects that patients can experience upon ceasing opioid treatment – adverse effects that also make it less likely that patients will be able to stop using the drugs.  Manufacturer Defendants also failed to disclose how difficult it is for patients to stop using opioids after they have used them for prolonged periods.

212.    A non-credit educational program sponsored by Endo, *Persistent Pain in the Older Adult,* claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days. However, this claim is at odds with the experience of patients addicted to opioids. Most patients who have been taking opioids regularly will, upon stopping treatment, experience withdrawal, characterized by intense physical and psychological effects, including anxiety, nausea, headaches, and delirium, among others. This painful and arduous struggle to terminate use can leave many patients unwilling or unable to give up opioids and heightens the risk of addiction.

213.    Purdue sponsored the American Pain Foundation's ("APF") *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but the guide did not disclose the significant hardships that often accompany cessation of use.

214.    To this day, the Manufacturer Defendants have not corrected or retracted their misrepresentations regarding tapering as a solution to opioid withdrawal.

      e.      **Falsehood #5: Opioid doses can be increased without limit or greater risks**

215.    In materials they produced, sponsored or controlled, Manufacturer Defendants instructed prescribers that they could safely increase a patient's dose to achieve pain relief.  Each of the Manufacturer Defendants' claims was deceptive in that it omitted warnings of increased adverse effects that occur at higher doses, effects confirmed by scientific evidence.

216.    These misrepresentations were integral to the Manufacturer Defendants' promotion of prescription opioids.  As discussed above, patients develop a tolerance to opioids' analgesic effects, so that achieving long-term pain relief requires constantly increasing the dose.

217.    In a 1996 sales memo regarding OxyContin, for example, a regional manager for Purdue instructed sales representatives to inform physicians that there is "no[] upward limit" for dosing and ask "if there are any reservations in using a dose of 240mg-320mg of OxyContin."[53]

218.    In addition, sales representatives aggressively pushed doctors to prescribe stronger doses of opioids. For example, one Purdue sales representative wrote about how his regional manager would drill the sales team on their upselling tactics:

> It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Q12h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Q12h, will you do that?" "Okay." "Doctor, what if that patient them came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q12h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?" "Yes."
>
> The next week the rep would see that same doctor and go through the same discussion with the goal of selling higher and higher doses of OxyContin.

---

[53] Letter from Windell Fisher, Purdue Regional Manager, to B. Gergely, Purdue Employee (Nov. 7, 1996), http://documents.latimes.com/sales-manager-on-12-hour-dosing-1996/ (last updated May 5, 2016) (hereinafter "Letter from Fisher").

219.    These misrepresentations were particularly dangerous. As noted above, opioid doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and 50 MME is equal to just 33 mg of oxycodone. The recommendation of 320 mg every twelve hours is ten times that.

220.    In its 2010 Risk Evaluation and Mitigation Strategy ("REMS") for OxyContin, however, Purdue does not address the increased risk of respiratory depression and death from increasing dose, and instead advises prescribers that "dose adjustments may be made every 1-2 days"; "it is most appropriate to increase the q12h dose"; the "total daily dose can usually be increased by 25% to 50%"; and if "significant adverse reactions occur, treat them aggressively until they are under control, then resume upward titration."[54]

221.    Endo sponsored a website, *www.painknowledge.com*, which claimed that opioids may be increased until "you are on the right dose of medication for your pain," at which point further dose increases would not be required.

222.    Endo also published on its website a patient education pamphlet entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*.  In Q&A format, it asked, "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased . . . You won't 'run out' of pain relief."

223.    Purdue and Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pai*n (2007), which taught patients that opioids have "no ceiling dose" and therefore are safer than NSAIDs.

---

[54] Purdue Pharma, L.P., *OxyContin Risk Evaluation and Mitigation Strategy*, Purdue Pharma L.P., https://web.archive.org/web/20170215190303/https://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/UCM220990.pdf (last modified Nov. 2010).

224.    Manufacturer Defendants were aware of the greater dangers high dose opioids posed. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." For example, a study of patient data from the Veterans Health Administration published in 2011 found that higher maximum prescribed daily opioid doses were associated with a higher risk of opioid overdose deaths.[55]

### f.    Falsehood #6: Long-term opioid use improves functioning

225.    Despite the lack of evidence of improved function and the existence of evidence to the contrary, the Manufacturer Defendants consistently promoted opioids as capable of improving patients' function and quality of life because they viewed these claims as a critical part of their marketing strategies.  In recalibrating the risk-benefit analysis for opioids, increasing the perceived benefits of treatment was necessary to overcome its risks.

226.    Janssen, for example, promoted Duragesic as improving patients' functioning and work productivity through an ad campaign that included the following statements: "[w]ork, uninterrupted," "[l]ife, uninterrupted," "[g]ame, uninterrupted," "[c]hronic pain relief that supports functionality," and "[i]mprove[s] . . . physical and social functioning."

227.    Purdue noted the need to compete with this messaging, despite the lack of data supporting improvement in quality of life with OxyContin treatment:

> Janssen has been stressing decreased side effects, especially constipation, as well as patient quality of life, as supported by patient rating compared to sustained release morphine…We do not have such data to support OxyContin promotion. . . . In addition, Janssen has been using the "life uninterrupted" message in

---

[55] Amy S. B. Bohnert, Ph.D. et al., *Association Between Opioid Prescribing Patterns and Opioid Overdose-Related Deaths*, 305(13) J. of Am. Med. Assoc. 1315, 1315-1321 (Apr. 6, 2011), https://jamanetwork.com/journals/jama/fullarticle/896182.

promotion of Duragesic for non-cancer pain, stressing that Duragesic "helps patients think less about their pain." This is a competitive advantage based on our inability to make any quality of life claims.[56]

228.    Despite its acknowledgment that "[w]e do not have such data to support OxyContin promotion," Purdue ran a full-page ad for OxyContin in the Journal of the American Medical Association, proclaiming, "There Can Be Life With Relief," and showing a man happily fly-fishing alongside his grandson, implying that OxyContin would help users' function. This ad earned a warning letter from the FDA, which admonished, "It is particularly disturbing that your November ad would tout 'Life With Relief' yet fail to warn that patients can die from taking OxyContin."[57]

229.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients.  But the article cited as support for this in fact stated the contrary, noting the absence of long-term studies and concluding, "[f]or functional outcomes, the other analgesics were significantly more effective than were opioids."

230.    A series of medical journal advertisements for OxyContin in 2012 presented "Pain Vignettes"—case studies featuring patients with pain conditions persisting over several months—that implied functional improvement. For example, one advertisement described a "writer with osteoarthritis of the hands" and implied that OxyContin would help him work more effectively.

---

[56] Meier, *supra,* at  281.

[57] Chris Adams, *FDA Orders Purdue Pharma To Pull Its OxyContin Ads*, Wall St. J. (Jan. 23, 2003, 12:01am), https://www.wsj.com/articles/SB1043259665976915824.

231.    Similarly, since at least May of 2011, Endo has distributed and made available on its website, www.*opana.com*, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like those of a construction worker or chef, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

232.    As noted above, Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which states as "a fact" that "opioids may make it easier for people to live normally." This guide features a man playing golf on the cover and lists examples of expected functional improvement from opioids, like sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs. It assures patients that, "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'" Similarly, *Responsible Opioid Prescribing* (2007), sponsored and distributed by Teva, Endo, and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

233.    In addition, Janssen's *Let's Talk Pain* website featured a video interview, which was edited by Janssen personnel, claiming that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative.

234.    The APF's *Treatment Options: A Guide for People Living with Pain* (2007), sponsored by Purdue and Cephalon, counseled patients that opioids "give [pain patients] a quality of life we deserve." The guide was available online until APF shut its doors in May 2012.

235.    Endo's NIPC website *www.painknowledge.com* claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." In addition to "improved function," the website touted improved quality of life as a benefit of

opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.

236.    Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient*, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

237.    Mallinckrodt's website, in a section on responsible use of opioids, claims that "[t]he effective pain management offered by our medicines helps enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society."[58]

238.    The Manufacturer Defendants' claims that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of opioids beyond 16 weeks, and there is no evidence that opioids improve patients' pain and function long term. The FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[59] Based upon a review of the existing scientific evidence, the CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use."[60]

---

[58]    Mallinckrodt Pharmaceuticals, *Responsible Use*, http://www.mallinckrodt.com/corporate-responsibility/responsible-use.

[59] The FDA has warned other drugmakers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Defendants on the FDA website.

[60] CDC Guideline at 20.

239.    Consistent with the CDC's findings, substantial evidence exists demonstrating that opioid drugs are ineffective for the treatment of chronic pain and worsen patients' health.  For example, a 2006 study-of-studies found that opioids as a class did not demonstrate improvement in functional outcomes over other non-addicting treatments.  The few longer-term studies of opioid use had "consistently poor results," and "several studies have showed that opioids for chronic pain may actually worsen pain and functioning . . ."[61] along with general health, mental health, and social function.  Over time, even high doses of potent opioids often fail to control pain, and patients exposed to such doses are unable to function normally.

240.    Increased duration of opioid use is also strongly associated with increased prevalence of mental health disorders (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization. The CDC Guideline concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[62] According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[63]

241.    As one pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and

---

[61] Thomas R. Frieden and Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, New Eng. J. Med., at 1503 (Apr. 21, 2016).

[62] CDC Guideline at 2, 18.

[63] Frieden & Debra Houry, *supra,* at 1503.

these patients are unable to function normally."[64] In fact, research such as a 2008 study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.[65] Another study demonstrated that injured workers who received a prescription opioid for more than seven days during the first six weeks after the injury were 2.2 times more likely to remain on work disability a year later than workers with similar injuries who received no opioids at all.[66]  Moreover, the first randomized clinical trial designed to make head-to-head comparisons between opioids and other kinds of pain medications was recently published on March 6, 2018, in the Journal of the American Medical Association.  The study reported that "[t]here was no significant difference in pain-related function between the 2 groups" – those whose pain was treated with opioids and those whose pain was treated with non-opioids, including acetaminophen and other non-steroidal anti-inflammatory drugs ("NSAIDs") like ibuprofen.  Accordingly, the study concluded: "Treatment with opioids was not superior to treatment with nonopioid medications for improving pain-related function over 12 months."

g.      **Falsehood #7: Alternative forms of pain relief pose greater risks than opioids**

242.    In materials they produced, sponsored or controlled, the Manufacturer Defendants omitted known risks of chronic opioid therapy and emphasized or exaggerated risks of competing

---

[64]  Andrea Rubinstein, M.D. *Are We Making Pain Patients Worse?*, Sonoma Med. (Fall 2009), http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse.aspx?pageid=144&tabid=747.

[65]  Jeffrey Dersh, et al., *Prescription Opioid Dependence Is Associated With Poorer Outcomes In Disabling Spinal Disorders*, 33(20) Spine 2219-27 (Sept. 15, 2008).

[66]  Franklin, GM, Stover, BD, Turner, JA, Fulton-Kehoe, D, Wickizer, TM, *Early Opioid Prescription and Subsequent Disability Among Workers With Back Injuries: The Disability Risk Identification Study Cohort*, 33 Spine 199, 201-202.

products so that prescribers and patients would favor opioids over other therapies such as over-the-counter acetaminophen or over-the-counter or prescription NSAIDs.

243.    For example, in addition to failing to disclose in promotional materials the risks of addiction, overdose, and death, the Manufacturer Defendants routinely ignored the risks of hyperalgesia, a "known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time;"[67] hormonal dysfunction;[68] decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly;[69] neonatal abstinence syndrome (when an infant exposed to opioids prenatally suffers withdrawal after birth), and potentially fatal interactions with alcohol or with benzodiazepines, which are used to treat anxiety and may be co-prescribed with opioids, particularly to veterans suffering from pain.[70]

244.    The APF's *Treatment Options: A Guide for People Living with Pain*, sponsored by Purdue and Cephalon, warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids.  The publication falsely attributed 10,000 to 20,000 deaths annually to NSAID overdoses, when the figure is closer to 3,200.[71]

245.    Janssen sponsored *Finding Relief: Pain Management for Older Adults* (2009), that listed dose limitations as "disadvantages" of other pain medicines but omitted any discussion of

---

[67] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. *Physicians for Responsible Opioid Prescribing,* Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

[68] H.W. Daniell, *Hypogonadism in Men Consuming Sustained-Action Oral Opioids*, 3(5) J. Pain 377-84 (2001).

[69] *See* Bernhard M. Kuschel, *The Risk of Fall Injury in Relation to Commonly Prescribed Medications Among Older People – a Swedish Case-Control Study*, Eur. J. Pub. H. 527, 527-32 (July 31, 2014).

[70] Karen H. Seal, *Association of Mental Health Disorders With Prescription Opioids and High-Risk Opioids in US Veterans of Iraq and Afghanistan*, 307(9) J. Am. Med. Ass'n 940-47 (2012).

[71] Robert E. Tarone, et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding:  Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. of Therapeutics 17-25 (2004).

risks of increased doses from opioids. *Finding Relief* described the advantages and disadvantages of NSAIDs on one page, and the "myths/facts" of opioids on the facing page. The disadvantages of NSAIDs are described as involving "stomach upset or bleeding," "kidney or liver damage if taken at high doses or for a long time," "adverse reactions in people with asthma," and "can increase the risk of heart attack and stroke." The only adverse effects of opioids listed are "upset stomach or sleepiness," which the brochure claims will go away, and constipation.

246.    Endo's NIPC website, *www.painknowledge.com*, which contained a flyer called "*Pain: Opioid Therapy*."  This publication listed opioids' adverse effects but with significant omissions, including hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death.

247.    As another example, the Endo-sponsored CME put on by NIPC, *Persistent Pain in the Older Adult*, discussed above, counseled that acetaminophen should be used only short-term and includes five slides on the FDA's restrictions on acetaminophen and its adverse effects, including severe liver injury and anaphylaxis (shock). In contrast, the CME downplays the risk of opioids, claiming opioids have "possibly less potential for abuse than in younger patients," and does not list overdose among the adverse effects.  Some of those misrepresentations are described above; others are laid out below.

248.    In April 2007, Endo sponsored an article aimed at prescribers, published in *Pain Medicine News*, titled "Case Challenges in Pain Management: Opioid Therapy for Chronic Pain."[72] The article asserted:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids –

---

[72] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News, https://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf.

> the gradual waning of relief at a given dose – and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.[73]

249.    To help allay these concerns, Endo emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the danger of extended use of NSAIDs, including that the subject was hospitalized with a massive upper gastrointestinal bleed believed to have resulted from his protracted NSAID use. In contrast, the article did not provide the same detail concerning the serious side effects associated with opioids.

250.    Additionally, Purdue acting with Endo sponsored *Overview of Management Options*, a CME issued by the AMA in 2003, 2007, 2010, and 2013. The 2013 version remains available for CME credit. The CME taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

251.    As a result of the Manufacturer Defendants' deceptive promotion of opioids over safer and more effective drugs, opioid prescriptions increased even as the percentage of patients visiting a doctor for pain remained constant. A study of 7.8 million doctor visits between 2000 and 2010 found that opioid prescriptions increased from 11.3% to 19.6% of visits, as NSAID and acetaminophen prescriptions fell from 38% to 29%, driven primarily by the decline in NSAID prescribing.[74]

### h.    Falsehood #8: OxyContin provides twelve hours of pain relief

---

[73] *Id*., at 1.

[74] M. Daubresse, *et al.*, *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, 51(*10*) Med. Care, 870-878 (2013). For back pain alone, the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined from 39.9% to 24.5% of these visits; and referrals to physical therapy remained steady. *See also* J. Mafi, *et al.*, *Worsening Trends in the Management and Treatment of Back Pain*, 173(17) J. of the Am Med. Ass'n Internal Med. 1573, 1573 (2013).

252.     Purdue also dangerously misled doctors and patients about OxyContin's duration and onset of action, making the knowingly false claim that OxyContin would provide 12 hours of pain relief for most patients.  As laid out below, Purdue made this claim for two reasons.  First, it provides the basis for both Purdue's patent and its market niche, allowing it to both protect and differentiate itself from competitors.  Second, it allowed Purdue to imply or state outright that OxyContin had a more even, stable release mechanism that avoided peaks and valleys and therefore the rush that fostered addiction and attracted abusers.

253.     Purdue promotes OxyContin as an extended-release opioid, but the oxycodone does not enter the body on a linear rate. OxyContin works by releasing a greater proportion of oxycodone into the body upon administration, and the release gradually tapers, as illustrated in the following chart, which was apparently adapted from Purdue's own sales materials:



Figure 1

254.    The reduced release of the drug over time means that the oxycodone no longer provides the same level of pain relief; as a result, in many patients, OxyContin does not last for the twelve hours for which Purdue promotes it—a fact that Purdue has known at all times relevant to this action.

255.    OxyContin tablets provide an initial absorption of approximately 40% of the active medicine. This has a two-fold effect. First, the initial rush of nearly half of the powerful opioid triggers a powerful psychological response. OxyContin thus behaves more like an immediate release opioid, which Purdue itself once claimed was more addicting in its original 1995 FDA-approved drug label. Second, the initial burst of oxycodone means that there is less of the drug at the end of the dosing period, which results in the drug not lasting for a full twelve hours and precipitates withdrawal symptoms in patients, a phenomenon known as "end of dose" failure. (The FDA found in 2008 that a "substantial number" of chronic pain patients will experience end-of-dose failure with OxyContin.)

256.    End-of-dose failure renders OxyContin even more dangerous because patients begin to experience withdrawal symptoms, followed by a euphoric rush with their next dose—a cycle that fuels a craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, has called OxyContin's 12-hour dosing "the perfect recipe for addiction."[75]  Many patients will exacerbate this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall amount of opioids they are taking.

---

[75] Harriet Ryan, *et al.,* "'*You Want a Description of Hell?' OxyContin's 12-Hour Problem*," Los Angeles Times, May 5, 2016, http://www.latimes.com/projects/oxycontin-part1/ (hereinafter, "*You Want a Description of Hell*").

257.     It was Purdue's decision to submit OxyContin for approval with 12-hour dosing. While the OxyContin label indicates that "[t]here are no well-controlled clinical studies evaluating the safety and efficacy with dosing more frequently than every 12 hours," that is because Purdue has conducted no such studies.

258.     Purdue nevertheless has falsely promoted OxyContin as if it were effective for a full twelve hours. Its advertising in 2000 included claims that OxyContin provides "Consistent Plasma Levels Over 12 Hours." That claim was accompanied by a chart, mirroring the chart on the previous page.  However, this version of the chart deceptively minimized the rate of end-of-dose failure by depicting 10 mg in a way that it appeared to be half of 100 mg in the table's y-axis. That chart, shown below, depicts the same information as the chart above, but does so in a way that makes the absorption rate appear more consistent:



259.     Purdue's 12-hour messaging was key to its competitive advantage over short-acting opioids that required patients to wake in the middle of the night to take their pills.  Purdue advertisements also emphasized "Q12h" dosing.  These include an advertisement in the February 2005 *Journal of Pain* and 2006 *Clinical Journal of Pain* featuring an OxyContin logo with two pill cups, reinforcing the twice-a-day message.  A Purdue memo to the OxyContin launch team stated that "OxyContin's positioning statement is 'all of the analgesic efficacy of immediate-release oxycodone, with convenient q12h dosing,'" and further that "[t]he convenience of q12h dosing was emphasized as the most important benefit."[76]

260.     In keeping with this positioning statement, a Purdue regional manager emphasized in a 1996 sales strategy memo that representatives should "convinc[e] the physician that there is no need" for prescribing OxyContin in shorter intervals than the recommended 12-hour interval, and instead the solution is prescribing higher doses."[77] One sales manage instructed her team that anything shorter than 12-hour dosing "needs to be nipped in the bud NOW!!"[78]

261.     Purdue executives therefore maintained the messaging of twelve-hour dosing even when many reports surfaced that OxyContin did not last twelve hours. Instead of acknowledging a need for more frequent dosing, Purdue instructed its representatives to push higher-strength pills, even though higher dosing carries its own risks, as noted above.  It also means that patients will experience higher highs and lower lows, increasing their craving for their next pill.  (Urging higher doses to avoid end-of-dose failure is like advising a pilot to avoid a crash by flying higher.)

---

[76] Memorandum from Lydia Johnson, Marketing Executive at Purdue, to members of Oxycontin Launch Team (Apr. 4, 1995), http://documents.latimes.com/oxycontin-launch-1995/ (last updated May 5, 2016).

[77] Letter from Fisher, *supra*.

[78] *You Want a Description of Hell*, *supra*.

Nationwide, based on an analysis by the *Los Angeles Times*, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day—which converts to the 90 MED that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[79]

262.     The information that OxyContin did not provide pain relief for a full twelve hours was known to Purdue, and Purdue's competitors, but was not disclosed to prescribers. Purdue's knowledge of some pain specialists' tendency to prescribe OxyContin three times per day instead of two was set out in Purdue's internal documents as early as 1999 and is apparent from MEDWATCH Adverse Event reports for OxyContin.

263.     Even Purdue's competitor, Endo, was aware of the problem; Endo attempted to position its Opana ER drug as offering "durable" pain relief, which Endo understood to suggest a contrast to OxyContin. Opana ER advisory board meetings featured pain specialists citing lack of 12-hour dosing as a disadvantage of OxyContin. Endo even ran advertisements for Opana ER referring to "real" 12-hour dosing.

264.     Purdue's failure to disclose the prevalence of end-of-dose failure meant that prescribers were misinformed about the advantages of OxyContin in a manner that preserved Purdue's competitive advantage and profits, at the expense of patients, who were placed at greater risk of overdose, addiction, and other adverse effects.

i.       **Falsehood #9: New formulations of certain opioids successfully deter abuse**

265.     Rather than take the widespread opioid abuse as reason to cease their untruthful marketing efforts, Manufacturer Defendants Purdue and Endo seized them as a competitive

---

[79] CDC Guideline, *supra*, at 16.

opportunity. These companies developed and oversold "abuse-deterrent formulations" ("ADF") opioids as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids, as well as an advantage of these expensive branded drugs over other opioids. These Defendants' false and misleading marketing of the benefits of their ADF opioids preserved and expanded their sales and falsely reassured prescribers thereby prolonging the opioid epidemic. Other Manufacturer Defendants, including Actavis and Mallinckrodt, also promoted their branded opioids as formulated to be less addictive or less subject to abuse than other opioids.

266. The CDC Guideline confirms that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes." Tom Frieden, the former Director of the CDC, reported that his staff could not find "any evidence showing the updated opioids [ADF opioids] actually reduce rates of addiction, overdoses, or death."

i.     **Purdue's deceptive marketing of reformulated OxyContin and Hysingla ER**

267. Reformulated ADF OxyContin was approved by the FDA in April 2010. It was not until 2013 that the FDA, in response to a citizen petition filed by Purdue, permitted reference to the abuse-deterrent properties in its label. When Hysingla ER (extended-release hydrocodone) launched in 2014, the product included similar abuse-deterrent properties and limitations. But in the beginning, the FDA made clear the limited claims that could be made about ADF, noting that no evidence supported claims that ADF prevented tampering, oral abuse, or overall rates of abuse.

268. It is unlikely a coincidence that reformulated OxyContin was introduced shortly before generic versions of OxyContin were to become available, threatening to erode Purdue's

market share and the price it could charge. Purdue nonetheless touted its introduction of ADF opioids as evidence of its good corporate citizenship and commitment to address the opioid crisis.

269.     Despite its self-proclaimed good intention, Purdue merely incorporated its generally deceptive tactics with respect to ADF.  Purdue sales representatives regularly overstated and misstated the evidence for and impact of the abuse-deterrent features of these opioids. Specifically, Purdue sales representatives:

- claimed that Purdue's ADF opioids prevent tampering and that its ADFs could not be crushed or snorted;

- claimed that Purdue's ADF opioids reduce opioid abuse and diversion;

- asserted or suggested that its ADF opioids are non-addictive or less addictive,

- asserted or suggested that Purdue's ADF opioids are safer than other opioids, could not be abused or tampered with, and were not sought out for diversion; and

- failed to disclose that Purdue's ADF opioids do not impact oral abuse or misuse.

270.     If pressed, Purdue acknowledged that perhaps some "extreme" patients might still abuse the drug, but claimed the ADF features protect the majority of patients. These misrepresentations and omissions are misleading and contrary to Purdue's ADF labels, Purdue's own information, and publicly available data.

271.     Purdue knew or should have known that reformulated OxyContin is not more tamper-resistant than the original OxyContin and is still regularly tampered with and abused.

272.     In 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the most common mode of abuse)".  In the 2012 medical office review of Purdue's application to include an abuse-deterrence claim in its label for OxyContin, the FDA noted that the overwhelming majority of deaths linked to OxyContin were associated with oral consumption, and that only 2% of deaths were associated with recent injection and only 0.2% with snorting the drug.

80

273.    The FDA's Director of the Division of Epidemiology stated in September 2015 that no data that she had seen suggested the reformulation of OxyContin "actually made a reduction in abuse," between continued oral abuse, shifts to injection of other drugs (including heroin), and defeat of the ADF mechanism. Even Purdue's own funded research shows that half of OxyContin abusers continued to abuse OxyContin orally after the reformulation rather than shift to other drugs.

274.    A 2013 article presented by Purdue employees based on review of data from poison control centers, concluded that ADF OxyContin can reduce abuse, but it ignored important negative findings.  The study revealed that abuse merely shifted to other drugs and that, when the actual incidence of harmful exposures was calculated, there were *more* harmful exposures to opioids after the reformulation of OxyContin.  In short, the article deceptively emphasized the advantages and ignored the disadvantages of ADF OxyContin.

275.    Websites and message boards used by drug abusers, such as bluelight.org and reddit.com, report a variety of ways to tamper with OxyContin and Hysingla ER, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which a tablet is dissolved. Purdue has been aware of these methods of abuse for more than a decade.

276.    One-third of the patients in a 2015 study defeated the ADF mechanism and were able to continue inhaling or injecting the drug. To the extent that the abuse of Purdue's ADF opioids was reduced, there was no meaningful reduction in opioid abuse overall, as many users simply shifted to other opioids such as heroin.

277.    In 2015, claiming a need to further assess its data, Purdue abruptly withdrew a supplemental new drug application related to reformulated OxyContin one day before FDA staff was to release its assessment of the application.  The staff review preceded an FDA advisory

committee meeting related to new studies by Purdue "evaluating the misuse and/or abuse of reformulated OxyContin" and whether those studies "have demonstrated that the reformulated product has a meaningful impact on abuse."[80]  Upon information and belief, Purdue never presented the data to the FDA because the data would not have supported claims that OxyContin's ADF properties reduced abuse or misuse.

278.    Despite its own evidence of abuse, and the lack of evidence regarding the benefit of Purdue's ADF opioids in reducing abuse, Dr. J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's ADF opioids are being abused in large numbers.  Purdue's recent advertisements in national newspapers also continues to claim its ADF opioids as evidence of its efforts to reduce opioid abuse, continuing to mislead prescribers, patients, payors, and the public about the efficacy of its actions.

### ii.    Endo's deceptive marketing of reformulated Opana ER

279.    As the expiration of its patent exclusivity for Opana ER neared, Endo also made abuse-deterrence a key to its marketing strategy.

280.    Opana ER was particularly likely to be tampered with and abused. That is because Opana ER has lower "bioavailability" than other opioids, meaning that the active pharmaceutical ingredient (the "API" or opioid) does not absorb into the bloodstream as rapidly as other opioids when taken orally. Additionally, when swallowed whole, the extended-release mechanism remains intact, so that only 10% of Opana ER's API is released into the patient's bloodstream relative to injection; when it is taken intranasally, that rate increases to 43%.  The larger gap between

---

[80] Meeting Notice, Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Anesthetic and Analgesic Drug Products Advisory Committee; Notice of Meeting, May 25, 2015, 80 FR 30686.

bioavailability when consumed orally versus snorting or injection, the greater the incentive for users to manipulate the drug's means of administration.

281.    Endo knew by July 2011 that "some newer statistics around abuse and diversion are not favorable to our product."

282.    In December 2011, Endo obtained approval for a new formulation of Opana ER that added a hard coating that the company claimed made it crush-resistant.

283.    Even prior to its approval, the FDA had advised Endo that it could not market the new Opana ER as abuse-deterrent. The FDA found that such promotional claims "may provide a false sense of security since the product may be chewed and ground for subsequent abuse." In other words, Opana ER was still crushable. Indeed, Endo's own studies dating from 2009 and 2010 showed that Opana ER could be crushed and ground, and, in its correspondence with the FDA, Endo admitted that "[i]t has not been established that this new formulation of Opana ER is less subject to misuse, abuse, diversion, overdose, or addiction."

284.    Further, a January 4, 2011 FDA Discipline Review letter made clear to Endo that "[t]he totality of these claims and presentations suggest that, as a result of its new formulation, Opana ER offers a therapeutic advantage over the original formulation when this has not been demonstrated by substantial evidence or substantial clinical experience.  In addition these claims misleadingly minimize the risks associated with Opana ER by suggesting that the new formulation's "INTAC" technology confers some form of abuse-deterrence properties when this has not been demonstrated by substantial evidence."  The FDA acknowledged that while there is "evidence to support some limited improvement" provided by the new coating, but it would not let Endo promote any benefit because "there are several limitations to this data." Also, Endo was required to add language to its label specifically indicating that "Opana ER tablets may be abused

by crushing, chewing, snorting, or injecting the product.  These practices will result in less controlled delivery of the opioid and pose a significant risk to the abuser that could result in overdose and death."

285.   The FDA expressed similar concerns in nearly identical language in a May 7, 2012 letter to Endo responding to a February 2, 2012, "request … for comments on a launch Draft Professional Detail Aid … for Opana ER." The FDA's May 2012 letter also includes a full two pages of comments regarding "Omissions of material facts" that Endo left out of the promotional materials.

286.   Endo consciously chose not to do any post-approval studies that might satisfy the FDA. According to internal documents, the company decided, by the time its studies would be done, generics would be on the market and "any advantages for commercials will have disappeared. However, this lack of evidence did not deter Endo from marketing Opana ER as ADF while its commercial window remained open.

287.   Nonetheless, in August of 2012, Endo submitted a citizen petition asking the FDA for permission to change its label to indicate that Opana ER was abuse-resistant, both in that it was less able to be crushed and snorted and that it was resistant injection by syringe.  Borrowing a page from Purdue's playbook, Endo announced it would withdraw original Opana ER from the market and sought a determination that its decision was made for safety reasons (its lack of abuse-deterrence), which would prevent generic copies of original Opana ER.

288.   Endo then sued the FDA, seeking to force expedited consideration of its citizen petition.  The court filings confirmed Endo's true motives:  in a declaration submitted with its lawsuit, Endo's chief operating officer indicated that a generic version of Opana ER would decrease the company's revenue by up to $135 million per year.  Endo also claimed that if the

FDA did not block generic competition, $125 million, which Endo spent on developing the reformulated drug to "promote the public welfare" would be lost.[81]  The FDA responded that: "Endo's true interest in expedited FDA consideration stems from business concerns rather than protection of the public health."[82]

289.    Despite Endo's purported concern with public safety, not only did Endo continue to distribute original, admittedly unsafe Opana ER for nine months after the reformulated version became available, it declined to recall original Opana ER despite its dangers.  In fact, Endo claimed in September 2012 to be "proud" that "almost all remaining inventory" of the original Opana ER had "been utilized."[83]

290.    In its citizen petition, Endo asserted that redesigned Opana ER had "safety advantages."  Endo even relied on its rejected assertion that Opana was less crushable to argue that it developed Opana ER for patient safety reasons and that the new formulation would help, for example, "where children unintentionally chew the tablets prior to an accidental ingestion."[84]

291.    However, in rejecting the petition in a 2013 decision, the FDA found that "study data show that the reformulated version's extended-release features can be compromised when subjected to ... cutting, grinding, or chewing."  The FDA also determined that "reformulated Opana ER" could also be "readily prepared for injections and more easily injected[.]" In fact, the FDA warned that preliminary data—including in Endo's own studies—suggested that a higher

[81] Plf.'s Opp. to Defs.' and Intervenor's Motions to Dismiss and Plf.'s Reply in Supp. of Motion for Prelim. Inj. ("Endo Br."), [ECF No. 23] *Endo Pharms, Inc. v. U.S. Food and Drug Admin., et al.*, No. 1:12-cv-01936, at 20 (D.D.C. Dec.14, 2012).

[82] Defs.' Resp. to the Court's Nov. 30, 2012 Order, [ECF No.9] *Endo Pharms., Inc. v. U.S. Food and Drug Admin., et al.*., No. 1:12-cv-01936, at 6 (D.D.C. Dec. 3, 2012).

[83] *Id.*; Endo News Release, (Sept. 6, 2012) [ECF No. 18-4], *Endo Pharms., Inc. v. U.S. Food and Drug Admin., et al.*, No. 1:12-cv-01936, Doc. 18-4(D.D.C. Dec. 9, 2012).

[84] CP, FDA Docket 2012-8-0895, at 2., https://www.documentcloud.org/documents/2086687-endo-pharmaceuticals-inc-citizen-petition.html

percentage of reformulated Opana ER abuse is via injection than was the case with the original formulation.

292.    Meanwhile, in 2012, an internal memorandum to Endo account executives noted that abuse of Opana ER had "increased significantly" in the wake of the purportedly abuse-deterrent formulation.  In February 2013, Endo received abuse data regarding Opana ER from Inflexxion, Inc., which gathers information from substance abusers entering treatment and reviews abuse-focused internet discussions, that confirmed continued abuse, particularly by injection.

293.    In 2009, only 3% of Opana ER abuse was by intravenous means. Since the reformulation, injection of Opana ER increased by more than 500%.  Endo's own data, presented in 2014, found between October 2012 and March 2014, 64% of abusers of Opana ER did so by injection, compared with 36% for the old formulation.[85]  The transition into injection of Opana ER made the drug even less safe than the original formulation.  Injection carries risks of HIV, Hepatitis C, and, in reformulated Opana ER's specific case, the blood-clotting disorder thrombotic thrombocytopenic purpura (TTP), which can cause kidney failure.

294.    Publicly, Endo sought to marginalize the problem. On a 2013 call with investors, when asked about an outbreak of TTP in Tennessee from injecting Opana ER, Endo sought to limit its import by assigning it to "a very, very distinct area of the country."

295.    Despite its knowledge that Opana ER was widely abused and injected, Endo marketed the drug as tamper-resistant and abuse-deterrent. Upon information and belief, based on the company's detailing elsewhere, Endo sales representatives informed doctors that Opana ER was abuse-deterrent, could not be tampered with, and was safe. In addition, sales representatives

---

[85] Theresa Cassidy, *The Changing Abuse Ecology: Implications for Evaluating the Abuse Pattern of Extended-Release Oxymorphone and Abuse-Deterrent Opioid Formulations*, Pain Week Abstract 2014, https://www.painweek.org/assets/documents/general/724-painweek2014acceptedabstracts.pdf.

did not disclose evidence that Opana was easier to abuse intravenously and, if pressed by prescribers, claimed that while outlier patients might find a way to abuse the drug, most would be protected.

296.    A review of national surveys of prescribers regarding their "take-aways" from pharmaceutical detailing confirms that prescribers remember being told Opana ER was tamper-resistant. Endo also tracked messages that doctors took from its in-person marketing. Among the advantages of Opana ER, according to participating doctors, was its "low abuse potential."  An internal Endo document also notes that market research showed that, "[l]ow abuse potential continues as the primary factor influencing physicians' anticipated increase in use of Opana ER over the next 6 months."

297.    In its written materials, Endo marketed Opana ER as having been designed to be crush-resistant, knowing that this would (falsely) imply that Opana ER actually was crush-resistant and that this crush-resistant quality would make Opana ER less likely to be abused. For example, a June 14, 2012 Endo press release announced "the completion of the company's transition of its Opana ER franchise to the new formulation designed to be crush resistant."

298.    The press release further stated that: "We firmly believe that the new formulation of Opana ER, coupled with our long-term commitment to awareness and education around appropriate use of opioids will benefit patients, physicians and payers.  The press release described the old formulation of Opana as subject to abuse and misuse but failed to disclose the absence of evidence that reformulated Opana was any better.  In September 2012, another Endo press release stressed that reformulated Opana ER employed "INTAC Technology" and continued to describe the drug as "designed to be crush-resistant."

299.     Similarly, journal advertisements that appeared in April 2013 stated Opana ER was "designed to be crush resistant." A January 2013 article in Pain Medicine News, based in part on an Endo press release, described Opana ER as "crush-resistant." This article was posted on the *Pain Medicine News* website, which was accessible to patients and prescribers.

300.     Endo, upon information and belief, targeted particular geographies for the redesigned Opana ER where abuse was most rampant.

301.     In March 2017, because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and TTP, an FDA advisory committee recommended that Opana be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017.[86] Endo announced on July 6, 2017 that it would agree to stop marketing and selling Opana ER.[87] However, by this point, the damage had been done. Even then, Endo continued to insist, falsely, that it "has taken significant steps over the years to combat misuse and abuse."

### iii.     Other Manufacturer Defendants' misrepresentations regarding abuse deterrence

302.     A guide for prescribers under Actavis's copyright deceptively represents that Kadian is more difficult to abuse and less addictive than other opioids. The guide declares that "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and "KADIAN may be less likely to be abused by health care providers and illicit users" because of its "[s]low onset of action." Kadian, however, was not approved by the FDA as abuse deterrent, and, upon information and belief, Actavis had no studies to suggest it was.

---

[86] Press Release, "FDA Requests Removal of Opana ER for Risks Related to Abuse," June 8, 2017, https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

[87] Press Release, U.S. Food & Drug Admin., FDA Requests Removal of Opana ER for Risks Related to Abuse (June 8, 2017), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

303.    Mallinckrodt promoted both Exalgo (extended-release hydromorphone) and Xartemis XR (oxycodone and acetaminophen) as specifically formulated to reduce abuse.  For example, Mallinckrodt's promotional materials stated that "the physical properties of EXALGO may make it difficult to extract the active ingredient using common forms of physical and chemical tampering, including chewing, crushing and dissolving."[88]  One member of the FDA's Controlled Substance Staff, however, noted in 2010 that hydromorphone has "a high abuse potential comparable to oxycodone" and further stated that "we predict that Exalgo will have high levels of abuse and diversion."[89]

304.    With respect to Xartemis XR, Mallinckrodt's promotional materials stated that "XARTEMIS XR has technology that requires abusers to exert additional effort to extract the active ingredient from the large quantity of inactive and deterrent ingredients."[90] In anticipation of Xartemis XR's approval, Mallinckrodt added 150-200 sales representatives to promote it, and CEO Mark Trudeau said the drug could generate "hundreds of millions in revenue."[91]

305.    While Manufacturer Defendants promote patented technology as the solution to opioid abuse and addiction, none of their "technology" addresses the most common form of abuse—oral ingestion—and their statements regarding abuse-deterrent formulations give the misleading impression that these reformulated opioids can be prescribed safely.

306.    In sum, each of the nine categories of misrepresentations discussed above regarding the use of opioids to treat chronic pain was not supported by or was contrary to the scientific

---

[88] Mallinckrodt Press Release, *FDA Approves Mallinckrodt's EXALGO® (hydromorphone HCl) Extended-Release Tablets 32 mg (CII) for Opioid-Tolerant Patients with Moderate-to-Severe Chronic Pain* (Aug. 27, 2012), http://newsroom.medtronic.com/phoenix.zhtml?c=251324&p=irol-newsArticle&ID=2004159.

[89] https://www.markey.senate.gov/imo/media/doc/2016-02-19-Markey-ADF-Opioid-timeline.pdf.

[90] Mallinckrodt, *Responsible Use of Opioid Pain Medications* (Mar. 7, 2014).

[91] Samantha Liss, *Mallinckrodt Banks on New Painkillers for Sales*, St. Louis Bus. J. 1 (Dec. 30, 2013), http://argentcapital.com/mallinckrodt-banks-on-new-painkillers-for-sales/.

evidence.  In addition, the misrepresentations and omissions set forth above and elsewhere in this Complaint are misleading and contrary to the Manufacturer Defendants' products' labels.

### 2. The Manufacturer Defendants Disseminated Their Misleading Messages About Opioids Through Multiple Channels

307.    The Manufacturer Defendants' false marketing campaign not only targeted the medical community who had to treat chronic pain, but also patients who experience chronic pain.

308.    The Manufacturer Defendants utilized various channels to carry out their marketing scheme of targeting the medical community and patients with deceptive information about opioids: (1) "Front Groups" with the appearance of independence from the Manufacturer Defendants; (2)  "KOLs", that is, doctors who were paid by the Manufacturer Defendants to promote their pro-opioid message; (3) CME programs controlled and/or funded by the Manufacturer Defendants; (4) branded   advertising;   (5) unbranded   advertising;   (6) publications;   (7) direct,   targeted communications with prescribers by sales representatives or "detailers"; and (8) speakers bureaus and programs.

### a. The Manufacturer Defendants Directed Front Groups to Deceptively Promote Opioid Use

309.    Patient advocacy groups and professional associations also became vehicles to reach prescribers, patients, and policymakers.  Manufacturer Defendants exerted influence and effective control over the messaging by these groups by providing major funding directly to them, as well as through KOLs who served on their boards.  These "Front Groups" put out patient education materials, treatment guidelines and CMEs that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks. [92] Manufacturer Defendants funded

---

[92] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Members' Office, (February 12, 2018), https://www.hsdl.org/?view&did=808171 at 3 ("*Fueling an Epidemic*"), at 3.

these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages—often at the expense of their own constituencies.

310.    "Patient advocacy organizations and professional societies like the Front Groups 'play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.'"[93] "Even small organizations— with 'their large numbers and credibility with policymakers and the public'—have 'extensive influence in specific disease areas.' Larger organizations with extensive funding and outreach capabilities 'likely have a substantial effect on policies relevant to their industry sponsors.'"[94] Indeed, the U.S. Senate's report, *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*,[95] which arose out of a 2017 Senate investigation and, drawing on disclosures from Purdue, Janssen, Insys, and other opioid manufacturers, "provides the first comprehensive snapshot of the financial connections between opioid manufacturers and advocacy groups and professional societies operating in the area of opioids policy,"[96] found that the Manufacturer Defendants gave millions of dollars in contributions to various Front Groups.[97]

---

[93] *Id*. at p. 2.

[94] *Id*.

[95] *Id.,* at 3.

[96] *Id*. at 1.

[97] *Id*. at 3.

311.    The Manufacturer Defendants also "made substantial payments to individual group executives, staff members, board members, and advisory board members" affiliated with the Front Groups subject to the Senate Committee's study.[98]

312.    As the Senate *Fueling an Epidemic* Report found, the Front Groups "amplified or issued messages that reinforce industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain."[99] They also "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for over prescription and misbranding."[100]

313.    The Manufacturer Defendants took an active role in guiding, reviewing, and approving many of the false and misleading statements issued by the Front Groups, ensuring that Manufacturer Defendants were consistently in control of their content. By funding, directing, editing, approving, and distributing these materials, Manufacturer Defendants exercised control over and adopted their false and deceptive messages and acted in concert with the Front Groups and through the Front groups, with each other to deceptively promote the use of opioids for the treatment of chronic pain.

### i.    American Pain Foundation

314.    The most prominent of the Front Groups was the American Pain Foundation ("APF"). While APF held itself out as an independent patient advocacy organization, in reality it received 90% of its funding in 2010 from the drug and medical-device industry, including from defendants Purdue, Endo, Janssen and Cephalon. APF received more than $10 million in funding

---

[98] *Id.* at 10.

[99] *Id.* at 12-15.

[100] *Id.* at 12.

from opioid manufacturers from 2007 until it closed its doors in May 2012.  By 2011, APF was entirely dependent on incoming grants from Defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.  Endo was APF's largest donor and provided more than half of its $10 million in funding from 2007 to 2012.

315.    For example, APF published a guide sponsored by Cephalon and Purdue titled *Treatment Options: A Guide for People Living with Pain* and distributed 17,200 copies of this guide in one year alone, according to its 2007 annual report. This guide contains multiple misrepresentations regarding opioid use which are discussed below.

316.    APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website, *www.painknowledge.com*.  NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field. NIPC published unaccredited prescriber education programs (accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies), including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC, by funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC materials.  Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan Endo submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or *www.painknowledge.org*.  Endo estimated it would reach 60,000 prescribers through NIPC.

317.    APF was often called upon to provide "patient representatives" for the Manufacturer Defendants' promotional activities, including for Purdue's "Partners Against Pain" and Janssen's "Let's Talk Pain." Although APF presented itself as a patient advocacy organization, it functioned largely as an advocate for the interests of the Manufacturer Defendants, not patients.

As Purdue told APF in 2001, the basis of a grant to the organization was Purdue's desire to strategically align its investments in nonprofit organizations that share [its] business interests.

318.    In practice, APF operated in close collaboration with Manufacturer Defendants, submitting grant proposals seeking to fund activities and publications suggested by Manufacturer Defendants and  assisting in marketing projects for Manufacturer Defendants.

319.    This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives.  Purdue and APF entered into a "Master Consulting Services" Agreement on September 14, 2011.  That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project. Moreover, based on the assignment of particular Purdue "contacts" for each project and APF's periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project.  The agreement gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason.  Even for projects not produced during the terms of this Agreement, the Agreement demonstrates APF's lack of independence and willingness to harness itself to Purdue's control and commercial interests, which would have carried across all of APF's work.

320.    APF's Board of Directors was largely comprised of doctors who were on the Manufacturer Defendants' payrolls, either as consultants or speakers at medical events.  The close relationship between APF and the Manufacturer Defendants demonstrates APF's clear lack of independence, in its finances, management, and mission, and its willingness to allow Manufacturer Defendants to control its activities and messages supports an inference that each Manufacturer Defendant that worked with it was able to exercise editorial control over its publications—even

when Manufacturer Defendants' messages contradicted APF's internal conclusions. For example, a roundtable convened by APF and funded by Endo also acknowledged the lack of evidence to support chronic opioid therapy. APF's formal summary of the meeting notes concluded that: "[An] important barrier[] to appropriate opioid management [is] the lack of confirmatory data about the long-term safety and efficacy of opioids in non-cancer chronic pain, amid cumulative clinical evidence."

321.    In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF then "cease[d] to exist, effective immediately."  Without support from Manufacturer Defendants, to whom APF could no longer be helpful, APF was no longer financially viable.

ii.        **American Academy of Pain Medicine and the American Pain Society**

322.    The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.[101] The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue. The sole consultant to the committee was Dr. Russell Portenoy, who was also a spokesperson for Purdue.  The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website.

---

[101] Consensus Statement by the Am. Acad. of Pain Med. & the Am. Pain Soc'y, *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997)., http://www.stgeorgeutah.com/wp-content/uploads/2016/05/OPIOIDES.DOLORCRONICO.pdf   (August 18, 2017).

323.    AAPM's corporate council includes Purdue, Depomed, Teva and other pharmaceutical companies. AAPM's past presidents include Haddox (1998), Dr. Scott Fishman ("Fishman") (2005), Dr. Perry G. Fine ("Fine") (2011) and Dr. Lynn R. Webster ("Webster") (2013), all of whose connections to the opioid manufacturers are well-documented as set forth below.

324.    Fishman, who also served as a KOL for Manufacturer Defendants, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[102]

325.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations.

326.    AAPM describes the annual event as an "exclusive venue" for offering CMEs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Manufacturer Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event. The conferences sponsored by AAPM heavily emphasized CME sessions on opioids – 37 out of roughly 40 at one conference alone.

---

[102] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), available at http://www.medscape.org/viewarticle/500829.

327.    AAPM's staff understood that they and their industry funders were engaged in a common task.  Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

328.    AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines") AAPM, with the assistance, prompting, involvement, and funding of Manufacturer Defendants, issued the treatment guidelines discussed herein, and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines, including KOL Dr. Fine, received support from Defendants Janssen, Cephalon, Endo, and Purdue.  Of these individuals, six received support from Purdue, eight from Teva, nine from Janssen, and nine from Endo.

329.    One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the Guidelines were influenced by contributions that drug companies, including Purdue, Endo, Janssen, and Teva, made to the sponsoring organizations and committee members.

330.    Dr. Gilbert Fanciullo, now retired as a professor at Dartmouth College's Geisel School of Medicine, who served on the AAPM/APS Guidelines panel, has since described them as "skewed" by drug companies and "biased in many important respects," including the high presumptive maximum dose, lack of suggested mandatory urine toxicology testing, and claims of a low risk of addiction.

331.    The 2009 Guidelines have been a particularly effective channel of deception.  They have influenced not only treating physicians, but also the scientific literature on opioids; they were reprinted in the *Journal of Pain*, have been cited hundreds of times in academic literature, were

disseminated during the relevant time period, and were and are available online.  Treatment guidelines are especially influential with primary care physicians and family doctors to whom Manufacturer Defendants promoted opioids, whose lack of specialized training in pain management and opioids makes them more reliant on, and less able to evaluate, these guidelines. For that reason, the CDC has recognized that treatment guidelines can "change prescribing practices."[103]

332.    The 2009 Guidelines are relied upon by doctors, especially general practitioners and family doctors who have no specific training in treating chronic pain.

333.    The Manufacturer Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions, their involvement in the development of the Guidelines or their financial backing of the authors of these Guidelines.  For example, a speaker presentation prepared by Endo in 2009 titled *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain* relies on the AAPM/APS Guidelines while omitting their disclaimer regarding the lack of evidence for recommending the use of opioids for chronic pain.

### iii.    The Federation of State Medical Boards

334.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians.

335.    The FSMB finances opioid- and pain-specific programs through grants from Manufacturer Defendants.

---

[103] 2016 CDC Guideline at 2.

336.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies." The 1998 Guidelines that the pharmaceutical companies helped author taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

337.    A 2004 iteration of the 1998 Guidelines and the 2007 book, Responsible Opioid Prescribing, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in Plaintiffs' Community.

338.    FSMB's 2007 publication *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Purdue, Endo and Cephalon. The publication also received support from the American Pain Foundation and the American Academy of Pain Medicine. The publication was written by Dr. Fishman, and Dr. Fine served on the Board of Advisors. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as "the leading continuing medical education (CME) activity for prescribers of opioid medications." This publication asserted that opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated, and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient.[104]

---

[104] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* 8-9 (Waterford Life Sciences 2007).

339.     The Manufacturer Defendants relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

### iv.     The Alliance for Patient Access

340.     Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."[105] It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[106] As of June 2017, the APA listed 30 "Associate Members and Financial Supporters." The list includes Johnson & Johnson, Endo, Mallinckrodt, Purdue and Cephalon.

341.     APA's board members have also directly received substantial funding from pharmaceutical companies.[107] For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu"), who practices in Kansas, received more than $800,000 from 2013 through 2015 from pharmaceutical companies—nearly all of it from manufacturers of opioids or drugs that treat

---

[105] *About AfPA*, The Alliance for Patient Access, http://allianceforpatientaccess.org/about-afpa (last visited Apr. 25, 2018). References herein to APA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.

[106] Mary Chris Jaklevic, *Alliance for Patient Access Uses Journalists and Politicians to Push Big Pharma's Agenda*, Health News Review (Oct. 2, 2017), https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ (hereinafter "Jaklevic, *Non-Profit Alliance for Patient Access*").

[107] All information concerning pharmaceutical company payments to doctors in this paragraph is from ProPublica's Dollars for Docs database, https://projects.propublica.org/docdollars/.

opioids' side effects, including from Defendants Endo, Insys, Purdue and Cephalon. Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed Subsys.[108] Other board members include Dr. Robert A. Yapundich from North Carolina, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by Defendants Cephalon and Mallinckrodt; Dr. Jack D. Schim from California, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including Defendants Endo, Mallinckrodt and Cephalon; Dr. Howard Hoffberg from Maryland, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including Defendants Endo, Purdue, Insys, Mallinckrodt and Cephalon; and Dr. Robin K. Dore from California, who received $700,000 between 2013 and 2015 from pharmaceutical companies.

342.    Among its activities, APA issued a "white paper" titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse."[109] Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.
>
> *        *        *

---

[108] Andy Marso, *FBI Seizes Records of Overland Park Pain Doctor Tied to Insys*, Kansas City Star (July 20, 2017), http://www.kansascity.com/news/business/health-care/article162569383.html.

[109] *Prescription Pain Medication: Preserving Patient Access While Curbing Abuse, Institute for Patient Access* (Dec. 2013), http://1yh21u3cjptv3xjder1dco9mx5s.wpengi

ne.netdna-cdn.com/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf.

> In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face loss of their professional licensure. Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff. Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives. . . .
>
> We cannot merely assume that these programs will reduce prescription pain medication use and abuse.[110]

343. The white paper also purports to express concern about policies that have been enacted in response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to address this problem have made it difficult for legitimate pain management centers to operate. For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and reporting requirements. . . . [I]t is not even certain that the regulations are helping prevent abuses.[111]

344. In addition, in an echo of earlier industry efforts to push back against what they termed "opiophobia," the white paper laments the stigma associated with prescribing and taking pain medication:

> Both pain patients and physicians can face negative perceptions and outright stigma. When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong – or even criminal. . . . Physicians can face similar stigma from peers. Physicians in non-pain specialty areas often look down on those who specialize in pain management – a situation fueled by the numerous regulations and fines that surround prescription pain medications.[112]

---

[110] *Id*. at 4-5.

[111] *Id*. at 5-6.

[112] *Id*. at 6.

345.     In conclusion, the white paper states that "[p]rescription pain medications, and specifically the opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."[113]

346.     The APA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015. The awards were funded by a $7.8 million donation from unnamed donors. While the awards are ostensibly given for protecting patients' access to Medicare and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they appear to be given to provide cover to and reward members of Congress who have supported the APA's agenda.[114]

347.     The APA also lobbies Congress directly. In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801 *et seq.* ("CSA" or "Controlled Substances Act").  The AAPM is also a signatory to this letter. An internal U.S. Department of Justice ("DOJ") memo stated that the proposed bill "'could actually result in increased diversion, abuse, and public health and safety consequences'"[115] and, according to DEA chief administrative law judge John J. Mulrooney ("Mulrooney"), the law would make it "all but logically impossible" to prosecute manufacturers

---

[113] *Id.* at 7.

[114] Jaklevic, *Non-profit Alliance for Patient Access*, *supra*.

[115] Bill Whitaker, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress*, CBS News (Oct. 17, 2017), https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/ (hereinafter, "Whitaker, Opioid Crisis Fueled by Drug Industry").

and distributors, like the defendants here, in the federal courts.[116] The bill passed both houses of Congress and was signed into law in 2016.

### v.      The U.S. Pain Foundation

348.    The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with the Manufacturer Defendants.  The USPF was one of the largest recipients of contributions from the Manufacturer Defendants, collecting nearly $3 million in payments between 2012 and 2015 alone.[117]  The USPF was also a critical component of the Manufacturer Defendants' lobbying efforts to reduce the limits on over-prescription.  The U.S. Pain Foundation advertises its ties to the Manufacturer Defendants, listing opioid manufacturers like Pfizer, Teva, Depomed, Endo, Purdue, McNeil (i.e. Janssen), and Mallinckrodt as "Platinum," "Gold," and "Basic" corporate members.[118]  Industry Front Groups like the American Academy of Pain Management, the American Academy of Pain Medicine, the American Pain Society, and PhRMA are also members of varying levels in the USPF.

### vi.      American Geriatrics Society

349.    The American Geriatrics Society ("AGS") was another Front Group with systematic connections and interpersonal relationships with the Manufacturer Defendants.  The AGS was a large recipient of contributions from the Manufacturer Defendants, including Endo, Purdue and Janssen.  AGS contracted with Purdue, Endo and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (The Management of Persistent Pain in Older Persons, hereinafter "2002 AGS Guidelines") and 2009 (Pharmacological Management of

---

[116] John J. Mulrooney, II & Katherine E. Legel, *Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters*, 101 Marquette L. Rev. 15 (2017).

[117] Fueling an Epidemic, *supra*.

[118] *Id*. at 12; Transparency, U.S. Pain Foundation, https://uspainfoundation.org/transparency/ (last visited on March 9, 2018).

Persistent Pain in Older Persons,[119] hereinafter "2009 AGS Guidelines").  According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009.[120] AGS's complicity in the common purpose with the Manufacturer Defendants is evidenced by the fact that AGS internal discussions in August 2009 reveal that it did not want to receive upfront funding from drug companies, which would suggest drug company influence, but would instead, accept commercial support to disseminate pro-opioid publications.

350.    The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy."  The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse.[121]  These Guidelines further recommended that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."  These recommendations are not supported by any study or other reliable scientific evidence.  Nevertheless, they have been cited as many as 1,833 times in Google Scholar (which allows users to search scholarly publications that would be have been relied on by researchers and prescribers) since their 2009 publication and as recently as this year.

351.    Representatives of the Manufacturer Defendants, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue.  AGS then

---

[119] *Pharmacological Management of Persistent Pain in Older Persons*, 57 J. Am. Geriatrics Soc'y 1331, 1339, 1342 ( 2009), available at https://www.nhqualitycampaign.org/files/AmericanGeriatricSociety-PainGuidelines2009.pdf (last visited Apr. 25, 2018).

[120] John Fauber & Ellen Gabler, "Narcotic Painkiller Use Booming Among Elderly," *Milwaukee J. Sentinel*, May 30, 2012, https://medpagetoday.com/geriatrics/painmanagement/32967

[121] 2009 AGS Guidelines at 1342.

submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

352.    Members of AGS Board of Directors were doctors who were on the Manufacturer Defendants' payrolls, either as consultants or speakers at medical events.  As described below, many of the KOLs also served in leadership positions within the AGS.

### b.    The Manufacturer Defendants Paid Key Opinion Leaders to Deceptively Promote Opioid Use

353.    To falsely promote their opioids, the Manufacturer Defendants paid and cultivated a select circle of doctors who were chosen and sponsored by the Manufacturer Defendants for their supportive messages.  As set forth below, pro-opioid doctors have been at the hub of the Manufacturer Defendants' well-funded, pervasive marketing scheme since its inception and were used to create the grave misperception that science and respected medical professionals favored the broader use of opioids. These doctors include Dr. Russell Portenoy and Dr. Lynn Webster, as set forth in this section, as well as Dr. Perry Fine and Dr. Scott Fishman, as set forth below.

354.    Although these KOLs were funded by the Manufacturer Defendants, the KOLs were used extensively to present the appearance that unbiased and reliable medical research supporting the broad use of opioid therapy for chronic pain had been conducted and was being reported on by independent medical professionals.

355.    As the Manufacturer Defendants' false marketing scheme picked up steam, these pro-opioid KOLs wrote, consulted on, edited, and lent their names to books and articles, and gave speeches and CMEs supportive of opioid therapy for chronic pain.  They served on committees that developed treatment guidelines that strongly encouraged the use of opioids to treat chronic pain and they were placed on boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.

356.     Through use of their KOLs and strategic placement of these KOLs throughout every critical distribution channel of information within the medical community, the Manufacturer Defendants were able to exert control of each of these modalities through which doctors receive their information.

357.     In return for their pro-opioid advocacy, the Manufacturer Defendants' KOLs received money, prestige, recognition, research funding, and avenues to publish.  For example, Dr. Webster has received funding from Endo, Purdue, and Cephalon.  Dr. Fine has received funding from Janssen, Cephalon, Endo, and Purdue.

358.     The Manufacturer Defendants carefully vetted their KOLs to ensure that they were likely to remain on-message and supportive of the Manufacturer Defendants' agenda.  The Manufacturer Defendants also kept close tabs on the content of the materials published by these KOLs. And, of course, the Manufacturer Defendants kept these KOLs well-funded to enable them to push the Manufacturer Defendants' deceptive message out to the medical community.

359.     Once the Manufacturer Defendants identified and funded KOLs and those KOLs began to publish "scientific" papers supporting the Manufacturer Defendants' false position that opioids were safe and effective for treatment of chronic pain, the Manufacturer Defendants poured significant funds and resources into a marketing machine that widely cited and promoted their KOLs and studies or articles by their KOLs to drive prescription of opioids for chronic pain.  The Manufacturer Defendants cited to, distributed, and marketed these studies and articles by their KOLs as if they were independent medical literature so that it would be well-received by the medical community.  By contrast, the Manufacturer Defendants did not support, acknowledge, or disseminate the truly independent publications of doctors critical of the use of chronic opioid therapy.

360.    In their promotion of the use of opioids to treat chronic pain, the Manufacturer Defendants' KOLs knew that their statements were false and misleading, or they recklessly disregarded the truth in doing so, but they continued to publish their misstatements to benefit themselves and the Manufacturer Defendants.

### i.    Dr. Russell Portenoy

361.    In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy."[122]

362.    Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids:

> *The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs.* This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction. According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter. It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life. *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects. There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.*[123]

---

[122] R. Portenoy & K. Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 cases*, 25(2) Pain 171 (1986).

[123] Russell K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, 1 Progress in Pain Res. & Mgmt., 247-287 (H.L. Fields and J.C. Liebeskind eds., 1994) (emphasis added).

According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy in all but the most desperate cases of chronic nonmalignant pain."[124]

363.     Despite having taken this position on long-term opioid treatment, Dr. Portenoy ended up becoming a spokesperson for Purdue and other Manufacturer Defendants, promoting the use of prescription opioids and minimizing their risks. A respected leader in the field of pain treatment, Dr. Portenoy was highly influential. Dr. Andrew Kolodny, cofounder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure. The megaphone for Portenoy is Purdue, which flies in people to resorts to hear him speak. It was a compelling message: 'Docs have been letting patients suffer; nobody really gets addicted; it's been studied.'"[125]

364.     As one organizer of CME seminars who worked with Portenoy and Purdue pointed out, "had Portenoy not had Purdue's money behind him, he would have published some papers, made some speeches, and his influence would have been minor. With Purdue's millions behind him, his message, which dovetailed with their marketing plans, was hugely magnified."[126]

365.     Dr. Portenoy was also a critical component of the Manufacturer Defendants' control over their Front Groups. Specifically, Dr. Portenoy sat as a Director on the board of the APF.  He was also the President of the APS.

366.     In recent years, some of the Manufacturer Defendants' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific

[124] *Id*.

[125] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* 314 (Bloomsbury Press 2015).

[126] *Id.* at 136.

literature.[127] Dr. Portenoy has now admitted that he minimized the risks of opioids, and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[128] He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, against the standards of 2012, I guess I did . . ."[129]

367.    In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, *none of which represented real evidence*, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before. *In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.*[130]

368.    Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, *Pain Killer*, Dr. Portenoy was more direct: "It was pseudoscience. I guess I'm going to have always to live with that one."[131]

### ii.     Dr. Lynn Webster

---

[127] *See*, *e.g.*, John Fauber, *Painkiller Boom Fueled by Networking*, Journal Sentinel (Feb. 18, 2012), http://archive.jsonline.com/watchdog/watchdogreports/painkiller-boom-fueled-by-networking-dp3p2rn-139609053.html/ (reporting that a key Endo KOL acknowledged that opioid marketing went too far).

[128] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, The Wall Street Journal https://www.wsj.com/articles/SB10001424127887324478304578173342657044604. (Last updated Dec. 17, 2012 11:36 AM).

[129] *Id.*

[130] Harrison Jacobs, *This 1-Paragraph Letter May Hae Launched the Opioid Epidemic*, AOL (May 26, 2016), https://www.aol.com/article/2016/05/26/letter-may-have-launched-opioid-epidemic/21384408/; Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w&feature=youtu.be..

[131] Meier, *supra*, at 277.

369.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah. Dr. Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports chronic opioid therapy. He is a Senior Editor of *Pain Medicine*, the same journal that published Endo's special advertising supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).

370.     Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool ("ORT") appear on, or are linked to, websites run by Endo, Janssen, and Purdue. In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, *Managing Patient's Opioid Use: Balancing the Need and the Risk*. Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors in Plaintiffs' Community.

371.     Dr. Webster was himself tied to numerous overdose deaths. He and the Lifetree Clinic were investigated by the DEA for overprescribing opioids after twenty patients died from overdoses. In keeping with the Manfacturing Defendants' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or addictive behaviors was more opioids: he prescribed staggering quantities of pills.

372.     At an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Webster and others titled, "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results." The presentation's agenda description states: "Most patients with chronic pain experience episodes of breakthrough pain, yet no currently available pharmacologic agent is ideal for its treatment." The presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that FEBT is safe and well-tolerated in patients with chronic pain and BTP."  This CME effectively amounted to off-label promotion of Cephalon's opioids–the only drugs in this category–for chronic pain, even though they were approved only for cancer pain.

373.     Cephalon sponsored a CME written by Dr. Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating breakthrough pain because of dose limitations on the non-opioid component.

### iii.     Dr. Perry Fine

374.     Dr. Perry Fine's ties to the Manufacturer Defendants have been well documented. He has authored articles and testified in court cases and before state and federal committees, and he, too, has argued against legislation restricting high-dose opioid prescription for non-cancer patients. He has served on Purdue's advisory board, provided medical legal consulting for Janssen, and participated in CME activities for Endo, along with serving in these capacities for several other drug companies. He co-chaired the APS-AAPM Opioid Guideline Panel, served as treasurer of the

AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and was also on the board of directors of APF.[132]

375.    Multiple videos feature Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith for pain did not make her an addict before her death.

376.    He has also acknowledged having failed to disclose numerous conflicts of interest. For example, Dr. Fine failed to fully disclose payments received as required by his employer, the University of Utah—telling the university that he had received under $5,000 in 2010 from Johnson & Johnson for providing "educational" services, but Johnson & Johnson's website states that the company paid him $32,017 for consulting, promotional talks, meals and travel that year.[133]

377.    Dr. Fine and Dr. Portenoy co-wrote *A Clinical Guide to Opioid Analgesia*, in which they downplayed the risks of opioid treatment, such as respiratory depression and addiction:

> At clinically appropriate doses, . . . respiratory rate typically does
> not decline. Tolerance to the respiratory effects usually develops
> quickly, and doses can be steadily increased without risk.
> Overall, the literature provides evidence that the outcomes of drug
> abuse and addiction are rare among patients who receive opioids for
> a short period (i.e., for acute pain) and among those with no history
> of abuse who receive long-term therapy for medical indications.[134]

378.    In November 2010, Dr. Fine and others published an article presenting the results of another Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl

---

[132] Scott M. Fishman, MD, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306 (13) JAMA 1445 (Sept. 20, 2011), https://jamanetwork.com/journals/jama/article-abstract/1104464?redirect=true. (hereinafter,

"Fishman").

[133] Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry,* ProPublica (Dec. 23,2011, 9:14 AM), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry (hereinafter, "Weber").

[134] Perry G. Fine, MD & Russell K. Portenoy, MD, *A Clinical Guide to Opioid Analgesia* 20 and 34, McGraw-Hill Companies (2004), at 20, 34. http://www.thblack.com/links/RSD/OpioidHandbook.pdf.

Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic

Pain: An 18-Month Study."[135] In that article, Dr. Fine explained that the 18-month "open-label"

study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP

in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for

noncancer pain." The article acknowledged that: (a) "[t]here has been a steady increase in the use

of opioids for the management of chronic noncancer pain over the past two decades"; (b) the

"widespread acceptance" had led to the publishing of practice guidelines "to provide evidence-

and consensus-based recommendations for the optimal use of opioids in the management of

chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of

opioid therapy for chronic pain."[136]

379.    The article concluded: "[T]he safety and tolerability profile of FBT in this study

was generally typical of a potent opioid. The [adverse events] observed were, in most cases,

predictable, manageable, and tolerable." They also conclude that the number of abuse-related

events was "small."[137]

380.    Multiple videos feature Dr. Fine delivering educational talks about the drugs. In

one video from 2011 titled "Optimizing Opioid Therapy," he sets forth a "Guideline for Chronic

Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for

cancer patients, but for non-cancer patients, and suggests it may take four or five switches over a

person's "lifetime" to manage pain.[138] He states the "goal is to improve effectiveness which is

---

[135] Perry G. Fine, et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Mgmt 747-60 (Nov. 2010).

[136] *Id*. at 748.

[137] *Id.* at 759.

[138] Perry A. Fine, *Safe and Effective Opioid Rotation*, YouTube (Nov. 8, 2012), https://www.youtube.com/watch?v=_G3II9yqgXI.

different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events *over the course of years*." The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat *sleep apnea*. He further states that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."[139]

### iv.      Dr. Scott Fishman

381.    Dr. Scott Fishman is a physician whose ties to the opioid drug industry are legion. He has served as an APF board member and as president of the AAPM, and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Manufacturer Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."[140]

382.    Dr. Fishman authored a physician's guide on the use of opioids to treat chronic pain titled "Responsible Opioid Prescribing," in 2007 which promoted the notion that long-term opioid treatment was a viable and safe option for treating chronic pain.

---

[139] *Id.*

[140] Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (2011); Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, ProPublica (Dec. 23, 2011, 2:14 PM), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry.

383.    In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.[141]

384.    The updated guide still assures that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and noncancer origins."[142]

385.    In another guide by Dr. Fishman, he continues to downplay the risk of addiction: "I believe clinicians must be very careful with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict."[143]  The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

c.    **The Manufacturer Defendants Disseminated Their Misrepresentations Through Continuing Medical Education Programs**

386.    Now that the Manufacturer Defendants had both a group of physician promoters and had built a false body of "literature," Manufacturer Defendants needed to make sure their false marketing message was widely distributed.

---

[141] Scott M. Fishman, *Responsible Opioid Prescribing: A Guide for Michigan Clinicians*, 10-11 (Waterford Life Sciences 2d ed.  2012).

[142] *Id.*

[143] Scott M. Fishman, *Listening to Pain: A Clinician's Guide to Improving Pain Management Through Better Communication* 45 (Oxford University Press 2012).

387.    One way the Manufacturer Defendants aggressively distributed their false message was through thousands of Continuing Medical Education courses ("CMEs").

388.    A CME is a professional education program provided to doctors. Doctors are required to attend a certain number and, often, type of CME programs each year as a condition of their licensure. These programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications.  Doctors rely on CMEs not only to satisfy licensing requirements, but also to get information on new developments in medicine or to deepen their knowledge in specific areas of practice.  Because CMEs typically are taught by KOLs who are highly respected in their fields, and are thought to reflect these physicians' medical expertise, they can be especially influential with doctors.

389.    The countless doctors and other health care professionals who participate in accredited CMEs constitute an enormously important audience for opioid reeducation. As one target, Manufacturer Defendants aimed to reach general practitioners, whose broad area of practice and lack of expertise and specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to the Manufacturer Defendants' deceptions.

390.    The Manufacturer Defendants sponsored CMEs that were delivered thousands of times, promoting chronic opioid therapy and supporting and disseminating the deceptive and biased messages described in this Complaint. These CMEs, while often generically titled to relate to the treatment of chronic pain, focus on opioids to the exclusion of alternative treatments, inflate the benefits of opioids, and frequently omit or downplay their risks and adverse effects.

391.     Cephalon sponsored numerous CME programs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians across the country.

392.     Another Cephalon-sponsored CME presentation titled *Breakthrough Pain: Treatment Rationale with Opioids* was available on Medscape starting September 16, 2003 and was given by a self-professed pain management doctor who "previously operated back, complex pain syndromes, the neuropathies, and interstitial cystitis." He describes the pain process as a non-time-dependent continuum that requires a balanced analgesia approach using "targeted pharmacotherapeutics to affect multiple points in the pain-signaling pathway."[144] The doctor lists fentanyl as one of the most effective opioids available for treating breakthrough pain, describing its use as an expected and normal part of the pain management process. Nowhere in the CME is cancer or cancer-related pain even mentioned, despite FDA restrictions that fentanyl use be limited to cancer-related pain.

393.     Teva paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain. The CME is still available online.

394.     *Responsible Opioid Prescribing* was sponsored by Purdue, Endo and Teva. The FSMB website described it as the "leading continuing medical education (CME) activity for

---

[144] Daniel S. Bennett, *Breakthrough Pain: Treatment Rationale with Opioids*, Medscape, (Sept 16, 2003) http://www.medscape.org/viewarticle/461612.

prescribers of opioid medications."  Endo sales representatives distributed copies of *Responsible Opioid Prescribing* with a special introductory letter from Dr. Scott Fishman.

395.    In all, more than 163,000 copies of *Responsible Opioid Prescribing* were distributed nationally.

396.    The American Medical Association ("AMA") recognized the impropriety that pharmaceutical company-funded CMEs creates; stating that support from drug companies with a financial interest in the content being promoted "creates conditions in which external interests could influence the availability and/or content" of the programs and urges that "[w]hen possible, CME[s] should be provided without such support or the participation of individuals who have financial interests in the education subject matter."[145]

397.    Physicians attended or reviewed CMEs sponsored by the Manufacturer Defendants during the relevant time period and were misled by them.

398.    By sponsoring CME programs put on by Front Groups like APF, AAPM, and others, the Manufacturer Defendants could expect instructors to deliver messages favorable to them, as these organizations were dependent on the Manufacturer Defendants for other projects. The sponsoring organizations honored this principle by hiring pro-opioid KOLs to give talks that supported chronic opioid therapy.  Manufacturer Defendant-driven content in these CMEs had a direct and immediate effect on prescribers' views on opioids.  Producers of CMEs and the Manufacturer Defendants both measure the effects of CMEs on prescribers' views on opioids and their absorption of specific messages, confirming the strategic marketing purpose in supporting them.

---

[145] Opinion 9.0115, *Financial Relationships with Industry in CME*, Am. Med. Ass'n (Nov. 2011), at 1.

### d.      The Manufacturer Defendants Used "Branded" Advertising to Promote Their Products to Doctors and Consumers

399.    The Manufacturer Defendants engaged in widespread advertising campaigns touting the benefits of their branded drugs. The Manufacturer Defendants published print advertisements in a broad array of medical journals, ranging from those aimed at specialists, such as the *Journal of Pain* and *Clinical Journal of Pain*, to journals with wider medical audiences, such as the *Journal of the American Medical Association*. The Manufacturer Defendants collectively spent more than $14 million on the medical journal advertising of opioids in 2011, nearly triple what they spent in 2001. The 2011 total includes $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

400.    The Manufacturer Defendants also targeted consumers in their advertising. They knew that physicians are more likely to prescribe a drug if a patient specifically requests it.[146] They also knew that this willingness to acquiesce to such patient requests holds true even for opioids and for conditions for which they are not approved.[147]  Endo's research, for example, also found that such communications resulted in greater patient "brand loyalty," with longer durations of Opana ER therapy and fewer discontinuations.  The Manufacturer Defendants thus increasingly took their opioid sales campaigns directly to consumers, including through patient-focused "education and support" materials in the form of pamphlets, videos, or other publications that patients could view in their physician's office.

### e.      The Manufacturer Defendants Used "Unbranded" Advertising to Promote Opioid Use for Chronic Pain Without FDA Review

---

[146] In one study, for example, nearly 20% of sciatica patients requesting oxycodone received a prescription for it, compared with 1% of those making no specific request. J.B. McKinlay *et al.*, *Effects of Patient Medication Requests on Physician Prescribing Behavior*, *Results of a Factorial Experiment* 52(2) Med. Care 294-99 (April 2014).

[147] *Id.*

401. The Manufacturer Defendants also aggressively promoted opioids through "unbranded advertising" to generally tout the benefits of opioids without specifically naming a particular brand-name opioid drug. Instead, unbranded advertising is usually framed as "disease awareness"—encouraging consumers to "talk to your doctor" about a certain health condition without promoting a specific product and, therefore, without providing balanced disclosures about the product's limits and risks. In contrast, a pharmaceutical company's "branded" advertisement that identifies a specific medication and its indication (i.e., the condition which the drug is approved to treat) must also include possible side effects and contraindications—what the FDA Guidance on pharmaceutical advertising refers to as "fair balance." Branded advertising is also subject to FDA review for consistency with the drug's FDA-approved label. Through unbranded materials, the Manufacturer Defendants expanded the overall acceptance of and demand for chronic opioid therapy without the restrictions imposed by regulations on branded advertising.

402. Many of the Manufacturer Defendants utilized unbranded websites to promote opioid use without promoting a specific branded drug, such as Purdue's pain-management website, *www.inthefaceofpain.com*. The website contained testimonials from several dozen "advocates," including health care providers, urging more pain treatment. The website presented the advocates as neutral and unbiased, but an investigation by the New York Attorney General later revealed that Purdue paid the advocates hundreds of thousands of dollars.

f. **The Manufacturer Defendants Funded, Edited and Distributed Publications that Supported Their Misrepresentations**

403. The Manufacturer Defendants created a body of false, misleading, and unsupported medical and popular literature about opioids that (a) understated the risks and overstated the benefits of long-term use; (b) appeared to be the result of independent, objective research; and (c) was likely to shape the perceptions of prescribers, patients, and payors. This literature served

marketing goals, rather than scientific standards, and was intended to persuade doctors and consumers that the benefits of long-term opioid use outweighed the risks.

404.    To accomplish their goal, the Manufacturer Defendants—sometimes through third-party consultants and/or Front Groups—commissioned, edited, and arranged for the placement of favorable articles in academic journals.

405.    The Manufacturer Defendants' plans for these materials did not originate in the departments with the organizations that were responsible for research, development, or any other area that would have specialized knowledge about the drugs and their effects on patients; rather, they originated in the Manufacturer Defendants' marketing departments.

406.    The Manufacturer Defendants made sure that favorable articles were disseminated and cited widely in the medical literature, even when the Manufacturer Defendants knew that the articles distorted the significance or meaning of the underlying study, as with the Porter & Jick letter.  The Manufacturer Defendants also frequently relied on unpublished data or posters, neither of which are subject to peer review, but were presented as valid scientific evidence.

407.    The Manufacturer Defendants published or commissioned deceptive review articles, letters to the editor, commentaries, case-study reports, and newsletters aimed at discrediting or suppressing negative information that contradicted their claims or raised concerns about chronic opioid therapy.

408.    For example, in 2007 Cephalon sponsored the publication of an article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate,"[148] published in the

---

[148] Donald R. Taylor, *et al., Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8(3) Pain Med. 281-88 (Mar. 2007).

nationally circulated journal *Pain Medicine*, to support its effort to expand the use of its branded fentanyl products. The article's authors (including Dr. Lynn Webster, discussed above) stated that the "OTFC [fentanyl] has been shown to relieve BTP more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of noncancer pain patients." The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Portenoy and recommends fentanyl for non-cancer BTP patients:

> In summary, BTP appears to be a clinically important condition in patients with chronic noncancer pain and is associated with an adverse impact on QoL. This qualitative study on the negative impact of BTP and the potential benefits of BTP-specific therapy suggests several domains that may be helpful in developing BTP-specific, QoL assessment tools.[149]

### g.   The Manufacturer Defendants Used Detailing to Directly Disseminate Their Misrepresentations to Prescribers

409.   The Manufacturer Defendants' sales representatives executed carefully crafted marketing tactics, developed at the highest rungs of their corporate ladders, to reach targeted doctors with centrally orchestrated messages.  The Manufacturer Defendants' sales representatives also distributed third-party marketing material to their target audience that was deceptive.

410.   Each Manufacturer Defendant promoted opioids through sales representatives (also called "detailers") and, upon information and belief, small group speaker programs to reach out to individual prescribers.  By establishing close relationships with doctors, the Manufacturer Defendants were able to disseminate their misrepresentations in targeted, one-on-one settings that

---

[149] *Id.*

allowed them to promote their opioids and to allay individual prescribers' concerns about prescribing opioids for chronic pain.

411.    In accordance with common industry practice, the Manufacturer Defendants purchase and closely analyze prescription sales data from IMS Health (now IQVIA), a healthcare data collection, management and analytics corporation. This data allows them to track precisely the rates of initial and renewal prescribing by individual doctors, which allows them to target and tailor their appeals. Sales representatives visited hundreds of thousands of doctors and disseminated the misinformation and materials described above.

412.    Manufacturer Defendants devoted and continue to devote massive resources to direct sales contacts with doctors. In 2014 alone, Manufacturer Defendants spent $166 million on detailing branded opioids to doctors. This amount is twice as much as Manufacturer Defendants spent on detailing in 2000. The amount includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Teva, and $10 million by Endo.

413.    Cephalon's quarterly spending steadily climbed from below $1 million in 2000 to more than $3 million in 2014 (and more than $13 million for the year), with a peak, coinciding with the launch of Fentora, of more than $27 million in 2007, as shown below:



414.  Endo's quarterly spending went from the $2 million to $4 million range in 2000-2004 to more than $10 million following the launch of Opana ER in mid-2006 (and more than $38 million for the year in 2007) and more than $8 million coinciding with the launch of a reformulated version in 2012 (and nearly $34 million for the year):



415.    Janssen's quarterly spending dramatically rose from less than $5 million in 2000 to more than $30 million in 2011, coinciding with the launch of Nucynta ER (with yearly spending at $142 million for 2011), as shown below:



416.    Purdue's quarterly spending notably decreased from 2000 to 2007, as Purdue came under investigation by the Department of Justice, but then spiked to above $25 million in 2011 (for a total of $110 million that year), and continues to rise, as shown below:



417.    For its opioid, Actiq, Cephalon also engaged in direct marketing in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

418.    Thousands of prescribers attended Cephalon speaking programs.

### h.    Manufacturer Defendants Used Speakers' Bureaus and Programs to Spread Their Deceptive Messages

419.    In addition to making sales calls, Manufacturer Defendants' detailers also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by the Manufacturer Defendants. These speaker programs and associated speaker trainings serve three purposes: they provide an incentive to doctors to prescribe, or increase their prescriptions of, a particular drug; to qualify to be selected for a forum in which to further market to the speaker himself or herself; and an opportunity to market to the speaker's peers. The Manufacturer Defendants grade their speakers, and future opportunities are based on speaking performance, post-program sales, and product usage.  Purdue, Janssen, Endo, Cephalon, and Mallinckrodt each made thousands of payments to physicians nationwide, for activities including participating on speakers' bureaus, providing consulting services, and other services.

420.    As detailed below, Insys paid prescribers for *fake* speakers' programs in exchange for prescribing its product, Subsys. Insys's schemes resulted in countless speakers' programs at which the designated speaker did not speak, and, on many occasions, speaker programs at which the only attendees at the events were the speaker and an Insys sales representative. It was a pay-to-prescribe program.

421.    Insys used speakers' programs as a front to pay for prescriptions, and paid to push opioids onto patients who did not need them.

3.      **The Manufacturer Defendants Targeted Vulnerable Populations.**

422.    The Manufacturer Defendants specifically targeted their marketing at two vulnerable populations—the elderly and veterans.

423.    Elderly patients taking opioids have been found to be exposed to elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression which occurs more frequently in elderly patients.

424.    The Manufacturer Defendants promoted the notion—without adequate scientific foundation—that the elderly are particularly unlikely to become addicted to opioids.  The AGS 2009 Guidelines, for example, which Purdue, Endo, and Janssen publicized, described the risk of addiction as "*exceedingly low* in older patients with no current or past history of substance abuse." (emphasis added).  As another example, an Endo-sponsored CME put on by NIPC, *Persistent Pain in the Older Adult*, taught that prescribing opioids to older patients carried "possibly less potential for abuse than in younger patients." Contrary to these assertions, however, a 2010 study examining overdoses among long-term opioid users found that patients 65 or older were among those with the largest number of serious overdoses.

425.    Similarly, Endo targeted marketing of Opana ER towards patients over 55 years old.  Such documents show Endo treated Medicare Part D patients among the "most valuable customer segments." However, in 2013, one pharmaceutical benefits management company recommended against the use of Opana ER for elderly patients and unequivocally concluded: "[f]or patients 65 and older these medications are not safe, so consult your doctor."

426.    According to a study published in the 2013 *Journal of American Medicine*, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, such as overdoses and self-inflicted and accidental injuries.  A 2008 survey showed that prescription drug misuse among military personnel doubled from 2002 to

2005, and then nearly tripled again over the next three years.  Veterans are twice as likely as non-veterans to die from an opioid overdose.

427.    Yet the Manufacturer Defendants deliberately targeted veterans with deceptive marketing.  For example, a 2009 publication sponsored by Purdue, Endo, and Janssen, and distributed by APF with grants from Janssen and Endo, was written as a personal narrative of one veteran but was in fact another vehicle for opioid promotion. Called *Exit Wounds*, the publication describes opioids as "underused" and the "gold standard of pain medications" while failing to disclose significant risks of opioid use, including the risks of fatal interactions with benzodiazepines.  According to a VA Office of Inspector General Report, 92.6% of veterans who were prescribed opioid drugs were also prescribed benzodiazepines, despite the increased danger of respiratory depression from the two drugs together.

428.    Opioid prescriptions have dramatically increased for veterans and the elderly.  Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.  And in 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills—four times as many as they did in 2001.

**4.    Insys Employed Fraudulent, Illegal, and Misleading Marketing Schemes to Promote Subsys.**

429.    Insys's opioid, Subsys, was approved by the FDA in 2012 for "management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."  Under FDA rules, Insys could only market Subsys for this use.  Subsys consists of the highly addictive narcotic, fentanyl, administered via a sublingual (under the tongue) spray, which provides rapid-onset pain relief.  It is in the class of drugs described as Transmucosal Immediate-Release Fentanyl ("TIRF").

430.    To reduce the risk of abuse, misuse, and diversion, the FDA instituted a Risk Evaluation and Mitigation Strategy ("REMS") for Subsys and other TIRF products, such as Cephalon's Actiq and Fentora.  The purpose of REMS was to educate "prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose" for this type of drug and to "ensure safe use and access to these drugs for patients who need them."[150]  Prescribers must enroll in the TIRF REMS before writing a prescription for Subsys.

431.    Since its launch, Subsys has been an extremely expensive medication and its price continues to rise each year.  Depending on a patient's dosage and frequency of use, a month's supply of Subsys could cost in the thousands of dollars.

432.    Due to its high cost, in most instances prescribers must submit Subsys prescriptions to insurance companies or health benefit payors for prior authorization to determine whether they will pay for the drug prior to the patient attempting to fill the prescription.  According to the U.S. Senate Homeland Security and Governmental Affairs Committee Minority Staff Report ("Staff Report"), the prior authorization process includes "confirmation that the patient had an active cancer diagnosis, was being treated by an opioid (and, thus, was opioid tolerant), and was being prescribed Subsys to treat breakthrough pain that the other opioid could not eliminate.  If any one of these factors was not present, the prior authorization would be denied . . . ."[151]

433.    These prior authorization requirements proved to be daunting.  Subsys received reimbursement approval in only approximately 30% of submitted claims.  In order to increase approvals, Insys created a prior authorization unit, called the Insys Reimbursement Center ("IRC"), to obtain approval for Subsys reimbursements.  This unit employed a number of

---

[150] Press Release, FDA, *U.S. Food & Drug Admin. FDA Approves Shared System REMS for TIRF Products*, (Dec. 29, 2011).

[151] *Fueling an Epidemic, supra*.

fraudulent and misleading tactics to secure reimbursements, including falsifying medical histories of patients, falsely claiming that patients had cancer, and providing misleading information to insurers and payors regarding patients' diagnoses and medical conditions.

434.    Subsys has proved to be extremely profitable for Insys. Insys made approximately $330 million in net revenue from Subsys last year. Between 2013 and 2016, the value of Insys stock rose 296%.

435.    Since its launch in 2012, Insys aggressively worked to grow its profits through fraudulent, illegal, and misleading tactics, including its reimbursement-related fraud. Through its sales representatives and other marketing efforts, Insys deceptively promoted Subsys as safe and appropriate for uses such as neck and back pain, without disclosing the lack of approval or evidence for such uses and misrepresented the appropriateness of Subsys for treatment those conditions. It implemented a kickback scheme wherein it paid prescribers for fake speakers' programs in exchange for prescribing Subsys. All of these fraudulent and misleading schemes had the effect of pushing Insys's dangerous opioid onto patients who did not need it.

436.    Insys incentivized its sales force to engage in illegal and fraudulent conduct. Many of the Insys sales representatives were new to the pharmaceutical industry and their base salaries were low compared to industry standard. The compensation structure was heavily weighted toward commissions and rewarded reps more for selling higher (and more expensive) doses of Subsys, a "highly unusual" practice because most companies consider dosing a patient-specific decision that should be made by a doctor.[152]

437.    The Insys "speakers program" was perhaps its most widespread and damaging scheme. A former Insys salesman, Ray Furchak, alleged in a qui tam action that the sole purpose

---

[152] *Id.*

of the speakers program was "in the words of his then supervisor Alec Burlakoff, 'to get money in the doctor's pocket.'"  Furchak went on to explain that "[t]he catch . . . was that doctors who increased the level of Subsys prescriptions, and at higher dosages (such as 400 or 800 micrograms instead of 200 micrograms), would receive the invitations to the program—and the checks."[153]  It was a pay-to-prescribe program.

438.    Insys's sham speaker program and other fraudulent and illegal tactics have been outlined in great detail in indictments and guilty pleas of Insys executives, employees, and prescribers across the country, as well as in a number of lawsuits against the company itself.

439.    In May of 2015, two Alabama pain specialists were arrested and charged with illegal prescription drug distribution, among other charges.  The doctors were the top prescribers of Subsys, though neither were oncologists.  According to prosecutors, the doctors received illegal kickbacks from Insys for prescribing Subsys.  Both doctors had prescribed Subsys to treat neck, back, and joint pain.  In February of 2016, a former Insys sales manager pled guilty to conspiracy to commit health care fraud, including engaging in a kickback scheme in order to induce one of these doctors to prescribe Subsys.  The plea agreement states that nearly all of the Subsys prescriptions written by the doctor were off-label to non-cancer patients.   In May of 2017 one of the doctors was sentenced to 20 years in prison.

440.    In June of 2015, a nurse practitioner in Connecticut described as the state's highest Medicare prescriber of narcotics, pled guilty to receiving $83,000 in kickbacks from Insys for prescribing Subsys.  Most of her patients were prescribed the drug for chronic pain.  Insys paid the nurse as a speaker for more than 70 dinner programs at approximately $1,000 per event; however,

---

[153] Roddy Boyd, *Insys Therapeutics and the New 'Killing It'"*, Southern Investigative Reporting Foundation, The Investigator, April 24, 2015, http://sirf-online.org/2015/04/24/the-new-killing-it/.

she did not give any presentations.  In her guilty plea, the nurse admitted receiving the speaker fees in exchange for writing prescriptions for Subsys.

441.    In August of 2015, Insys settled a complaint brought by the Oregon Attorney General.  In its complaint, the Oregon Department of Justice cited Insys for, among other things, misrepresenting to doctors that Subsys could be used to treat migraine, neck pain, back pain, and other uses for which Subsys is neither safe nor effective, and using speaking fees as kickbacks to incentivize doctors to prescribe Subsys.

442.    In August of 2016, the State of Illinois sued Insys for similar deceptive and illegal practices.  The Complaint alleged that Insys marketed Subsys to high-volume prescribers of opioid drugs instead of to oncologists whose patients experienced the breakthrough cancer pain for which the drug is indicated.  The Illinois Complaint also details how Insys used its speaker program to pay high volume prescribers to prescribe Subsys.  The speaker events took place at upscale restaurants in the Chicago area, and Illinois speakers received an "honorarium" ranging from $700 to $5,100, and they were allowed to order as much food and alcohol as they wanted.  At most of the events, the "speaker" being paid by Insys did not speak, and, on many occasions, the only attendees at the events were the speaker and an Insys sales representative.

443.    In December of 2016, six Insys executives and managers were indicted and then, in October 2017, Insys's founder and owner was arrested and charged with multiple felonies in connection with an alleged conspiracy to bribe practitioners to prescribe Subsys and defraud insurance companies.  A U.S. Department of Justice press release explained that, among other things: "Insys executives improperly influenced health care providers to prescribe a powerful opioid for patients who did not need it, and without complying with FDA requirements, thus

putting patients at risk and contributing to the current opioid crisis."[154]   A Drug Enforcement Administration ("DEA") Special Agent in Charge further explained that: "Pharmaceutical companies whose products include controlled medications that can lead to addiction and overdose have a special obligation to operate in a trustworthy, transparent manner, because their customers' health and safety and, indeed, very lives depend on it."[155]

> **5.    The Manufacturer Defendants' Scheme Succeeded, Creating a Public Health Epidemic.**
>
> > **a.    Manufacturer Defendants Dramatically Expanded Opioid Prescribing and Use**

444.    The Manufacturer Defendants necessarily expected a return on the enormous investment they made in their deceptive marketing scheme and worked to measure and expand their success.  Their own documents show that they knew they were influencing prescribers and increasing prescriptions.  Studies also show that in doing so, they fueled an epidemic of addiction and abuse.

445.    Endo, for example directed the majority of its marketing budget to sales representatives—with good results: 84% of its prescriptions were from the doctors they detailed. Moreover, as of 2008, cancer and post-operative pain accounted for only 10% of Opana ER's uses; virtually all of Endo's opioid sales—and profits—were from a market that did not exist ten years earlier.   Internal emails from Endo staff attributed increases in Opana ER sales to the aggressiveness and persistence of sales representatives.  Similarly, according to an internal Janssen

---

[154] Press Release, U.S. Dep't of Just., U.S. Attorney's Office, Dist. of Mass., *Founder and Owner of Pharmaceutical Company Insys Arrested and Charged with Racketeering* (Oct. 26, 2017),   https://www.justice.gov/usao-ma/pr/founder-and-owner-pharmaceutical-company-insys-arrested-and-charged-racketeering.

[155] *Id.*

training document, sales representatives were told that sales calls and call intensity have high correlation to sales.

446.    Cephalon also recognized the return of its efforts to market Actiq and Fentora off-label for chronic pain. In 2000, Actiq generated $15 million in sales.  By 2002, Actiq sales had increased by 92%, which Cephalon attributed to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[156]  Actiq became Cephalon's second best-selling drug. By the end of 2006, Actiq's sales had exceeded $500 million.[157]  Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists.  One measure suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[158]

447.    Upon information and belief, each of the Manufacturer Defendants tracked the impact of their marketing efforts to measure their impact in changing doctors' perceptions and prescribing of their drugs.  They purchased prescribing and survey data that allowed them to closely monitor these trends, and they did actively monitor them.  For instance, they monitored doctors' prescribing before and after detailing visits, and at various levels of detailing intensity, and before and after speaker programs. Manufacturer Defendants continued and, in many cases, expanded and refined their aggressive and deceptive marketing for one reason:  it worked.  As described in this Complaint, both in specific instances, and more generally, Manufacturer Defendants' marketing changed prescribers' willingness to prescribe opioids, led them to prescribe

---

[156]    Cephalon, Inc. Annual Report (Form 10-K) at 28 (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/873364/000104746903011137/a2105971z10-k.htm.

[157]    John Carreyrou, *Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs,* WSJ (Nov. 3, 2006), https://www.wsj.com/articles/SB116252463810112292.

[158]    *Id.*

more of their opioids, and persuaded them to continue prescribing opioids or to switch to supposedly "safer" opioids, such as ADF.

448.    This success would have come as no surprise.  Drug company marketing materially impacts doctors' prescribing behavior.[159]  The effects of sales calls on prescribers' behavior is well documented in the literature, including a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers. The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study examined four practices, including visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on drug utilization.  An additional study found that doctor meetings with sales representatives are related to changes in both prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

449.    Manufacturer Defendants spent millions of dollars to market their drugs to prescribers and patients and meticulously tracked their return on that investment.  In one recent survey published by the AMA, even though nine in ten general practitioners reported prescription drug abuse to be a moderate to large problem in their communities, 88% of the respondents said they were confident in their prescribing skills, and nearly half were comfortable using opioids for

---

[159] *See, e.g.*, P. Manchanda & P. Chintagunta, *Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis*, 15 (2-3) Mktg. Letters 129 (2004) (detailing has a positive impact on prescriptions written); I. Larkin, *Restrictions on Pharmaceutical Detailing Reduced Off-Label Prescribing of Antidepressants and Antipsychotics in Children*, 33(6) Health Affairs 1014 (2014) (finding academic medical centers that restricted direct promotion by pharmaceutical sales representatives resulted in a 34% decline in on-label use of promoted drugs); *see also* A. Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am J. Pub. Health 221 (2009) (correlating an increase of OxyContin prescriptions from 670,000 annually in 1997 to 6.2 million in 2002 to a doubling of Purdue's sales force and trebling of annual sales calls).

chronic non-cancer pain.[160]   These results are directly due to the Manufacturer Defendants' fraudulent marketing campaign focused on several misrepresentations.

450.   Thus, both independent studies and Manufacturer Defendants' own tracking confirm that Manufacturer Defendants' marketing scheme dramatically increased their sales.

### b.   Manufacturer Defendants' Deception in Expanding Their Market Created and Fueled the Opioid Epidemic

451.   Independent research demonstrates a close link between opioid prescriptions and opioid abuse.  For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[161]  It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

452.   There is a parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes.   The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[162]

453.   In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."  Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses.  For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

---

160 Research Letter, Prescription Drug Abuse:  A National Survey of Primary Care Physicians, JAMA Intern. Med. (Dec. 8, 2014), E1-E3.

161 Theodore J. Cicero *et al.*, *Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States*, 16.8 Pharmacoepidemiology and Drug Safety, 827-40 (2007).

162 Robert M. Califf, M.D., *et al., A Proactive Response to Prescription Opioid Abuse,* New Eng. J. Med., http://www.nejm.org/doi/full/10.1056/NEJMsr1601307

### E. The Distributor Defendants and Other Defendants Throughout the Supply Chain Deliberately Disregarded Their Duties to Maintain Effective Controls to Prevent Diversion and to Identify, Report, and Take Steps to Halt Suspicious Orders

454.    The Manufacturer Defendants created a vastly and dangerously larger market for opioids.  All of the Defendants compounded this harm by facilitating the supply of far more opioids that could have been justified to serve that market.  The failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious breached both their statutory and common law duties.

455.    For over a decade, as the Manufacturer Defendants increased the demand for opioids, all the Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold.  However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers.  Rather, as described below, Defendants are subject to various duties to report the quantity of Schedule II controlled substances in order to monitor such substances and prevent oversupply and diversion into the illicit market.

456.    The Manufacturer Defendants' scheme was resoundingly successful.  Chronic opioid therapy—the prescribing of opioids long-term to treat chronic pain—has become a commonplace, and often first-line, treatment.  The Manufacturer Defendants' deceptive marketing caused prescribing not only of their opioids, but of opioids as a class, to skyrocket.  According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. While previously a small minority of opioid sales, today between 80% and 90% of opioids (measured by weight) used are for chronic pain.  Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the

population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include the prescription of an opioid.

457.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[163]  Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses.  For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[164]

458.    Defendants are all required to register as either manufacturers or distributors pursuant to 21 U.S.C. § 823 and 21 C.F.R. §§ 1301.11, 1301.74.

459.    Under Illinois law, the applicable definition of "wholesale drug distributor" includes "manufacturers; … drug wholesalers or distributors; … and retail pharmacies that conduct wholesale distribution." *See* 225 ILCS 120/15; *see also* Ill. Admin. Code Title 68, § 1510.10 (defining "wholesale distributor").

460.    Under Illinois law, every "wholesale drug distributor" or "wholesale distributor" must comply with the licensing requirements mandated by Illinois statute and regulation before it can engage in wholesale distribution into, out of, or within the State of Illinois. *See* 225 ILCS 120/25; Ill. Admin. Code Title 68, § 1510.20.

461.    Under Illinois law, each of the Defendants was required to provide effective controls and procedures to guard against the theft and diversion of opioid drugs. *See* 720 ILCS 570/201(h); Ill. Admin. Code Title 68, § 1510.50(b)(3).

---

[163] Rose A. Rudd, et al. "*Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2000–2014.*", 64 (50 &51) Ctrs. For Disease Control and Prevention, Morbidity & Mortality Wkly. Rep. 1323-1327 (2016), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

[164] *Id.*

1. **All Defendants Have a Duty to Provide Effective Controls and Procedures to Guard Against Theft and Diversion, and to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions.**

462.    Multiple sources, including Illinois statutes and regulations, impose duties on the Defendants to provide effective controls and procedures to guard against theft and diversion of opioid drugs.  Multiple sources also impose duties on the Defendants to report suspicious orders and to not ship such orders unless due diligence disproves those suspicions.

463.    First, under the common law, the Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding Plaintiffs' Community with more opioids than could be used for legitimate medical purposes, by failing to provide effective controls and procedures against theft and diversion, and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

464.    Second, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

465.    Third, each of the Defendants was required to be licensed through the Illinois Department of Financial and Professional Regulation for the wholesale distribution of prescription drugs. *See* 225 ILCS 120/25; Ill. Admin. Code Title 68, § 1510.20. As licensees with the Illinois Department of Financial and Professional Regulations and registrants with the Drug Enforcement Administration, each of the Defendants was required to maintain effective controls and procedures to guard against theft and diversion (*see* 720 ILCS 570/201(h); Ill. Admin. Code Title 68, § 1510.50(b)(3)), and to operate in compliance with all applicable federal, state and local laws and regulations. *See* Ill. Admin. Code Title 68, § 1510.50(i). Defendants violated their obligations and breached their duties under Illinois law.

466.    Fourth,  each  of  the  Defendants  was  required  to  register  with  the  DEA  to manufacture and/or distribute Schedule II controlled substances.  *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100.  As registrants, Defendants were required, under federal law, to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . .  suspicious orders of controlled substances."  21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74.  Defendants were further required to take steps to halt suspicious orders.  Defendants violated their obligations and breached their duties under federal law.

467.    Recognizing  a  need  for  greater  scrutiny  over  controlled  substances  due  to  their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.  The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.  Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances  into  the  illicit  market.   Congress  was  concerned  with  the  diversion  of  drugs  out  of legitimate  channels  of  distribution  and  acted  to  halt  the  "widespread  diversion  of  [controlled substances]  out  of  legitimate  channels  into  the  illegal  market."   Moreover,  the  closed-system  was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.  All registrants – which includes all manufacturers and distributors of controlled substances – must adhere to the specific security,  recordkeeping,  monitoring  and  reporting  requirements  that  are  designed  to  identify  or prevent  diversion.   When  registrants  at  any  level  fail  to  fulfill  their  obligations,  the  necessary checks and balances collapse.  The result is the scourge of addiction that has occurred.

468.    The  CSA  requires  manufacturers  and  distributors  of  Schedule  II  substances  like opioids to: (a) limit sales within a quota set by the DEA for the overall production of Schedule II

substances like opioids; (b) register to manufacture or distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

469.    Central to the closed-system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year.  The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."  When evaluating production quotas, the DEA was instructed to consider the following information:

a.    Information provided by the Department of Health and Human Services;

b.    Total net disposal of the basic class [of each drug] by all manufacturers;

c.    Trends in the national rate of disposal of the basic class [of drug];

d.    An applicant's production cycle and current inventory position;

e.    Total actual or estimated inventories of the class [of drug] and of all substances manufactured from the class and trends in inventory accumulation; and

f.    Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.

470.    It is unlawful to manufacture a controlled substance in Schedule II, like prescription opioids, in excess of a quota assigned to that class of controlled substances by the DEA.

471.    To ensure that even drugs produced within quota are not diverted, Federal regulations issued under the CSA mandate that all registrants, manufacturers and distributors alike, "design and operate a system to disclose to the registrant suspicious orders of controlled

substances." 21 C.F.R. § 1301.74(b).  Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant."  *Id*.  Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.  *Id*.  Other red flags may include, for example, "[o]rdering the same controlled substance from multiple distributors."

472.    These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a distributor or manufacturer need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

473.    Furthermore, both the Illinois Controlled Substances Act, 720 ILCS 570/100, *et seq.*, and Section 1510.50 of Title 68 of the Illinois Administrative Code, independent and exclusive of any federal law or regulation, required all Defendants to maintain controls, procedures and security suitable to protect against theft and diversion of prescription opioid drugs.

474.    In sum, Defendants have several responsibilities under state and federal law with respect to control of the supply chain of opioids.  First, they must set up a system to prevent diversion, including excessive volume and other suspicious orders.  That would include reviewing

their own data, relying on their observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion.  All suspicious orders must be reported to relevant enforcement authorities.  Further, they must also stop shipment of any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, they can determine that the order is not likely to be diverted into illegal channels.

475.    State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent manufacturers and distributors would not fall.  Together, these laws and industry guidelines make clear that Distributor and Manufacturer Defendants alike possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled.

476.    Further, these laws and industry guidelines make clear that the Distributor Defendants and Manufacturer Defendants alike have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

477.    The FTC has recognized the unique role of distributors.  Since their inception, Distributor Defendants have continued to integrate vertically by acquiring businesses that are related to the distribution of pharmaceutical products and health care supplies.  In addition to the actual distribution of pharmaceuticals, as wholesalers, Distributor Defendants also offer their pharmacy, or dispensing, customers a broad range of added services.  For example, Distributor Defendants offer their pharmacies sophisticated ordering systems and access to an inventory management system and distribution facility that allows customers to reduce inventory carrying costs.  Distributor Defendants are also able to use the combined purchase volume of their

customers to negotiate the cost of goods with manufacturers and offer services that include software assistance and other database management support. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 41 (D.D.C. 1998) (granting the FTC's motion for preliminary injunction and holding that the potential benefits to customers did not outweigh the potential anti-competitive effect of a proposed merger between Cardinal Health, Inc. and Bergen Brunswig Corp.). As a result of their acquisition of a diverse assortment of related businesses within the pharmaceutical industry, as well as the assortment of additional services they offer, Distributor Defendants have a unique insight into the ordering patterns and activities of their dispensing customers.

478. Manufacturer Defendants also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies, and from their purchase of data from commercial sources, such as IMS Health (now IQVIA). Their extensive boots-on-the-ground through their sales force, allows Manufacturer Defendants to observe the signs of suspicious prescribing and dispensing discussed elsewhere in the Complaint—lines of seemingly healthy patients, out-of-state license plates, and cash transactions, to name only a few. In addition, Manufacturer Defendants regularly mined data, including, upon information and belief, chargeback data, that allowed them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusually high dose prescribing that would have alerted them independent of their sales representatives, to suspicious prescribing. These information points gave Manufacturer Defendants insight into prescribing and dispensing conduct that enabled them to play a valuable role in the preventing diversion and fulfilling their obligations under the CSA.

479.    Defendants have a duty to, and are expected, to be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

480.    Defendants breached these duties by failing to: (a) control the supply chain; (b) mainrain effective controls, procedures and security to prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious overuse of opioids.

### 2.    Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders.

481.    The reason for the reporting rules is to create a "closed" system intended to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.  Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical.  Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

482.    Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

483.    Recently, Mallinckrodt, admitted in a settlement with DEA that "[a]s a registrant under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion, including a requirement that it review and monitor these sales and report suspicious orders to

DEA." Mallinckrodt further stated that it "recognizes the importance of the prevention of diversion of the controlled substances they manufacture" and agreed that it would "design and operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize all available transaction information to identify suspicious orders of any Mallinckrodt product." Mallinckrodt specifically agreed "to notify DEA of any diversion and/or suspicious circumstances involving any Mallinckrodt controlled substances that Mallinckrodt discovers."

484. Trade organizations to which Defendants belong have acknowledged that wholesale distributors have been responsible for reporting suspicious orders for more than 40 years. The Healthcare Distribution Management Association ("HDMA," now known as the Healthcare Distribution Alliance ("HDA")), a trade association of pharmaceutical distributors to which Distributor Defendants belong, has long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society." Guidelines established by the HDA also explain that distributors, "[a]t the center of a sophisticated supply chain . . . are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."

485. The DEA also repeatedly reminded the Defendants of their obligations to report and decline to fill suspicious orders. Responding to the proliferation of pharmacies operating on the internet that arranged illicit sales of enormous volumes of opioids to drug dealers and customers, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations. Since 2007, the DEA has hosted at least five conferences that provided registrants with updated information about diversion trends and regulatory changes. Each of the Distributor Defendants attended at least one of these

conferences.  The DEA has also briefed wholesalers regarding legal, regulatory, and due diligence responsibilities since 2006.  During these briefings, the DEA pointed out the red flags wholesale distributors should look for to identify potential diversion.

486.    The DEA also advised in a September 27, 2006 letter to every commercial entity registered to distribute controlled substances that they are "one of the key components of the distribution chain.  If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.  This responsibility is critical, as . . .  the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."   The DEA's September 27, 2006 letter also expressly reminded them that registrants, in addition to reporting suspicious orders, have a "statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."   The same letter reminds distributors of the importance of their obligation to "be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes," and warns that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."

487.    The DEA sent another letter to Defendants on December 27, 2007, reminding them that, as registered manufacturers and distributors of controlled substances, they share, and must each abide by, statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."   The DEA's December 27, 2007 letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (*e.g.*, by specifically identifying an order as suspicious, not merely transmitting

data to the DEA).  Finally, the letter references the Revocation of Registration issued in *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."

### 3.     Defendants Worked Together to Inflate the Quotas of Opioids They Could Distribute.

488.     Finding it impossible to legally achieve their ever-increasing sales ambitions, Defendants engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and distribution of their prescription opioids.

489.     Wholesale distributors such as the Distributor Defendants had close financial relationships with both Manufacturer Defendants and customers, for whom they provide a broad range of value added services that render them uniquely positioned to obtain information and control against diversion.  These services often otherwise would not be provided by manufacturers to their dispensing customers and would be difficult and costly for the dispenser to reproduce.  For example, "[w]holesalers have sophisticated ordering systems that allow customers to electronically order and confirm their purchases, as well as to confirm the availability and prices of wholesalers' stock."  *Fed. Trade Comm'n v. Cardinal Health, Inc*., 12 F. Supp. 2d 34, 41 (D.D.C. 1998).  Through their generic source programs, wholesalers are also able "to combine the purchase volumes of customers and negotiate the cost of goods with manufacturers." Wholesalers typically also offer marketing programs, patient services, and other software to assist their dispensing customers.

490.     Distributor Defendants had financial incentives from the Manufacturer Defendants to distribute higher volumes, and thus to refrain from reporting or declining to fill suspicious orders, or using any effective controls to prevent against diversion. Wholesale drug distributors

acquire pharmaceuticals, including opioids, from manufacturers at an established wholesale acquisition cost.  Discounts and rebates from this cost may be offered by manufacturers based on market share and volume.  As a result, higher volumes may decrease the cost per pill to distributors. Decreased cost per pill in turn, allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit.  Either way, the increased sales volumes result in increased profits.

491.    The Manufacturer Defendants engaged in the practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids as a way to help them boost sales and better target their marketing efforts.  The *Washington Post* has described the practice as industry-wide, and the HDA includes a "Contracts and Chargebacks Working Group," suggesting a standard practice.  Further, in a recent settlement with the DEA, Mallinckrodt, acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors)."   The transaction information contains data relating to the direct customer sales of controlled substances to 'downstream' registrants," meaning pharmacies or other dispensaries, such as hospitals. Manufacturer Defendants buy data from pharmacies as well.  This exchange of information, upon information, and belief, would have opened channels providing for the exchange of information revealing suspicious orders as well.

492.    The contractual relationships among the Defendants also include vault security programs.  Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opioids.  The manufacturers negotiated agreements whereby the Manufacturer Defendants installed security vaults for the Distributor Defendants in exchange for agreements to maintain minimum sales performance thresholds.  These agreements

were used by the Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements.

493.    In addition, Defendants worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the HDA.

494.    The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint.  The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

495.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drug makers and their allies shaped the national response to the ongoing wave of prescription opioid abuse."[165]  Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[166]

496.    The Defendants who stood to profit from expanded prescription opioid use are members of and/or participants in the PCF.  In 2012, membership and participating organizations included Endo, Purdue, Actavis and Cephalon.  Each of the Manufacturer Defendants worked together through the PCF.  But, the Manufacturer Defendants were not alone.  The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through

---

[165] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity, https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echochamber-shaped-policy-amid-drug-epidemic. (Last Updated Dec. 15, 2016, 9:09 AM) (emphasis added).

[166] *Id.*

162 of 273

their trade organization, the HDA.[167]  The Distributor Defendants participated directly in the PCF as well.

497.    Additionally, the HDA led to the formation of interpersonal relationships and an organization among the Defendants.  Although the entire HDA membership directory is private, the HDA website confirms that each of the Distributor Defendants and the Manufacturer Defendants, including Actavis, Endo, Purdue, Mallinckrodt and Cephalon, were members of the HDA.  Additionally, the HDA and each of the Distributor Defendants eagerly sought the active membership and participation of the Manufacturer Defendants by advocating for the many benefits of members, including "strengthen[ing] . . . alliances."[168]

498.    Defendants also worked together through HAD and the National Association of Chain Drugstores ("NACDS"). The respective CEOs of the HDA and NACDS have spoken with one voice with respect to portraying their members as committed to safeguarding the integrity of the supply chain when opposing efforts to promote the importation of prescription drugs as a means of mitigating the escalating costs of medications. These statements support the inference that Defendants worked together in other ways as well to mislead the public regarding their commitment to complying with their legal obligations and safeguarding against diversion.

499.    Beyond strengthening alliances, the benefits of HDA membership included the ability to, among other things, "network one on one with manufacturer executives at HDA's members-only Business and Leadership Conference," "networking with HDA wholesale

---

[167] *Id*; The Executive Committee of the HDA (formerly the HDMA) currently includes the Chief Executive Officer, Pharmaceutical Segment for Cardinal Health, Inc., the Group President, Pharmaceutical Distribution and Strategic Global Source for AmerisourceBergen Corporation, and the President, U.S. Pharmaceutical for McKesson Corporation.      *Executive          Committee*,      Healthcare      Distribution      Alliance, https://www.healthcaredistribution.org/about/executive-committee (last accessed Apr. 25, 2018).

[168] *Manufacturer          Membership*,      Healthcare      Distribution      Alliance, https://healthcaredistribution.org/about/membership/manufacturer (last accessed Apr. 25, 2018).

distributor members," "opportunities to host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "make connections."[169]   Clearly, the HDA and the Defendants believed that membership in the HDA was an opportunity to create interpersonal and ongoing organizational relationships and "alliances" between the Manufacturer Defendants and Distributor Defendants.

500.     The application for manufacturer membership in the HDA further indicates the level of connection among the Defendants and the level of insight that they had into each other's businesses.[170]   For example, the manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company.

501.     The HDA application also requests that the manufacturer identify its current distribution information, including the facility name and contact information.   Manufacturer members were also asked to identify their "most recent year end net sales" through wholesale distributors, including the Distributor Defendants AmerisourceBergen, Cardinal Health, and McKesson and their subsidiaries.

502.     The closed meetings of the HDA's councils, committees, task forces and working groups provided the Manufacturer Defendants and Distributor Defendants with the opportunity to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise.

---

[169] *Id.*

[170] *Manufacturer     Membership     Application*,     Healthcare     Distribution     Alliance, https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.

503.    The HDA also offers a multitude of conferences, including annual business and leadership conferences.  The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[171]  The conferences also gave the Manufacturer Defendants and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[172]  The HDA and its conferences were significant opportunities for the Manufacturer Defendants and Distributor Defendants to interact at a high-level of leadership.  It is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[173]

504.    After becoming members of HDA, Defendants were eligible to participate on councils, committees, task forces and working groups, including:

a.    Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."

b.    Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions.  The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e-commerce." Participation in this committee includes distributor and manufacturer members.

c.    Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain.  Its major areas of focus include process automation, information systems, operational

---

[171] *Business and Leadership Conference – Information for Manufacturers*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for-manufacturers.

[172] *Id.*

[173] *2015 Distribution Management Conference and Expo*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/events/2015-distribution-management-conference.

integration, resource management and quality improvement." Participation in this committee includes distributor and manufacturer members.

d.  Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel.  Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.

e.  Contracts and Chargebacks Working Group:  "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies.  It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation in this group includes manufacturer and distributor members.

505.  The Distributor Defendants and Manufacturer Defendants also participated, through the HDA, in Webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[174]  For example, on April 27, 2011, the HDA offered a Webinar to "accurately and effectively exchange business transactions between distributors and manufacturers …." The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell prescription opioids.

506.  Taken together, the interaction and length of the relationships between and among the Manufacturer Defendants and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry.  The Manufacturer Defendants and Distributor Defendants were not two separate groups operating in isolation or two groups forced

---

[174] *Webinar Leveraging EDI: Order-to-Cash Transactions CD Box Set*, Healthcare Distribution Alliance, (Apr. 27, 2011), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

to work together in a closed system.  Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

507.    The HDA and the PCF are but two examples of the overlapping relationships, and concerted joint efforts to accomplish common goals and demonstrates that the leaders of each of the Defendants were in communication and cooperation.

508.    Publications and guidelines issued by the HDA nevertheless confirm that the Defendants utilized their membership in the HDA to form agreements.  Specifically, in the fall of 2008, the HDA published the Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (the "Industry Compliance Guidelines") regarding diversion.  As the HDA explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of HDMA members contribut[ing] to the development of this publication" beginning in late 2007.

509.    This statement by the HDA and the Industry Compliance Guidelines support the allegation that Defendants utilized the HDA to form agreements about their approach to their duties under the CSA.  As John M. Gray, President/CEO of the HDA stated to the Energy and Commerce Subcommittee on Health in April 2014, is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."  Here, it is apparent that all of the Defendants found the same balance – an overwhelming pattern and practice of failing to identify, report or halt suspicious orders, and failure to prevent diversion.

510.    The Defendants' scheme had a decision-making structure driven by the Manufacturer Defendants and corroborated by the Distributor Defendants.  The Manufacturer Defendants worked together to control the state and federal government's response to the

156

manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion, to identify suspicious orders, to report suspicious orders to the DEA, or to take steps to halt the suspicious orders.

511. The Defendants worked together to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution. The Manufacturer Defendants and Distributor Defendants did this through their participation in the PCF and HDA.

512. The Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had no basis for refusing to increase or decrease production quotas due to diversion.

513. The Defendants also had reciprocal obligations under the CSA to report suspicious orders of other parties if they became aware of them. Defendants were thus collectively responsible for each other's compliance with their reporting obligations.

514. Defendants thus knew that their own conduct could be reported by other distributors or manufacturers and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Defendants had an incentive to communicate with each other about the reporting of suspicious orders to ensure consistency in their dealings with DEA.

515. The desired consistency was achieved. As described below, none of the Defendants reported suspicious orders and the flow of opioids continued unimpeded.

4.      **Defendants Kept Careful Track of Prescribing Data and Knew About Diversion and Suspicious Orders and Prescribers.**

516.    Publicly available information confirms that the Manufacturer Defendants and Distributor Defendants funneled far more opioids into communities across the United States than could have been expected to serve legitimate medical use and ignored other red flags of suspicious orders.  This information, along with the information known only to the Manufacturer Defendants and Distributor Defendants, would have alerted them to likely signs of diversion and potentially suspicious orders of opioids.

517.    This information includes the following facts:

a.      Distributors and manufacturers have access to detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

b.      Manufacturers make use of that data to target their marketing and, for that purpose, regularly monitor the activity of doctors and pharmacies;

c.      Manufacturers and distributors regularly visit pharmacies and doctors to promote and provide their products and services, which allows them to observe red flags of diversion, as described in paragraphs 186 and 200;

d.      Distributor Defendants together account for approximately 90% of all revenues from prescription drug distribution in the United States, and each plays such a large part in the distribution of opioids that its own volume provides a ready vehicle for measuring the overall flow of opioids into a pharmacy or geographic area; and

e.      Manufacturer Defendants purchased chargeback data (in return for discounts to Distributor Defendants) that allowed them to monitor the combined flow of opioids into a pharmacy or geographic area.

518.    The conclusion that Defendants were on notice of the problems of abuse and diversion follows inescapably from the fact that they flooded communities with opioids in quantities that they knew or should have known exceeded any legitimate market for opioids – even the wider market for chronic pain.

519.    At all relevant times, the Defendants were in possession of national, regional, state, and local prescriber-and patient-level data that allowed them to track prescribing patterns over time.  They obtained this information from data companies, including but not limited to: IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science, and all of their predecessors or successors in interest (the "Data Vendors").

520.    The Distributor Defendants developed "know your customer" questionnaires and files.  This information, compiled pursuant to comments from the DEA in 2006 and 2007 was intended to help the Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[175]  The "know your customer" questionnaires informed the Defendants of the number of pills that the pharmacies sold, how many non-controlled substances were sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

521.    Defendants purchased nationwide, regional, state, and local prescriber- and patient-level data from the Data Vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc.  The Data Vendors'

---

[175] *Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances*, Drug Enforcement Admin. Diversion Control Div.,  https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf; Richard Widup, Jr., Kathleen H. Dooley, Esq. *Pharmaceutical Production Diversion: Beyond the PDMA,* Purdue Pharma and McGuireWoods LLC (Oct. 2010),  https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf.

information purchased by the Defendants allowed them to view, analyze, compute, and track their competitors' sales, and to compare and analyze market share information.[176]

522. IMS Health, for example, provided Defendants with reports detailing prescriber behavior and the number of prescriptions written between competing products.[177]

523. Similarly, Wolters Kluwer, an entity that eventually owned data mining companies that were created by McKesson (Source) and Cardinal Health (ArcLight), provided the Defendants with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs, and analyzed the market share of those drugs.[178]

524. This information allowed the Defendants to track and identify instances of overprescribing. In fact, one of the Data Vendors' experts testified that the Data Vendors' information could be used to track, identify, report and halt suspicious orders of controlled substances.[179]

525. Defendants were, therefore, collectively aware of the suspicious orders that flowed daily from their manufacturing and distribution facilities.

526. Defendants refused to maintain effective controls to prevent diversion, and refused to identify, investigate and report suspicious orders to the DEA when they became aware of the same, despite their actual knowledge of drug diversion rings. For instance, as described in detail

---

[176] A Verispan representative testified that the Supply Chain Defendants use the prescribing information to "drive market share." *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 661712, *9-10 (Feb. 22, 2011).

[177] Paul Kallukaran & Jerry Kagan, *Data Mining at IMS HEALTH: How We Turned a Mountain of Data into a Few Information-Rich Molehills*, (accessed on February 15, 2018), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.198.349&rep=rep1&type=pdf. , Figure 2 at p.3.

[178] Joint Appendix in *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 705207, *467-471 (Feb. 22, 2011).

[179] In *Sorrell*, expert Eugene "Mick" Kolassa testified, on behalf of the Data Vendor, that "a firm that sells narcotic analgesics was able to use prescriber-identifiable information to identify physicians that seemed to be prescribing an inordinately high number of prescriptions for their product." *Id*; *see also* Joint Appendix in *Sorrell v. IMS Health*, No. 10-779, 2011 WL 687134, at *204 (Feb. 22, 2011).

below, Defendants refused to identify suspicious orders and diverted drugs despite the DEA

issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008

and 2012[180] and 117 recommended decisions in registrant actions from The Office of

Administrative Law Judges.  These numbers include seventy-six (76) actions involving orders to

show cause and forty-one (41) actions involving immediate suspension orders, all for failure to

report suspicious orders.[181]

527.    Sales representatives were also aware that the prescription opioids they were

promoting were being diverted, often with lethal consequences. As a sales representative wrote on

a public forum:

> Actions have consequences – so some patient gets Rx'd the 80mg
> OxyContin when they probably could have done okay on the 20mg
> (but their doctor got "sold" on the 80mg) and their teen
> son/daughter/child's teen friend finds the pill bottle and takes out a
> few 80's... next they're at a pill party with other teens and some kid
> picks out a green pill from the bowl... they go to sleep and don't
> wake up (because they don't understand respiratory depression)
> Stupid decision for a teen to make...yes... but do they really deserve
> to die?

528.    Moreover, Defendants' sales incentives rewarded sales representatives who

happened to have pill mills within their territories, enticing those representatives to look the other

way even when their in-person visits to such clinics should have raised numerous red flags. In one

example, a pain clinic in South Carolina was diverting massive quantities of OxyContin. People

traveled to the clinic from towns as far as 100 miles away to get prescriptions, the DEA's diversion

unit raided the clinic, and prosecutors eventually filed criminal charges against the doctors. But

Purdue's sales representative for that territory, Eric Wilson, continued to promote OxyContin sales

---

[180] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

[181] *Id.*

at the clinic. He reportedly told another local physician that this clinic accounted for 40% of the OxyContin sales in his territory. At that time, Wilson was Purdue's top-ranked sales representative.[182] In response to news stories about this clinic, Purdue issued a statement, declaring that "if a doctor is intent on prescribing our medication inappropriately, such activity would continue regardless of whether we contacted the doctor or not."[183]

529.     In another example, a Purdue sales manager informed her supervisors in 2009 about a suspected pill mill in Los Angeles, reporting over email that when she visited the clinic with her sales representative, "it was packed with a line out the door, with people who looked like gang members," and that she felt "very certain that this an organized drug ring[.]"[184] She wrote, "This is clearly diversion. Shouldn't the DEA be contacted about this?" But her supervisor at Purdue responded that while they were "considering all angles," it was "really up to [the wholesaler] to make the report."[185] This pill mill was the source of 1.1 million pills trafficked to Everett, Washington, a city of around 100,000 people. Purdue waited until after the clinic was shut down in 2010 to inform the authorities.

530.     A Kadian prescriber guide discusses abuse potential of Kadian. It is full of disclaimers that Actavis has not done any studies on the topic and that the guide is "only intended to assist you in forming your own conclusion." However, the guide includes the following statements: 1) "unique pharmaceutical formulation of KADIAN may offer some protection from extraction of morphine sulfate for intravenous use by illicit users," and 2) "KADIAN may be less

---

[182] Meier, *supra*, at 298-300.

[183] *Id.*

[184] Harriet Ryan et al., *More Than 1 million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, LOS ANGELES TIMES (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2// 

[185] *Id.*

likely to be abused by health care providers and illicit users" because of "Slow onset of action," "Lower peak plasma morphine levels than equivalent doses of other formulations of morphine," "Long duration of action," and "Minimal fluctuations in peak to trough plasma levels of morphine at steady state." The guide is copyrighted by Actavis in 2007, before Actavis officially purchased Kadian from Alpharma.

531.    Defendants' obligations to maintain effective controls against diversion and to report suspicious prescribing ran head on into their marketing strategy.  Defendants did identify doctors who were their most prolific prescribers, not to report them, but to market to them.  It would make little sense to focus on marketing to doctors who may be engaged in improper prescribing only to report them to law enforcement, nor to report those doctors who drove Defendants' sales.

532.    Defendants purchased data from IMS Health (now IQVIA) or other proprietary sources to identify doctors to target for marketing and to monitor their own and competitors' sales. Marketing visits were focused on increasing, sustaining, or converting the prescriptions of the biggest prescribers, particularly through aggressive, high frequency detailing visits.

533.    For example, at a national sales meeting presentation in 2011, Actavis pressed its sales representatives to focus on its high prescribers: "To meet and exceed our quota, we must continue to get Kadian scripts from our loyalists. MCOs will continue to manage the pain products more closely. We MUST have new patient starts or we will fall back into 'the big leak'. We need to fill the bucket faster than it leaks." "The selling message should reflect the opportunity and prescribing preferences of each account. High Kadian Writers / Protect and Grow/ Grow = New Patient Starts and Conversions." In an example of how new patients + a high volume physician

can impact performance: "102% of quota was achieved by just one high volume physician initiating Kadian on 2-3 new patients per week."

534.     This focus on marketing to the highest prescribers had two impacts.  First, it demonstrates that manufacturers were keenly aware of the doctors who were writing large quantities of opioids.  But instead of investigating or reporting those doctors, Defendants were singularly focused on maintaining, capturing, or increasing their sales.

535.     Whenever examples of opioid diversion and abuse have drawn media attention, Purdue and other Manufacturer Defendants have consistently blamed "bad actors." For example, in 2001, during a Congressional hearing, Purdue's attorney Howard Udell answered pointed questions about how it was that Purdue could utilize IMS Health data to assess their marketing efforts but not notice a particularly egregious pill mill in Pennsylvania run by a doctor named Richard Paolino. Udell asserted that Purdue was "fooled" by the doctor: "The picture that is painted in the newspaper [of Dr. Paolino] is of a horrible, bad actor, someone who preyed upon this community, who caused untold suffering. And he fooled us all. He fooled law enforcement. He fooled the DEA. He fooled local law enforcement. He fooled us."[186]

536.     But given the closeness with which Defendants monitored prescribing patterns through IMS Health data, it is highly improbable that they were "fooled." In fact, a local pharmacist had noticed the volume of prescriptions coming from Paolino's clinic and alerted authorities. Purdue had the prescribing data from the clinic and alerted no one.  Indeed, a Purdue executive referred to Purdue's tracking system and database as a "gold mine" and acknowledged that Purdue could identify highly suspicious volumes of prescriptions.

---

[186] Meier, *supra*, at 179.

164

537.    As discussed below, Endo knew that Opana ER was being widely abused.  Yet, the New York Attorney General revealed, based on information obtained in an investigation into Endo, that Endo sales representatives were not aware that they had a duty to report suspicious activity and were not trained on the company's policies or duties to report suspicious activity, and Endo paid bonuses to sales representatives for detailing prescribers who were subsequently arrested for illegal prescribing.

538.    Sales representatives making in-person visits to such clinics were likewise not fooled. But as pill mills were lucrative for the manufacturers and individual sales representatives alike, Manufacturer Defendants and their employees turned a collective blind eye, allowing certain clinics to dispense staggering quantities of potent opioids and feigning surprise when the most egregious examples eventually made the nightly news.

**5.      Defendants Failed to Report Suspicious Orders or Otherwise Act to Prevent Diversion.**

539.    As discussed above, Defendants failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids following into communities across America. Despite the notice described above, and in disregard of their duties, Defendants continued to pump massive quantities of opioids despite their obligations to control the supply, prevent diversion, report and take steps to halt suspicious orders.

540.    Governmental agencies and regulators have confirmed (and in some cases Defendants have admitted) that Defendants did not meet their obligations and have uncovered especially blatant wrongdoing.

541.    For example, on January 5, 2017, McKesson entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150 million civil penalty for, inter alia, failure to identify and report suspicious orders at its facilities in Aurora, CO; Aurora, IL;

Delran, NJ; LaCrosse, WI; Lakeland FL; Landover, MD; La Vista, NE; Livonia, MI; Methuen, MA; Santa Fe Springs, CA; Washington Courthouse, OH; and West Sacramento, CA. McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters."

542.    McKesson further admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations, 21 C.F.R. Part 1300 et seq., at the McKesson Distribution Centers" throughout the United States.  Due to these violations, McKesson agreed to a partial suspension of its authority to distribute controlled substances from certain of its facilities some of which, investigators found "were supplying pharmacies that sold to criminal drug rings."

543.    Similarly, in 2017, the Department of Justice fined Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.  The government alleged that "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances – orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."

544.    On December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the Controlled Substances Act in Maryland, Florida and New

York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA.  In the settlement agreement, Cardinal Health admitted, accepted, and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to:

a.  "timely identify suspicious orders of controlled substances and inform the DEA of those orders, as required by 21 C.F.R. §1301.74(b)";

b.  "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. §1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. §842(a)(5)"; and

c.  "execute, fill, cancel, correct, file with the DEA, and otherwise handle DEA 'Form 222' order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. §828 and 21 C.F.R. Part 1305."

545.    In 2012, the State of West Virginia sued AmerisourceBergen and Cardinal Health, as well as several smaller wholesalers, for numerous causes of action, including violations of the CSA, consumer credit and protection, and antitrust laws and the creation of a public nuisance. Unsealed court records from that case demonstrate that AmerisourceBergen, along with McKesson and Cardinal Health, together shipped 423 million pain pills to West Virginia between 2007 and 2012.   AmerisourceBergen itself shipped 80.3 million hydrocodone pills and 38.4 million oxycodone pills during that time period.  These quantities alone are sufficient to show that the Defendants failed to control the supply chain or to report and take steps to halt suspicious orders. In 2016, AmerisourceBergen agreed to settle the West Virginia lawsuit for $16 million to the state; Cardinal Health settled for $20 million.

546.    H.D. Smith has also routinely been found to have violated its duties to report suspicious orders and halt suspicious shipments of prescription opioids.  According to a recent letter from the U.S. House of Representatives Committee on Energy and Commerce, data provided to the Committee showed that between 2007 and 2008, H.D. Smith provided two pharmacies in

Williamson, WV, a town with a population of 3,191, combined total of nearly 5 million hydrocodone and oxycodone pills - approximately 1,565 hydrocodone and oxycodone pills for every man, woman, and child in Williamson, WV.[187]  According to press reports, H.D. Smith distributed approximately 13.7 million hydrocodone and 4.4 million oxycodone pills to West Virginia between 2007 and 2012.[188]  Press accounts further indicate that H.D. Smith did not submit any suspicious order reports to the state for at least a decade.[189]

547.    Thus, it is the various governmental agencies who have alleged or found—and the Defendants themselves who have admitted—that the Defendants, acting in disregard of their duties, pumped massive quantities of opioids into communities around the country despite their obligations to control the supply, prevent diversions, and report and take steps to halt suspicious orders.

### 6.    Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement.

548.    When a manufacturer or distributor does not report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse.  This, in turn, fuels and expands the illegal market and results in opioid-related overdoses.  Without reporting and without maintaining effective controls against diversion by those involved in the supply chain, law enforcement may be delayed in taking action – or may not know to take action at all.

---

[187] *See* January 26, 2018 Letter to J. Christopher Smith, President and CEO, H.D. Smith, from the House Committee on Energy and Commerce.

[188] Eric Eyre, *Drug wholesaler agrees to pay $3.5M to settle WV lawsuit,* Charleston Gazette-Mail, Jan. 3, 2017 available at https://www.wvgazettemail.com/news/health/drug-wholesaler-agrees-to-pay-m-to-settle-wv-lawsuit/article_4e8c7f4c-cec5-5173-a199-c19374a6250c.html

[189] *Id.*

549.    After being caught for failing to comply with particular obligations at particular facilities, Distributor Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens.  As part of McKesson's 2008 Settlement with the DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future," including specific measures delineated in a "Compliance Addendum" to the Settlement.  Yet, in 2017, McKesson paid $150 million to resolve an investigation by the U.S. DOJ for again failing to report suspicious orders of certain drugs, including opioids.  Even though McKesson had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though McKesson had specifically agreed in 2008 that it would no longer violate those obligations, McKesson continued to violate the laws in contrast to its written agreement not to do so.

550.    More generally, the Distributor Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs.  For example, Defendant Cardinal claims that: "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."  Defendant Cardinal likewise claims to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse."  Along the same lines, it claims to "maintain a sophisticated, state-of-the-art program to identify, block and report to regulators those orders of prescription controlled medications that do not meet [its] strict criteria."  Defendant Cardinal also promotes funding it provides for "Generation Rx," which funds grants related to prescription drug misuse.  A Cardinal executive recently claimed that Cardinal uses "advanced

analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

551.    Along the same lines, Defendant McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent diversion.  Defendant McKesson has also publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

552.    Defendant AmerisourceBergen, too, has taken the public position that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A company spokeswoman also provided assurance that: "At AmerisourceBergen, we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."

553.    Moreover, in furtherance of their effort to affirmatively conceal their conduct and avoid detection, the Defendants, through their trade associations, HDMA and NACDS, filed an *amicus* brief in *Masters Pharmaceuticals*, which made the following statements:[190]

> a.    "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."
>
> b.    "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders

---

[190] Brief for HDMA and NACDS, *Masters Pharms., Inc. v. U.S. Drug Enf't Admin.,* Case No 15-1335, 2016 WL 1321983, (D.C. Cir. April 4, 2016) at *3-4, *25.

based on the generalized information that *is* available to them in the ordering process."

554.    Through the above statements made on their behalf by their trade associations, and other similar statements assuring their continued compliance with their legal obligations, the Defendants not only acknowledged that they understood their obligations under the law, but they further affirmed that their conduct was in compliance with those obligations.

555.    Defendant Mallinckrodt similarly claims to be "committed. . . to fighting opioid misuse and abuse," and further asserts that: "In key areas, our initiatives go beyond what is required by law.  We address diversion and abuse through a multidimensional approach that includes educational efforts, monitoring for suspicious orders of controlled substances, . . . ."

556.    Other Manufacturer Defendants also misrepresented their compliance with their legal duties and their cooperation with law enforcement.  Purdue serves as a hallmark example of such wrongful conduct.  Purdue deceptively and unfairly failed to report to authorities illicit or suspicious prescribing of its opioids, even as it has publicly and repeatedly touted its "constructive role in the fight against opioid abuse," including its commitment to ADF opioids and its "strong record of coordination with law enforcement."[191]

557.    At the heart of Purdue's public outreach is the claim that it works hand-in-glove with law enforcement and government agencies to combat opioid abuse and diversion.  Purdue has consistently trumpeted this partnership since at least 2008, and the message of close cooperation is in virtually all of Purdue's recent pronouncements in response to the opioid abuse.

---

[191]    Purdue, *Setting The Record Straight On OxyContin's FDA-Approved Label*, May 5, 2016, http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-oxycontins-fda-approved-label/; *Setting The Record Straight On Our Anti-Diversion Programs*, Purdue Pharma (July 11, 2016), http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-our-anti-diversion-programs/.

558.    Touting the benefits of ADF opioids, Purdue's website asserts: "[W]e are acutely aware of the public health risks these powerful medications create . . . . That's why we work with health experts, law enforcement, and government agencies on efforts to reduce the risks of opioid abuse and misuse . . . ."[192]  Purdue's statement on "Opioids Corporate Responsibility" likewise states that "[f]or many years, Purdue has committed substantial resources to combat opioid abuse by partnering with . . . communities, law enforcement, and government."[193]  And, responding to criticism of Purdue's failure to report suspicious prescribing to government regulatory and enforcement authorities, the website similarly proclaims that Purdue "ha[s] a long record of close coordination with the DEA and other law enforcement stakeholders to detect and reduce drug diversion."[194]

559.    These public pronouncements create the misimpression that Purdue is proactively working with law enforcement and government authorities nationwide to root out drug diversion, including the illicit prescribing that can lead to diversion.  It aims to distance Purdue from its past conduct in deceptively marketing opioids and make its current marketing seem more trustworthy and truthful.

560.    Public statements by the Defendants and their associates created the false and misleading impression to regulators, prescribers, and the public that the Defendants rigorously carried out their legal duties, including their duty to report suspicious orders and exercise due

---

[192]  *Opioids With Abuse-Deterrent Properties*, Purdue Pharma, http://www.purduepharma.com/healthcare-professionals/responsible-use-of-opioids/opioids-with-abuse-deterrent-properties/.

[193]  *Opioids & Corporate Responsibility*, Purdue Pharma http://www.purduepharma.com/news-media/opioids-corporate-responsibility/.

[194]  *Setting The Record Straight On Our Anti-Diversion Programs*, Purdue Pharma (July 11, 2016), http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-our-anti-diversion-programs/. Contrary to its public statements, Purdue seems to have worked behind the scenes to push back against law enforcement.

diligence to prevent diversion of these dangerous drugs, and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact.

### 7. The National Retail Pharmacies Were on Notice of and Contriubted to Illegal Diversion of Prescription Opioids.

561.    National retail pharmacy chains earned enormous profits by flooding the country with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries.  Yet, instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it.

562.    Each of the National Retail Pharmacies does substantial business throughout the United States. This business includes the distribution and dispensing of prescription opioids.

563.    The National Retail Pharmacies failed to take meaningful action to stop this diversion despite their knowledge of it, and contributed substantially to the diversion problem.

564.    The National Retail Pharmacies developed and maintained extensive data on opioids they distributed and dispensed.  Through this data, National Retail Pharmacies had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country.  They used the data to evaluate their own sales activities and workforce.  On information and belief, the National Retail Pharmacies also provided Defendants with data regarding, *inter alia*, individual doctors in exchange for rebates or other forms of consideration. The National Retail Pharmacies' data is a valuable resource that they could have used to help stop diversion but failed to do so.

#### a.    The National Retail Pharmacies Have a Duty to Prevent Diversion

565. Each participant in the supply chain of opioid distribution, including the National Retail Pharmacies, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

566. Under federal law, the National Retail Pharmacies, like manufacturers and other distributors, are registrants under the CSA. 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." See 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Because pharmacies themselves are registrants under the CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

567. Under Illinois law, the National Retail Pharmacies are included under the definition of "wholesale drug distributor" and "wholesale distributor" by way of conducting wholesale distribution. *See* 225 ILCS 120/15; Ill. Admin. Code Title 68, § 1510.10. As a result, they are subject to the same licensing requirements with the Illinois Department of Financial and Professional Regulation as all other drug distributors (*see* 225 ILCS 120/25; Ill. Admin. Code Title 68, § 1510.20, as well as the same duties to provide effective controls, procedures and security to guard against the theft and diversion of opioid drugs. See 720 ILCS 570/201(h); Ill. Admin. Code Title 68, § 1510.50(b)(3).

568. The DEA, among others, has provided extensive guidance to National Retail Pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion.

569.     Suspicious pharmacy orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

570.     Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwriting. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies.

571.     Suspicious pharmacy orders are red flags for, if not direct evidence of, diversion.

572.     Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the National Retail Pharmacies themselves.  That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

573.     According to industry standards, if a pharmacy finds evidence of prescription diversion, the DEA and State local authorities must be contacted.

574.     Despite their legal obligations as registrants under the CSA, the National Retail Pharmacies allowed widespread diversion to occur—and they did so knowingly.

575.    Performance metrics and prescription quotas adopted by the National Retail Pharmacies for their retail stores contributed to their failure. Under CVS's Metrics System, for example, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations.  There is no measurement for pharmacy accuracy or customer safety.  Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year.  The result is both deeply troubling and entirely predictable: opioids flowed out of National Retail Pharmacies and into communities throughout the country.  The policies remained in place even as the epidemic raged.

576.    Upon information and belief, this problem was compounded by the National Retail Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills supplied for the purpose of illegal diversion and drug trafficking.

577.    Upon information and belief, the National Retail Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

578.    Upon information and belief, the National Retail Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the

pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

579.    Upon information and belief, the National Retail Pharmacies also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

580.    Upon information and belief, the National Retail Pharmacies also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

581.    The National Retail Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

### b.    Multiple Enforcement Actions Against the National Retail Pharmacies Confirms Their Compliance Failures

582.    The National Retail Pharmacies have long been on notice of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the National Retail Pharmacies have been repeatedly penalized for their illegal prescription opioid practices. Upon information and belief, based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and practices of the National Retail Pharmacies.

### i.    CVS

583.    CVS is one of the largest companies in the world, with annual revenue of more than $150 billion.  According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants, CVS sought profits over people.

584.    CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

585.    As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[195]

586.    This fine was preceded by numerous others throughout the country.

587.    In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.[196]

---

[195] Press Release, U.S. Attorney's Office E. Dist. of Cal., *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. Dep't of Just. (July 11, 2017), https://www.justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violations-controlled-substance-act.

[196] Press Release, U.S. Attorney's Office Dist. of Md., *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. Dep't of Just. (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawful-distribution-controlled.

588.    In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.[197]

589.    In September 2016, CVS entered into a $795,000 settlement with the West Virginia Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.[198]

590.    In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.[199]

591.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted

---

[197] Press Release, U.S. Attorney's Office Dist. of Conn., *CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations*, U.S. Dep't of Just. (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-act-allegations.

[198] Dialynn Dwyer, *CVS Will Pay 4795,000, Strengthen Policies Around Dispensing Opioids in Agreement With State*, Boston.com (Sept. 1, 2016), https://www.boston.com/news/local-news/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-in-agreement-with-state.

[199] Press Release, U.S. Attorney's Office Dist. of Mass., *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacists Filled Fake Prescriptions*, U.S. Dep't of Just. (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions.

to prescribe that drug.  Additionally, the government alleged that CVS had recordkeeping deficiencies.[200]

592.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."[201]

593.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.[202]

594.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.[203]

---

[200] Press Release, U.S. Attorney's Office Dist. of R.I., Drug Diversion Claims Against CVS Health Corp. Resolved With $450,000 Civil Settlement, U.S. Dep't of Just. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

[201] Press Release, U.S. Attorney's Office M. Dist. of Fla., United States Reaches $22 Million Settlement Agreement With CVS For Unlawful Distribution of Controlled Substances, U.S. Dep't of Just. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

[202] Patrick Danner, H-E-B, CVS Fined Over Prescriptions, San Antonio Express-News (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVS-fined-over-prescriptions-5736554.php.

[203] Andrew Knittle, *Oklahoma Pharmacy Board Stays Busy, Hands Out Massive Fines at Times*, NewsOK (May 3, 2015), http://newsok.com/article/5415840.

595.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[204]

### ii.    Walgreens

596.    Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion.  According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

597.    Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription opioids to be diverted for abuse and illegal black-market sales.[205]

598.    The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

599.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly

---

[204]  Press Release, U.S. Attorney's Office W. Dist. of Okla., CVS to Pay $11 Million To Settle Civil Penalty Claims Involving Violations of Controlled Substances Act, U.S. Dep't of Just. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled.

[205]  Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act*, U.S. Dep't of Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled.

ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.[206]

600.    They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the CSA or the health of communities.[207]

601.    Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.[208]

---

[206] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf't Admin. Sept. 13, 2012).

[207] *Id.*

[208] *Id.*

602.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[209]

603.    The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

604.    In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[210]

605.    Numerous state and federal drug diversion prosecutions have occurred in which prescription opioid pills were procured from National Retail Pharmacies.  The allegations in this Complaint do not attempt to identify all these prosecutions, and the information above is merely by way of example.

606.    The litany of state and federal actions against the National Retail Pharmacies demonstrate that they routinely, and as a matter of standard operating procedure, violated their legal obligations under the CSA, Illinois law, and other laws and regulations that govern the distribution and dispensing of prescription opioids.

607.    Throughout the country and in Illinois in particular, the National Retail Pharmacies were or should have been aware of numerous red flags of potential suspicious activity and diversion.

---

[209] *Walgreens to Pay $200,000 Settlement for Lapses with Opioids*, APhA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.

[210] *Id.*

608.    On information and belief, from the catbird seat of their retail pharmacy operations, the National Retail Pharmacies knew or reasonably should have known about the disproportionate flow of opioids into Illinois and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for if not direct evidence of illicit supply and diversion.  Additional information was provided by news reports, and state and federal regulatory actions, including prosecutions of pill mills in the area.

609.    On information and belief, the National Retail Pharmacies knew or reasonably should have known about the devastating consequences of the oversupply and diversion of prescription opioids, including spiking opioid overdose rates in the community.

610.    On information and belief, because of (among other sources of information) regulatory and other actions taken against the National Retail Pharmacies directly, actions taken against others pertaining to prescription opioids obtained from their retail stores, complaints and information from employees and other agents, and the massive volume of opioid prescription drug sale data that they developed and monitored, the National Retail Pharmacies were well aware that their distribution and dispensing activities fell far short of legal requirements.

611.    The National Retail Pharmacies' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids.

**F. The Opioids the Defendants Sold Migrated into Other Jurisdictions**

612.    As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

613.    First, prescriptions written in one state would, under some circumstances, be filled in a different state.  But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another.

614.    When authorities in states such as Ohio and Kentucky cracked down on opioid suppliers, out-of-state suppliers filled the gaps.  Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills.  Residents of Illinois and other states would simply fly or drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell.  The practice became so common that authorities dubbed these individuals "prescription tourists."

615.    The facts surrounding numerous criminal prosecutions illustrate the common practice.  For example, one man from Warren County, Ohio, sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription for 180 pills from a quick appointment in West Palm Beach, and that back home, people were willing to pay as much as $100 a pill—ten times the pharmacy price.[211]  In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the "oxycodone pipeline between Ohio and Florida."[212]  When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash.  In 2015, another Columbus man was sentenced for the same

---

[211] Andrew Welsh-Huggins, *'Prescription Tourists' Thwart States' Crackdown on Illegal Sale of Painkillers*, NBC News (July 8, 2012), http://www.nbcnews.com/id/48111639/ns/us_news-crime_and_courts/t/prescription-tourists-thwart-states-crackdown-illegal-sale-painkillers/#. WtdyKE2Wy71.

[212] *16 Charged in Pill Mill Pipeline*, Columbus Dispatch (June 7, 2011), http://www.dispatch.com/content/stories/loal/2011/06/07/16-charged-in-pill-mill-pipeline.html.

conduct—paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. District Judge Michael Watson, contributing to a "pipeline of death."[213]

616.     Outside of Atlanta, Georgia, four individuals pled guilty in 2015 to operating a pill mill; the U.S. attorney's office found that most of the pain clinic's customers came from other states, including North Carolina, Kentucky, Tennessee, Ohio, South Carolina, and Florida.[214] Another investigation in Atlanta led to the 2017 conviction of two pharmacists who dispensed opioids to customers of a pill mill across from the pharmacy; many of those customers were from other states, including Ohio and Alabama.[215]

617.     In yet another case, defendants who operated a pill mill in south Florida within Broward County tried in eastern Kentucky based on evidence that large numbers of customers transported oxycodone back to the area for both use and distribution by local drug trafficking organizations.  As explained by the Sixth Circuit in its decision upholding the venue decision, "[d]uring its existence, the clinic generated over $10 million in profits.  To earn this sum required more business than the local market alone could provide.  Indeed, only about half of the [Pain Center of Broward's] customers came from Florida.  Instead, the clinic grew prosperous on a flow of out-of-state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio, Georgia, and West Virginia."[216]  The court further noted that

---

[213] *Leader of Ohio Pill Mill Trafficking Scheme Sentenced*, Star Beacon (July 16, 2015), http://www.starbeacon.com/news/leader-of-ohio-pill-mill-trafficking-scheme-sentenced/article_5fb058f5-deb8-5963-b936-d71c279ef17c.html.

[214] Press Release, U.S. Dep't of Just., U.S. Atty's Off., Northern District of Ga., Four Defendants Plead Guilty to Operating a "Pill Mill" in Lilburn, Georgia (May 14, 2015), https://www.justice.gov/usao-ndga/pr/four-Defendants-plead-gulity-operating-pill-mill-lilburn-georgia.

[215] Press Release, U.S Dep't of Just., U.S. Atty's Off., Northern District of Ga, Two Pharmacists Convicted for Illegally Dispensing to Patients of a Pill Mill (Mar. 29, 2017), https://gdna.georgia.gov/press-releases/2017-03-30/two-pharmacists-convicted-illegally-dispensing-patients-pill-mill.

[216] *United States v. Elliott*, 876 F.3d 855, 858 (6th Cir. 2017).

the pill mill "gained massive financial benefits by taking advantage of the demand for oxycodone by Kentucky residents."[217]

618.    The route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so well traveled that it became known as the Blue Highway, a reference to the color of the 30mg Roxicodone pills manufactured by Mallinckrodt.[218]  Eventually, as police began to stop vehicles with certain out-of-state tags cruising north on I-75, the prescription tourists adapted.  They rented cars just over the Georgia state line to avoid the telltale out-of-state tag.[219]  If they were visiting multiple pill mills on one trip, they would stop at FedEx between clinics to mail the pills home and avoid the risk of being caught with multiple prescriptions if pulled over.[220]  Or they avoided the roads altogether:  Allegiant Air, which offered several flights between Appalachia and Florida, was so popular with drug couriers that it was nicknamed the "Oxy Express."[221]

619.    While the I-75 corridor was well utilized, prescription tourists also came from other states.  The director of the Georgia drugs and narcotics agency observed that visitors to Georgia pill mills come from as far away as Arizona and Nebraska.[222]

620.    Similar pipelines developed in other regions of the country.  For example, the I-95 corridor was another transport route for prescription pills.  As the director of the Maine Drug Enforcement Agency explained, the oxycodone in Maine was coming up extensively from Florida,

---

[217] *Id.* at 861.

[218] John Temple, *American Pain* 171 (2016).

[219] *Id.* at 172.

[220] *Id.* at 171.

[221] *Id.*; *see also* Welsh-Huggins, *supra*. Note that Interstate 75 was also called as the Oxy Express; for example, the Peabody Award-winning documentary named *The OxyContin Express* focuses on the transport of prescription opioids along I-75.  https://www.youtube.com/watch?v=wGZEvXNqzkM.

[222] *The OxyContin Express.* YouTube (Feb. 26, 2014). http://www.youtube.com/watch?v=wGZEvXNqzkM.

Georgia and California.[223] Another similar pipeline developed in Michigan.  According to the FBI, Michigan plays an important role in the opioid epidemic in other states; opioids prescribed in Michigan are often trafficked down to West Virginia, Ohio, and Kentucky.[224]

621.    Along the West Coast, over a million pills were transported from the Lake Medical pain clinic in Los Angeles and cooperating pharmacies to the City of Everett, Washington.[225] Couriers drove up I-5 through California and Oregon, or flew from Los Angeles to Seattle.[226]  The Everett-based dealer who received the pills from southern California wore a diamond necklace in the shape of the West Coast states with a trail of green gemstones—the color of 80-milligram OxyContin—connecting Los Angeles and Washington state.[227]



### G. Illinois Specific Facts

622.    Illinois has been especially ravaged by the national opioid crisis.

---

[223] Nok-Noi Ricker, *Slaying of Florida Firefighter in Maine Puts Focus on Interstate 95 Drug Running*, Bangor Daily News (March 9, 2012), http://bangordailynews.com/2012/03/09/news/state/slaying-of-florida-firefighter-in-maine-puts-focus-on-interstate-95-drug-running.

[224] Julia Smillie, *Michigan's Opioid Epidemic Tackled From All Directions By Detroit FBI*, Workit Health (October 6, 2017), https://www.workithealth.com/blog/fbi-michigan-opioid-crisis

[225] Harriet Ryan et al., *How Black-Market Oxycontin Spurred a Town's Descent Into Crime, Addiction and Heartbreak*, Los Angeles Times (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-everett/.

[226] *Id.*

[227] *Id.*

623.    Illinois has been devastated by the opioid epidemic. In Illinois, more people died from an opioid drug overdose in 2014 than from homicide or motor vehicle accidents. Opioid drug overdoses killed 45% more people than homicide. Opioid drug overdoses killed 25% more people than motor vehicle crashes. And, opioid drug overdoses killed more people than gun-related causes.[228]

624.    In 2016 the opioid epidemic killed 1,889 Illinois residents, and from 2008 to 2014, the State saw a 274 percent increase in opioid-related overdose deaths.[229]

625.    Illinois is one of the States identified by the United States Center for Disease Control and Prevention (CDC) as having a statistically significant drug overdose death rate increase from 2014 to 2015, and from 2013 to 2014.[230] The percent increase from 2014 to 2015 was 7.6%, and the percent increase from 2013 to 2014 was 8.3%.[231]

**H. County Specific Facts**

626.    The opioid epidemic is occurring in The County. Union County is one of several counties in the southernmost part of Illinois that have been hardest hit by the State's opioid epidemic.[232] Prescriptions in the southern 16 counties of Illinois, which includes Union County,

---

[228] *See Prescription Opioids and Heroin*, Illinois Department of Public Health, available at http://www.dph.illinois.gov/topics-services/prevention-wellness/prescription-opioids-and-heroin (last visited Oct. 8, 2017). 25.

[229] Travis Morse, *Opioid victims speak out*, Mt. Vernon Register News, Oct. 13, 2017, available at http://www.register-news.com/news/opioid-victims-speak-out/article_674c5270-b063-11e7-9b59-cbeb0ceae992.html (last visited Oct. 25, 2017).

[230] Drug Overdose Death Data, CDC, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last visited Aug. 8, 2017).

[231] *Id.*

[232] Casey Bischel, *Opioid prescribing trends are worse in Southern Illinois*, Belleville News-Democrat, June 1, 2017, available at http://www.bnd.com/news/local/article153771384.html (last visited July 6, 2018); *see also Opioid Epidemic Hits Illinois Hardest in the Southern Region*, U.S. News, June 2, 2017, available at https://www.usnews.com/news/best-states/illinois/articles/2017-06-02/opioid-epidemic-hits-illinois-hardest-in-the-southern-region (last visited July 6, 2018).

grew thirty percent, from 2.16 to 2.75 per patient, from 2008 through 2016.[233] According to data compiled by the Illinois Prescription Monitoring Program, in 2016, Union County had the eighth highest county by county rank of Schedule II opioid prescriptions per patient in the State, at 2.75 prescriptions per patient.[234]

627.    The CDC has tracked prescription rates per county in the United States, identifying the geographic "hotspots" for rates of opioid prescriptions.[235] The CDC has calculated the geographic distribution at county levels of opioid prescriptions dispensed per 100 persons,[236] revealing that The County has been a consistent hotspot over at least the past decade.

628.    The CDC's statistics prove that the opioid prescription rates in The County have exceeded any legitimate medical, scientific, or industrial purpose. The overall opioid prescribing rate in 2016 was 66.5 prescriptions per 100 people.[237] However, in Union County, Illinois, the 2016 prescription rate was 159.4 per 100 people – a rate of more than one prescription for every person and nearly double the national rate.[238] Similarly, the Union County prescription rate was 163.5 per 100 people in 2015.[239]

629.    Unfortunately, the 2015 and 2016 high rates of opioid prescriptions were not an aberration for this County. Consistently, the opioid prescribing rates in The County have been in

---

[233] *Id.*

[234] *Id.*

[235] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[236] *Id.*

[237] *Id.*

[238]U.S.       County       Prescribing       Rates,       2016,       CDC       available       at https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html (last visited July 6, 2018).

[239]U.S.       County       Prescribing       Rates,       2015,       CDC,       available       at https://www.cdc.gov/drugoverdose/maps/rxcounty2015.html (last visited July 6, 2018).

excess of one prescription per person and significantly greater than the national average. Compared to a national average of 75.6 opioid prescriptions per 100 people in 2014,[240] the Union County opioid prescription rate was 162.9 per 100 people in 2014.[241] Compared to a national average of 78.1 opioid prescriptions per 100 people in 2013,[242] the opioid prescription rate in Union County was 160.9 per 100 people in 2013.[243] Compared to a national average of 81.3 opioid prescriptions per 100 people in 2012,[244] the opioid prescription rate in Union County was 163.8 per 100 people in 2012.[245] Compared to a national average of 80.9 opioid prescriptions per 100 people prescribed opioids in 2011,[246] the opioid prescription rate in Union County was 170.6 per 100 people in 2011.[247] Compared to a national average of 81.2 opioid prescriptions per 100 people prescribed opioids in 2010,[248] the Union County opioid prescription rate was 173.6 per 100 people in 2010.[249]

---

[240] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[241]U.S. County Prescribing Rates, 2014, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2014.html (last visited July 6, 2018).

[242] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[243]U.S. County Prescribing Rates, 2013, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2013.html (last visited July 6, 2018).

[244] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[245]U.S. County Prescribing Rates, 2012, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2012.html (last visited July 6, 2018).

[246] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[247]U.S. County Prescribing Rates, 2011, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2011.html (last visited July 6, 2018).

[248] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[249]U.S. County Prescribing Rates, 2010, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxcounty2010.html (last visited July 6, 2018).

Compared to a national average of 79.5 opioid prescriptions per 100 people in 2009,[250] the rate in Union County was 127.5 per 100 in 2009.[251] Compared to a national average of 78.2 opioid prescriptions per 100 people in 2008,[252] the Union County rate was 118.1 per 100 people in 2008.[253] Compared to a national average of 75.9 opioid prescriptions per 100 people in 2007,[254] the Union County rate was 115.1 per 100 people in 2007.[255] Compared to a national average of 72.4 opioid prescriptions per 100 people prescribed opioids in 2006,[256] the Union County rate was 123.78 per 100 people in 2006.[257]

630.     The instance of heroin and opioid-related deaths is a problem in the State and The County.

631.     The opioid epidemic has placed increased budgetary constraints upon *inter alia* the public health and medical care expenditures of the State and The County.

632.     Opioid addiction is a primary reason that Illinois citizens seek substance abuse treatment.  Thus, the epidemic has placed increased budgetary costs upon the State and The County's services and expenditures.

---

[250]   U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[251]U.S.         County         Prescribing         Rates,         2009,         CDC,         available         at https://www.cdc.gov/drugoverdose/maps/rxcounty2009.html (last visited July 6, 2018).

[252] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[253]U.S.         County         Prescribing         Rates,         2008,         CDC,         available         at https://www.cdc.gov/drugoverdose/maps/rxcounty2008.html (last visited July 6, 2018).

[254] U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[255]U.S.         County         Prescribing         Rates,         2007,         CDC,         available         at https://www.cdc.gov/drugoverdose/maps/rxcounty2007.html (last visited July 6, 2018).

[256]   U.S. Prescribing Rate Maps, CDC, available at https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html (last visited July 6, 2018).

[257]U.S.         County         Prescribing         Rates,         2006,         CDC,         available         at https://www.cdc.gov/drugoverdose/maps/rxcounty2006.html (last visited July 6, 2018).

633.     Criminal charges associated with the diversion of opioids have increased. This has placed increased budgetary costs upon the State and The County's criminal law enforcement expenses.

634.     Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and The County.

635.     Prescription opioid abuse, addiction, morbidity, and mortality are a temporary public nuisance in the State and The County, which remains unabated.

636.     Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in the State and The County.

637.     Heroin abuse, addiction, morbidity, and mortality are a temporary public nuisance in the State and The County, which remains unabated.

638.     To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[258]

639.     "A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain."[259]

---

[258] *See* Rose A. Rudd, MSPH, et al, *Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015*, Morbidity and Mortality Weekly Report (MMWR), Centers for Disease Control and Prevention, 65(50-51);1445–1452 (December 30, 2016).

[259] *See* Alexander GC, Frattaroli S, Gielen AC, eds. *The Prescription Opioid Epidemic: An Evidence-Based Approach*, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland: 2015, available at http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-injury-research-and-policy/publications-resources/CenterPubs/2015-prescription-opioid-epidemic-report.pdf  (last visited Aug. 10, 2017).

**I. The Defendants Conspired To Engage In The Wrongful Conduct Complained Of Herein and Intended To Benefit Both Independently and Jointly From Their Conspiracy**

**1.      Conspiracy Among Manufacturer Defendants.**

640.    The Manufacturer Defendants agreed among themselves to set up, develop, and fund an unbranded promotion and marketing network to promote the use of opioids for the management of pain in order to mislead physicians, patients, health care providers, and health care payors through misrepresentations and omissions regarding the appropriate uses, risks, and safety of opioids, to increase sales, revenue, and profit from their opioid products.

641.    This interconnected and interrelated network relied on the Manufacturer Defendants' collective use of unbranded marketing materials, such as KOLs, scientific literature, CMEs, patient education materials, and Front Groups developed and funded collectively by the Manufacturer Defendants intended to mislead consumers and medical providers of the appropriate uses, risks, and safety of opioids.

642.    The Manufacturer Defendants' collective marketing scheme to increase opioid prescriptions, sales, revenues and profits centered around the development, the dissemination, and reinforcement of nine false propositions:  (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition dubbed "pseudo addiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

643.    The Manufacturer Defendants knew that none of these propositions is true and that there was no evidence to support them.

644.    Each Manufacturer Defendant worked individually and collectively to develop and actively promulgate these nine false propositions in order to mislead physicians, patients, health care providers, and healthcare payors regarding the appropriate uses, risks, and safety of opioids.

645.    What is particularly remarkable about the Manufacturer Defendants' effort is the seamless method in which the Manufacturer Defendants joined forces to achieve their collective goal: to persuade consumers and medical providers of the safety of opioids, and to hide their actual risks and dangers.  In doing so, the Manufacturer Defendants effectively built a new – and extremely lucrative – opioid marketplace for their select group of industry players.

646.    The Manufacturer Defendants' unbranded promotion and marketing network was a wildly successful marketing tool that achieved marketing goals that would have been impossible to have been met by a single or even a handful of the network's distinct corporate members.

647.    For example, the network members pooled their vast marketing funds and dedicated them to expansive and normally cost-prohibitive marketing ventures, such as the creation of Front Groups.  These collaborative networking tactics allowed each Manufacturer Defendant to diversify its marketing efforts, all the while sharing any risk and exposure, financial and/or legal, with other Manufacturer Defendants.

648.    The most unnerving tactic utilized by the Manufacturer Defendants' network, was their unabashed mimicry of the scientific method of citing "references" in their materials.  In the scientific community, cited materials and references are rigorously vetted by objective unbiased and disinterested experts in the field, scientific method, and an unfounded theory or proposition would, or should, never gain traction.

649.    Manufacturer Defendants put their own twist on the scientific method: they worked together to manufacture wide support for their unfounded theories and propositions involving

opioids. Due to their sheer numbers and resources, the Manufacturer Defendants were able to create a false consensus through their materials and references.

650. An illustrative example of the Manufacturer Defendants' utilization of this tactic is the wide promulgation of the Porter & Jick Letter, which declared the incidence of addiction "rare" for patients treated with opioids. The authors had analyzed a database of hospitalized patients who were given opioids in a controlled setting to ease suffering from acute pain. These patients were *not* given long-term opioid prescriptions or provided opioids to administer to themselves at home, nor was it known how frequently or infrequently and in what doses the patients were given their narcotics. Rather, it appears the patients were treated with opioids for short periods of time under in-hospital doctor supervision.

651. Nonetheless, Manufacturer Defendants widely and repeatedly cited this letter as proof of the low addiction risk in connection with taking opioids in connection with taking opioids despite its obvious shortcomings. Manufacturer Defendants' egregious misrepresentations based on this letter included claims that less than one percent of opioid users became addicted.

652. Manufacturer Defendants' collective misuse of the Porter & Jick Letter helped the opioid manufacturers convince patients and healthcare providers that opioids were not a concern. The enormous impact of Manufacturer Defendants' misleading amplification of this letter was well documented in another letter published in the NEJM on June, 1, 2017, describing the way the one-paragraph 1980 letter had been irresponsibly cited and in some cases "grossly misrepresented." In particularly, the authors of this letter explained:

> [W]e found that a five-sentence letter published in the Journal in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crises by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy…

196

653.    By knowingly misrepresenting the appropriate uses, risks, and safety of opioids, the Manufacturer Defendants committed overt acts in furtherance of their conspiracy.

**2.    Conspiracy Among All Defendants.**

654.    In addition, and on an even broader level, all Defendants took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage. Defendants agreed among themselves to increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and supply of prescription opioids. Defendants did so to increase sales, revenue, and profit from their opioid products.

655.    The interaction and length of the relationships between and among the Defendants reflects a deep level of interaction and cooperation between Defendants in a tightly knit industry. The Manufacturer Defendants and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

656.    Defendants collaborated to expand the opioid market in an interconnected and interrelated network in a number of ways, including, for example, membership in the Healthcare Distribution Alliance ("HDA").

657.    Defendants utilized their membership in the HDA and other forms of collaboration to form agreements about their approach to their duties under the CSA to report suspicious orders. The Defendants overwhelmingly agreed on the same approach – to fail to identify, report or halt suspicious opioid orders, and fail to prevent diversion. Defendants' agreement to restrict reporting provided an added layer of insulation from DEA scrutiny for the entire industry as Defendants were thus collectively responsible for each other's compliance with their reporting obligations.

Defendants were aware, both individually and collectively, of the suspicious orders that flowed directly from Defendants' facilities.

658.    Defendants knew that their own conduct could be reported by other Defendants and that their failure to report suspicious orders or maintain effect controls against diversion could be brought to the DEA or State authority's attention. As a result, Defendants had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with the DEA and Illinois state authorities.

659.    The Defendants also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA or Illinois state authorities, in order to ensure that there was no basis for refusing to increase or decrease production quotas due to diversion.

660.    The desired consistency and collective end goal was achieved. Defendants achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

## J. Statutes Of Limitations Are Tolled and Defendants Are Estopped From Asserting Statutes Of Limitations As Defenses

### 1.    Continuing Conduct.

661.    Plaintiffs contend they continue to suffer harm from the unlawful actions by the Defendants.

662.    The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury.  The damages have not occurred all at once but have continued to occur and have increased as time progresses.  The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.  The wrongdoing and unlawful activity by Defendants has not ceased.  The public nuisance remains unabated.  The conduct causing the damages remains unabated.

2.      **Equitable Estoppel and Fraudulent Concealment.**

663.    Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiffs and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State and the County, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status with the DEA, and wholesale drug distributor license status with the State, and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State and the County, that they are working to curb the opioid epidemic.

664.    The Defendants were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

665.    As set forth herein, the Manufacturer Defendants deliberately worked through Front Groups purporting to be patient advocacy and professional organizations, through public relations companies hired to work with the Front Groups and through paid KOLs to secretly control messaging, influence prescribing practices and drive sales. The Manufacturer Defendants concealed their role in shaping, editing, and approving the content of prescribing guidelines, informational brochures, KOL presentations and other false and misleading materials addressing pain management and opioids that were widely disseminated to regulators, prescribers and the public at large. They concealed the addictive nature and dangers associated with opioid use and denied blame for the epidemic attributing it instead solely to abuse and inappropriate prescribing. They manipulated scientific literature and promotional materials to make it appear that misleading statements about the risks, safety and superiority of opioids were actually accurate, truthful, and

supported by substantial scientific evidence. Through their public statements, omissions, marketing, and advertising, the Manufacturer Defendants' deceptions deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

666.    Defendants also concealed from Plaintiffs the existence of Plaintiffs' claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that their legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers and the public, including Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims.

667.    Plaintiffs did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on jurisdiction, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

668.    The Manufacturer Defendants' campaign to misrepresent and conceal the truth about the opioid drugs that they were aggressively pushing in the Plaintiffs' Community deceived the medical community, consumers, the State and the County.

669.    Defendants intended that their actions and omissions would be relied upon, including by Plaintiffs.  Plaintiffs did not know, and did not have the means to know, the truth, due to Defendants' actions and omissions.

670.    Plaintiffs reasonably relied on Defendants' affirmative statements regarding their purported compliance with their obligations under the law and consent orders.  Furthermore, with

respect to co-conspirators, the general rule is that if the statute of limitation is tolled as to one defendant in a civil conspiracy, it is tolled as to all alleged co-conspirators.

### K. Facts Pertaining to Civil Penalties and Punitive Damages

671.   As set forth above, Defendants acted deliberately to increase sales of, and profits from, opioid drugs.  The Manufacturer Defendants knew there was no support for their claims that addiction was rare, that addiction risk could be effectively managed, that signs of addiction were merely "pseudo addiction," that withdrawal is easily managed, that higher doses pose no significant additional risks, that long-term use of opioids improves function, or that time-release or abuse-deterrent formulations would prevent addiction or abuse.  Nonetheless, they knowingly promoted these falsehoods in order to increase the market for their addictive drugs.

672.   All of the Defendants, moreover, knew that large and suspicious quantities of opioids were being poured into communities throughout the United States, yet, despite this knowledge, took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion.  Indeed as described above, Defendants acted in concert together to maintain high levels of quotas for their products and to ensure that suspicious orders would not be reported to regulators.

673.   Defendants' conduct was so willful and deliberate that it continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies.  Defendants paid their fines, made promises to do better, and continued on with their marketing and supply schemes.  This ongoing course of conduct knowingly, deliberately and repeatedly threatened and accomplished harm and risk of harm to public health and safety, and large scale economic loss to communities and government liabilities across the country.

674.   Defendants' actions demonstrated both malice and also aggravated and egregious fraud. Defendants engaged in the conduct alleged herein with a conscious disregard for the rights

and safety of other persons, even though that conduct had a great probability of causing substantial harm. The Manufacturer Defendants' fraudulent wrongdoing was done with a particularly gross and conscious disregard.

1.      **The Manufacturer Defendants Persisted in Their Fraudulent Scheme Despite Repeated Admonitions, Warning, and Prosecutions.**

675.    So determined were the Manufacturer Defendants to sell more opioids that they simply ignored multiple admonitions, warnings and prosecutions.  These governmental and regulatory actions included:

a.      **FDA Warnings to Janssen Failed to Deter Janssen's Misleading Promotion of Duragesic**

676.    On February 15, 2000, the FDA sent Janssen a letter concerning the dissemination of "homemade" promotional pieces that promoted the Janssen drug Duragesic in violation of the Federal Food, Drug, and Cosmetic Act.  In a subsequent letter, dated March 30, 2000, the FDA explained that the "homemade" promotional pieces were "false or misleading because they contain misrepresentations of safety information, broaden Duragesic's indication, contain unsubstantiated claims, and lack fair balance."  The March 30, 2000 letter detailed numerous ways in which Janssen's marketing was misleading.

677.    The letter did not stop Janssen.  On September 2, 2004, the U.S. Department of Health and Human Services ("HHS") sent Janssen a warning letter concerning Duragesic due to "false or misleading claims about the abuse potential and other risks of the drug, and . . . unsubstantiated effectiveness claims for Duragesic," including, specifically, "suggesting that Duragesic has a lower potential for abuse compared to other opioid products." The September 2, 2004 letter detailed a series of unsubstantiated, false or misleading claims.

678.    One year later, Janssen was still at it.  On July 15, 2005, the FDA issued a public health advisory warning doctors of deaths resulting from the use of Duragesic and its generic

competitor, manufactured by Mylan N.V.  The advisory noted that the FDA had been "'examining the circumstances of product use to determine if the reported adverse events may be related to inappropriate use of the patch'" and noted the possibility "that patients and physicians might be unaware of the risks" of using the fentanyl transdermal patch, which is a potent opioid analgesic approved only for chronic pain in opioid-tolerant patients that could not be treated by other drugs.

> **b.** **Governmental Action, Including Large Monetary Fines, Failed to Stop Cephalon from Falsely Marketing Actiq for Off-Label Uses**

679.    On September 29, 2008, Cephalon finalized and entered into a corporate integrity agreement with the Office of the Inspector General of HHS and agreed to pay $425 million in civil and criminal penalties for its off-label marketing of Actiq and two other drugs (Gabitril and Provigil).  According to a DOJ press release, Cephalon had trained sales representatives to disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of the three drugs and funded CME to promote off-label uses.

680.    Notwithstanding letters, an FDA safety alert, DOJ and state investigations, and the massive settlement, Cephalon has continued its deceptive marketing strategy.

> **c.** **FDA Warnings Did Not Prevent Cephalon from Continuing False and Off-Label Marketing of Fentora**

681.    On September 27, 2007, the FDA issued a public health advisory to address numerous reports that patients who did not have cancer or were not opioid tolerant had been prescribed Fentora, and death or life-threatening side effects had resulted.  The FDA warned: "Fentora should not be used to treat any type of short-term pain." Indeed, FDA specifically denied Cephalon's application, in 2008, to broaden the indication of Fentora to include treatment of non-cancer breakthrough pain and use in patients who were not already opioid-tolerant.

682.    Flagrantly disregarding the FDA's refusal to broaden the indication for Fentora, Cephalon nonetheless marketed Fentora beyond its approved indications.   On March 26, 2009, the FDA warned Cephalon against its misleading advertising of Fentora ("Warning Letter").  The Warning Letter described a Fentora Internet advertisement as misleading because it purported to broaden "the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora . . . when this is not the case."  It further criticized Cephalon's other direct Fentora advertisements because they did not disclose the risks associated with the drug.

683.    Despite this warning, Cephalon continued to use the same sales tactics to push Fentora as it did with Actiq.  For example, on January 13, 2012, Cephalon published an insert in Pharmacy Times titled "An Integrated Risk Evaluation and Mitigation Strategy (REMS) for FENTORA (Fentanyl Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)."  Despite the repeated warnings of the dangers associated with the use of the drugs beyond their limited indication, as detailed above, the first sentence of the insert states: "It is well recognized that the judicious use of opioids can facilitate effective and safe management of chronic pain."

### d.    A Guilty Plea and a Large Fine Did Not Deter Purdue from Continuing Its Fraudulent Marketing of OxyContin

684.    In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science. Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and

Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

685.     Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations.  At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction. After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business.  Between 2006 and 2015, Purdue and other opioid producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions – eight times what the gun lobby spent during that period.

### 2.     Repeated Admonishments and Fines Did Not Stop Defendants from Ignoring Their Obligations to Control the Supply Chain and Prevent Diversion.

686.     Defendants were repeatedly admonished and even fined by regulatory authorities, but continued to disregard their obligations to control the supply chain of dangerous opioids and to institute controls to prevent diversion.

687.     In a *60 Minutes* interview last fall, former DEA agent Joe Rannazzisi described Defendants' industry as "out of control," stating that "[w]hat they wanna do, is do what they wanna do, and not worry about what the law is.  And if they don't follow the law in drug supply, people die.  That's just it.  People die."   He further explained that:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen.  They control probably 85 or 90 percent of the drugs going downstream.
>
> [INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping drugs into American communities that were killing people.

JOE RANNAZZISI: That's not an implication, that's a fact.  That's exactly what they did.

688.     Another DEA veteran similarly stated that these companies failed to make even a "good faith effort" to "do the right thing."  He further explained that "I can tell you with 100 percent accuracy that we were in there on multiple occasions trying to get them to change their behavior.  And they just flat out ignored us."

689.     Government actions against the Defendants with respect to their obligations to control the supply chain and prevent diversion include:

    a.    On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances.  On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

    b.    On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

    c.    On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

    d.    On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

    e.    On January 30, 2008, the DEA issued an Order to Show Cause against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

    f.    On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn, Lakeland, Swedesboro and Stafford Facilities.  The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of

controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

g.  On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health's Lakeland Facility for failure to maintain effective controls against diversion of oxycodone; and

h.  On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland Facility.

690.  McKesson's deliberate disregard of its obligations was especially flagrant.  On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement ("2008 McKesson MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program."

691.  Despite its 2008 agreement with DEA, McKesson continued to fail to report suspicious orders between 2008 and 2012 and did not fully implement or follow the monitoring program it agreed to.  It failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers and bypassed suspicious order reporting procedures set forth in the CSMP.  It failed to take these actions despite its awareness of the great probability that its failure to do so would cause substantial harm.

692.  On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA, as well as failure to identify and report suspicious orders at its facilities in Aurora, CO; Aurora, IL; Delran,NJ; LaCrosse, WI; Lakeland, FL; Landover, MD; La Vista,

NE; Livonia, MI; Methuen, MA; Santa Fe Springs, CA; Washington Courthouse, OH; and West Sacramento, CA.  McKesson's 2017 agreement with the DEA documents that McKesson continued to breach its admitted duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders to DEA, in accordance with McKesson's obligations."

693.    As *The Washington Post* and *60 Minutes* recently reported, DEA staff recommended a much larger penalty than the $150 million ultimately agreed to for McKesson's continued and renewed breach of its duties, as much as a billion dollars, and delicensing of certain facilities.  A DEA memo outlining the investigative findings in connection with the administrative case against 12 McKesson distribution centers included in the 2017 Settlement stated that McKesson "[s]upplied controlled substances in support of criminal diversion activities"; "[i]gnored blatant diversion"; had a "[p]attern of raising thresholds arbitrarily"; "[f]ailed to review orders or suspicious activity"; and "[i]gnored [the company's] own procedures designed to prevent diversion."

694.    On December 17, 2017, CBS aired an episode of *60 Minutes* featuring Assistant Special Agent Schiller, who described McKesson as a company that killed people for its own financial gain and blatantly ignored the CSA requirement to report suspicious orders:

> DAVID SCHILLER: If they would stayed in compliance with their authority and held those that they're supplying the pills to, the epidemic would be nowhere near where it is right now.  Nowhere near.
>
> * * *
>
> They had hundreds of thousands of suspicious orders they should have reported, and they didn't report any.  There's not a day that goes by in the pharmaceutical world, in the McKesson world, in the distribution world, where there's not something suspicious.  It happens every day.
>
> [INTERVIEWER:] And they had none.

> DAVID SCHILLER: They weren't reporting any.  I mean, you have
> to understand that, nothing was suspicious?[260]

695.    Following the 2017 settlement, McKesson shareholders made a books and records request of the company.  According to a separate action pending on their behalf, the Company's records show that the Company's Audit Committee failed to monitor McKesson's information reporting system to assess the state of the Company's compliance with the CSA and McKesson's 2008 Settlements.  More particularly, the shareholder action alleges that the records show that in October 2008, the Audit Committee had an initial discussion of the 2008 Settlements and results of internal auditing, which revealed glaring omissions; specifically:

    a.    some customers had "not yet been assigned thresholds in the system to flag large shipments of controlled substances for review";

    b.    "[d]ocumentation evidencing new customer due diligence was incomplete";

    c.    "documentation supporting the company's decision to change thresholds for existing customers was also incomplete"; and

    d.    Internal Audit "identified opportunities to enhance the Standard Operating Procedures."

696.    Yet, instead of correcting these deficiencies, after that time, for a period of more than four years, the Audit Committee failed to address the CSMP or perform any more audits of McKesson's compliance with the CSA or the 2008 Settlements, the shareholder action's description of McKesson's internal documents reveals.  During that period of time, McKesson's Audit Committee failed to inquire whether the Company was in compliance with obligations set forth in those agreements and with the controlled substances regulations more generally.  It was

---

[260] Bill Whitaker, *Whistleblowers: DEA Attorneys Went Easy on McKesson, the Country's Largest Drug Distributor*, CBS News (Dec. 17, 2017), https://www.cbsnews.com/news/whistleblowers-deaattorneys-went-easy-on-mckesson-the-countrys-largest-drug-distributor/.

only in January 2013 that the Audit Committee received an Internal Audit report touching on these issues.

697.    In short, McKesson, was "neither rehabilitated nor deterred by the 2008 [agreement]," as a DEA official working on the case noted.  Quite the opposite, "their bad acts continued and escalated to a level of egregiousness not seen before."  According to statements of "DEA investigators, agents and supervisors who worked on the McKesson case" reported in *The Washington Post*, "the company paid little or no attention to the unusually large and frequent orders placed by pharmacies, some of them knowingly supplying the drug rings."  "Instead, the DEA officials said, the company raised its own self-imposed limits, known as thresholds, on orders from pharmacies and continued to ship increasing amounts of drugs in the face of numerous red flags."

698.    Since at least 2002, Purdue has maintained a database of health care providers suspected of inappropriately prescribing OxyContin or other opioids.  Physicians could be added to this database based on observed indicators of illicit prescribing such as excessive numbers of patients, cash transactions, patient overdoses, and unusual prescribing of the highest-strength pills (80 mg OxyContin pills or "80s," as they were known on the street, were a prime target for diversion).  Purdue claims that health care providers added to the database no longer were detailed, and that sales representatives received no compensation tied to these providers' prescriptions.

699.    Yet, Purdue failed to cut off these providers' opioid supply at the pharmacy level—meaning Purdue continued to generate sales revenue from their prescriptions—and failed to report these providers to state medical boards or law enforcement.  Purdue's former senior compliance officer acknowledged in an interview with the *Los Angeles Times* that in five years of investigating suspicious pharmacies, the company never stopped the supply of its opioids to a pharmacy, even where Purdue employees personally witnessed the diversion of its drugs.

700.     The same was true of prescribers.  For example, as discussed above, despite Purdue's knowledge of illicit prescribing from one Los Angeles clinic which its district manager called an "organized drug ring" in 2009, Purdue did not report its suspicions until long after law enforcement shut it down and not until the ring prescribed more than 1.1 million OxyContin tablets.

701.     Indeed, the New York Attorney General found that Purdue placed 103 New York health care providers on its "No-Call" List between January 1, 2008 and March 7, 2015, and that Purdue's sales representatives had detailed approximately two-thirds of these providers, some quite extensively, making more than a total of 1,800 sales calls to their offices over a six-year period.

702.     The New York Attorney General similarly found that Endo knew, as early as 2011, that Opana ER was being abused in New York, but certain sales representatives who detailed New York health care providers testified that they did not know about any policy or duty to report problematic conduct.  The New York Attorney General further determined that Endo detailed health care providers who were subsequently arrested or convicted for illegal prescribing of opioids a total of 326 times, and these prescribers collectively wrote 1,370 prescriptions for Opana ER (although the subsequent criminal charges at issue did not involve Opana ER).

703.     As all of the governmental actions against the Manufacturer Defendants and against all the Defendants shows, Defendants knew that their actions were unlawful, and yet deliberately refused to change their practices because compliance with their legal obligations would have decreased their sales and their profits.

## V.     LEGAL CAUSES OF ACTION

### COUNT I – PUBLIC NUISANCE – ILLINOIS COMMON LAW
(Against All Defendants)

704. Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

705. This Count for common law public nuisance is brought by Plaintiffs.

706. Defendants created and maintained a public nuisance which proximately caused injury to Plaintiffs.

707. Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of Plaintiffs' injury.

708. By causing dangerously addictive drugs to flood the community, and to be diverted for illicit purposes, each Defendant has injuriously affected rights common to the general public, specifically including the rights of the State and The County to public health, public safety, public peace, public comfort, and public convenience. The public nuisance caused by Defendants' diversion of dangerous drugs has caused substantial annoyance, inconvenience, and injury to the public.

709. By selling dangerously addictive opioid drugs diverted from a legitimate medical, scientific, or industrial purpose, Defendants have committed a course of conduct that injuriously affects the safety, health, and morals of the State and The County.

710. By failing to maintain a closed system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected the safety, health and morals of the State and The County.

711. The residents of the State and The County have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and

property. Specifically, widespread distribution of prescription opioids for illicit purposes jeopardizes these common rights, and the illegal widespread distribution of prescription opioids would not be possible but for the unlawful and intentional acts, or failures to act, by Defendants.

712.    Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the State and The County and its residents.

713.    Defendants intentionally, unlawfully, and recklessly manufacture, market, distribute, and sell opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to the State and The County, resulting in addiction and abuse, an elevate level of crime, death and injuries to the residents of the State and The County, a higher level of fear, discomfort, and inconvenience to the residents of the State and The County, and direct costs to the State and The County.

714.    Defendants unlawfully and/or intentionally manufacture, market, distribute, and sell opioids without maintaining effective controls against diversion. Such conduct was illegal. Defendants violated the federal and Illinois Controlled Substances Acts. Defendants' failures to maintain effective controls against diversion include Defendants' failures to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

715.    Defendants have caused a substantial and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property. Moreover, when an enterprise is regulated by state or federal law, as is the case here, the substantial and unreasonable interference element of a public nuisance claim can be met by a showing that Defendants violated applicable statutes or regulations or that Defendants were otherwise negligent in carrying out the enterprise.

*Gilmore v. Stanmar, Inc.*, 633 N.E.2d 985, 993 (Ill. 1994). Here, Defendants are not in compliance with applicable law or are otherwise negligent in carrying out their respective enterprises.

716.    Defendants' conduct in illegally distributing and selling prescription opioids, or causing such opioids to be distributed and sold, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally in the State and The County is of a continuing nature and has produced a significant effect upon the public's rights, including the public's right to health and safety.

717.    Defendants have created and maintained a public nuisance by marketing, distributing, and selling opioids in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiffs' Community, and Plaintiffs and the residents of Plaintiffs' Community have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property

718.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

719.    A violation of any rule or law controlling the distribution of a drug of abuse in the State and The County and the State of Illinois is a public nuisance.

720.    Defendants' distribution of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

721.    The consequences of Defendants' wrongful and illegal actions as set forth above have also resulted in an intentional invasion of the interest of Plaintiffs in the use and enjoyment of public and private land.

722.     Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that the Defendants allow and/or cause to be illegally distributed and possessed in the State and The County will be diverted, leading to abuse, addiction, crime, and public health costs.

723.     As a result of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance to person and property.

724.     Defendants know, and/or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

725.     Defendants know, or reasonably should know, that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

726.     Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the State and The County. Defendants are in the business of distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous according to federal and Illinois law. *See, e.g.*, 21 U.S.C.A. § 812 (b)(2); 720 ILCS 570/205.

727.     Defendants' conduct in marketing, distributing, and selling prescription opioids which the Defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to the residents of the State and The County and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

728.    It is, or should be, reasonably foreseeable to Defendants that their conduct will cause deaths and injuries to residents in the State and The County, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

729.    The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in the State and The County not only causes deaths and injuries, but also creates a palpable climate of fear among the residents of the State and The County where opioid diversion, abuse, and addiction are prevalent and where they tend to be used frequently.

730.    Defendants' conduct makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

731.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' unique position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

732.    The presence of diverted prescription opioids in the State and The County, and the consequence of prescription opioids having been diverted in the State and The County, proximately results in significant costs to the Plaintiffs and to the State and The County in order to enforce the law, equip its police force, respond to emergencies, and treat the victims of opioid abuse and addiction.

733.    Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make the State and The County a safer place to live.

734.    Defendants' conduct is a direct and proximate cause of deaths and injuries to the residents of the State and The County, costs borne by the State and The County, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

735.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the State and The County residents, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. The County has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

736.    Defendants' actions created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in the State and The County, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting, and without refusing to fill, suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids.  Such actions were inherently dangerous.

737.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without

maintaining effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in the State and The County.

738.    Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

739.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm. Defendants acted willfully, and with such gross negligence as to indicate a wanton disregard of the rights of others.

740.    The damages available to the Plaintiffs include, *Inter alia*, recoupment of governmental costs, flowing from an ongoing and persistent public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiffs seek all damages flowing from Defendants' conduct. Plaintiffs further seek to abate the nuisance and harm created by Defendants' conduct.

741.    As a direct and proximate result of Defendants' conduct, the Plaintiff, The County, has suffered actual injury and damages including, but not limited to, significant increased expenses for police, emergency, ambulance services, health, prosecution, corrections and other services. The Plaintiffs seek recovery for their own harm. While The County normally has some expenses related to these services, the expenses have been significantly increased as a direct and proximate result of Defendants' conduct, and thus constitute specific and special injuries. The increased expenditures have been a necessary means to respond to issues created by unlawful opioid prescription drugs in The County, but much greater expenditures are needed to abate the serious problems caused by the opioid epidemic.

742.    The County has sustained specific and special injuries because its damages include, *inter alia,* health services and law enforcement expenditures, and include without limitation costs sustained by the Plaintiffs' County Sheriff and State's Attorney offices, costs sustained by their medical examiners and crime labs, Health and Human Services costs, costs sustained by The County's payments for health services, including *inter alia* hospital and ambulance operations, costs related to opioid addiction treatment and overdose prevention, and payments by governmental payor programs, such as employee health insurance. Thus, The County seeks recovery for its own harm.

743.    The Plaintiffs further seek to abate in the future this nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference with a right common to the public. Such abatement is feasible here and can be accomplished by providing financial resources to The County to combat the problems arising from unlawfully diverted opioids.

744.    Plaintiffs seek all legal and equitable relief as allowed by law, including *inter alia* abatement, compensatory damages, and punitive damages from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

745.    Defendants' intentional and unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

746.    The opioid epidemic in Plaintiffs' Community remains an immediate hazard to public health and safety.

747.    Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in the State and The County. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which

are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and severe addiction. Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

748.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit.

749.    The interference is unreasonable because Defendants' nuisance-creating conduct:

a.    Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

b.    At all relevant times was and is proscribed by state and federal laws and regulations; and/or

c.    Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

750.    Defendants' unlawful nuisance-creating conduct includes violating federal and Illinois statutes and regulations, including the controlled substances laws, by:

a.    Wholesale distribution, as defined under Illinois law, by Defendants without maintains effective controls and procedures to guard against theft and diversion (*see* 720 ILCS 570/201(h); Ill. Admin. Code Title 68, § 1510.50(b)(3));

b.    Distribution by Distributors and sales by Manufacturers of opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

c.    Distribution by Distributors and sales by Manufacturers of opioids without maintaining effective controls against the diversion of opioids;

d.    Choosing not to effectively monitor for suspicious orders;

e.    Choosing not to investigate suspicious orders;

f.    Choosing not to report suspicious orders;

g.    Choosing not to stop or suspend shipments of suspicious orders; and

h.    Distribution by Distributors and sales by Manufacturers of opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

751.    The staggering rates of prescription opioid abuse and heroin use resulting from Defendants' abdication of their gate-keeping and diversion prevention duties, and the Manufacturer Defendants' fraudulent marketing activities, have caused harm to the entire community that includes, but is not limited to:

a.    The high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

b.    Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids has made opioids a recreational drug of choice among Illinois teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c.    Even those residents of the State and County who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d.    The opioid epidemic has increased health care costs.

e.    Employers have lost the value of productive and healthy employees.

f.    Defendants' failure to maintain effective controls against diversion of dangerously addictive prescription opioids for non-medical use and abuses has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g.    Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h.    The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on health care services and law enforcement in the State and The County.

    i.    The significant and unreasonable interference with public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the State and The County;

    j.    Defendants' interference with the comfortable enjoyment of life in the State and The County is unreasonable because there is little society utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

    k.    The categories of damages sustained by The County includes opioid-related costs and burdens placed upon first responders, whose resources and expertise are necessary to keep our community safe. The resources of *inter alia* emergency responders, police, medical, and ambulance services have been drained, over and above typical municipal community needs, as a result of the opioid epidemic in the State and County.

752.    As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiffs have suffered and will continue to suffer stigma damage, non-physical property damage, and damage to proprietary interests.

753.    The nuisance created by Defendants' conduct has not been abated.

754.    The nuisance created by Defendants' conduct is abatable.

755.    Defendants' misconduct alleged in this case is ongoing and persistent.

756.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

757.    Plaintiffs have incurred expenditures for special programs over and above that necessary for ordinary public services.

758.    Plaintiffs seek to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

759.    Plaintiffs have suffered, and will continue to suffer, unique harms as described in this Complaint.

760.    The tortious conduct of each Defendant was a substantial factor in creating the public nuisance.

761.    The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiffs.

762.    Plaintiff have suffered indivisible injuries as a result of the tortious conduct of Defendants.

763.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

764.    Defendants' actions demonstrated both malice and also aggravated and egregious fraud. Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm. The Manufacturer Defendants' fraudulent wrongdoing was also particularly gross.

765.     Plaintiffs seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, temporary and preliminary injunctive relief, equitable relief, restitution, disgorgement, abatement, punitive damages, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest.

### COUNT II – NARCOTICS PROFIT FORFEITURE ACT – 725 ILCS 175/1 *et seq.*
### (Against All Defendants)

766.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

767.    This Count is brought by the People of the State, the People of The County, and The County. This Count is brought pursuant to 725 ILCS 175/7 for civil relief only.  Plaintiffs were injured in their business, person, and/or property as a result of each Defendant's wrongful conduct (725 ILCS 175/6(c)), and are persons who can bring an action for civil damages, threefold damages, and attorney fees (725 ILCS 175/3(c)).

768.    Defendant corporations are "persons" within the meaning of 725 ILCS 175/3(c), which conducted the affairs of an opioid narcotics racketeering enterprise through a pattern of racketeering activity, in violation of Chapter 725, Act 175, the Illinois Narcotics Profit Forfeiture Act.

769.    Defendants' Opioids Diversion Enterprise is an association in fact and meets the definition of enterprise in 725 ILCS 175/3(d).

770.    As alleged above in language incorporated herewith by reference, each Defendant has violated the Illinois Controlled Substances Act and the United States Controlled Substances Act, and such conduct is punishable as a felony. Therefore, each Defendant has engaged in narcotics activity, as prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/3(a).

771.    Each Defendant receives income knowing such income is derived from the pattern of racketeering activity in which it participated, which is prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/4(a). As more fully described in this Complaint, each Defendant is aware that it has diverted dangerously addictive opioid narcotics into illicit streams of commerce in violation of mandatory, non-delegable duties and requirements for state and federal wholesale drug distribution licenses and registrations. Defendants have received income by distributing dangerous Schedule II substances in violation of state and federal Controlled Substances Acts and associated regulations.

772.    As more fully described in this Complaint, in addition to said receipt of income, each Defendant uses or invests all or part of the income, or proceeds of such income, to establish, acquire, and/or operate an enterprise doing business in the State of Illinois, which is prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/4(b).

773.    As more fully described in this Complaint, each Defendant knowingly, through a pattern of narcotics activity, acquires and maintains an interest in or contract of an enterprise which is engaged in, and which activities affect, business in the State of Illinois, which is prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/4(c).

774.    As more fully described in this Complaint, each Defendant is associated with an enterprise doing business in the State of Illinois and knowingly conducts or participates in the conduct of such enterprise's affairs through a pattern of narcotics activity in which Defendants participate, as prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 725/4(d).

775.    As more fully described in this Complaint, each Defendant knowingly, through a pattern of narcotics activity, acquires and maintains an interest in or contract of an enterprise which is engaged in, and which activities affect, business in the State of Illinois, which is prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 175/4(c).

776.    As more fully described in this Complaint, each Defendant is associated with an enterprise doing business in the State of Illinois and knowingly conducts or participates in the conduct of such enterprise's affairs through a pattern of narcotics activity in which Defendants participate, as prohibited by the Narcotics Profit Forfeiture Act, 725 ILCS 725/4(d).

777.    As explained herein, each Defendant conducted or participated in the enterprise's affairs through commission of criminal offenses which constitute a pattern of narcotics racketeering activity. 725 ILCS 175/3(b). Each Defendant has committed two or more, and indeed

multiple, acts of narcotics activity within 5 years of each other. At least one, and indeed multiple, acts of narcotics activity were committed after the effective date of Act 175. At least one of these acts, and indeed multiple, acts of narcotics activity are punishable as a Class X, 1, or 2 felonies.

778.    Defendants' violations of law and their pattern of racketeering activity have directly and proximately caused The County and its citizens to be injured in their business or property because The County has paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference.

779.    The injuries incurred by the Plaintiffs were proximately caused by Defendants' racketeering activities. But for Defendants' conduct, The County would not have paid *inter alia* the health services and law enforcement services expenditures required by the plague of drug-addicted residents.

780.    The Plaintiffs' injuries were directly caused by Defendants' racketeering activities.

781.    Plaintiffs seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, treble damages, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

### COUNT III – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1 *et seq.*
### (Against Manufacturer Defendants for Deceptive Business Practices)

782.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

783.    This Count is brought by the Plaintiffs, The County, the People of The County, and the People of the State, as the State's Attorney has reason to believe that each of the Defendants named herein is in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act

("Fraud Act"), 815 ILCS 505/1 *et seq.*, and further that this action is in the public interest of the Plaintiffs. Count III is brought pursuant to Section 7 of the Fraud Act, 815 ILCS 505/7.

784.    The Illinois Consumer Fraud and Deceptive Business Practices Act makes unlawful, among other things, "[u]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact" in the conduct of any trade or commerce." 815 ILCS 505/2. The Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/2, also makes unlawful "the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act."

785.    The Manufacturer Defendants have engaged in unlawful and deceptive business practices in violation of the ICFA as set forth above.

786.    The Manufacturer Defendants' practices as described in the Amended Complaint are deceptive business practices that violate the ICFA because the practices were and are intended to deceive consumers and occurred and continue to occur in the course of conduct involving trade and commerce in The County and throughout Illinois.

787.    At all times relevant to this Amended Complaint, the Manufacturer Defendants, directly, through their control of third parties and/or by aiding and abetting third parties, violated the ICFA by making and disseminating untrue, false, and misleading statements to Illinois prescribers and consumers to promote the sale and use of opioids to treat chronic pain, or by causing untrue, false and misleading statements about opioids to be made or disseminated to Illinois prescribers and consumers in order to promote the sale and use of opioids to treat chronic pain. These untrue, false, and misleading statements included, but were not limited to:

a. Claiming or implying that opioids would improve patients' function and quality of life;

b. Mischaracterizing the risk of opioid addiction and abuse, including by stating or implying the opioids were rarely addictive, that "steady state" and abuse-resistant properties meant the drugs were less likely to be addictive or abused, and that specific opioid drugs were less addictive or less likely to be abused than other opioids;

c. Claiming or implying that addiction can be avoided or successfully managed through the use of screening and other tools;

d. Promoting the misleading concept of pseudoaddiction, thus concealing the true risk of addiction;

e. Mischaracterizing the difficulty of discontinuing opioid therapy, including by mischaracterizing the prevalence and severity of withdrawal symptoms;

f. Claiming of implying that increased doses of opioids pose no significant additional risk;

g. Misleadingly depicting the safety profile of opioids prescribed by minimizing their risks and adverse effects while emphasizing or exaggerating the risks of competing products, including NSAIDs; and

h. In the case of Purdue, mischaracterizing OxyContin's onset of action and duration of efficacy to imply that the drug provided a full 12 hours of pain relief.

788. As evidenced by the deceptive conduct discussed in the Amended Complaint, the Manufacturer Defendants, directly, through their control of third parties and/or by aiding and abetting third parties, violated the ICFA by engaging in the following deceptive trade practices prohibited by Section 2 of the UDTPA, including:

a. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

b. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

c. Representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

d. Disparaging the goods, services, or business of another by false or misleading representations of fact; and

     e.   Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

789.    At all times relevant to this Amended Complaint, the Manufacturer Defendants, directly, through their control of third parties, and by aiding and abetting third parties, also violated ICFA by making statements that omitted or concealed material facts to promote the sale and use of opioids to treat chronic pain. The Manufacturer Defendants and their third-party allies repeatedly failed to disclose or minimized material facts about the risks of opioids, including the risk of addiction, significant risks of side effects, and their risks compared to alternative treatments, including NSAIDs. Such material omissions were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of opioids for treatment of chronic pain.

790.    At all times relevant to this Amended Complaint, the Manufacturer Defendants, directly, through their control of third parties, and by aiding and abetting third parties, made and disseminated the foregoing untrue, false and misleading statements, and material omissions, through an array of marketing channels, including but not limited to: in-person and other forms of detailing; speaker events, including meals, conferences, and teleconferences; CMEs; studies, and journal articles and supplements; advertisements; and brochures and other patient education materials.

791.    The Manufacturer Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public. In addition, the Manufacturer Defendants knew or should have known

that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids.

792.    The third-party KOLS and Front Groups which the Manufacturer Defendants aided and abetted likewise knew at the time of making or disseminating these misstatements and material omissions that such statements were untrue, false, or misleading and therefore likely to deceive the public. The Manufacturer Defendants were aware of the misleading nature of the misstatements and material omissions made by KOLs and Front Groups, and yet the Defendants provided them substantial assistance and encouragement by helping them develop, refine and promote these misstatements and material omissions and distributing them to a broader audience. The Manufacturer Defendants also substantially encouraged the dissemination of these misstatements and material omissions by providing the Front Groups and KOLs with funding and technical assistance for the shared purpose of issuing misleading, pro-opioid messaging.

793.    In sum, the Manufacturer Defendants: (a) directly engaged in untrue, false, and misleading marketing of KOLS and Front Groups; and (c) aided and abetted the untrue, false, and misleading marketing of KOLS and Front Groups. Thus, while the Defendants made, controlled, and disseminated deceptive marketing themselves, the Manufacturer Defendants made, controlled, and disseminated deceptive marketing themselves, the Manufacturer Defendants also are independently liable for the deceptive activity of third parties.

794.    All of this conduct, separately and collectively, was intended to deceive Illinois consumers who used or paid for opioids for chronic pain; Illinois physicians who prescribed opioids to consumers to treat chronic pain; and Illinois payors.

795.    As a direct result of the foregoing acts and practices, the Manufacturer Defendants have received, or will receive, income, profits, and other benefits, which they would not have

received if they had not engaged in the violations of the ICFA as described in this Amended Complaint.

796.    In addition, 815 ILCS 505/7 specifically allows the State's Attorney to bring this claim for a penalty for each violation by the Defendants.

797.    Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, payment of all civil penalties permissible under 815 ILCS 505/7(b) and (c), compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest, and awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

### COUNT IV – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1 *et seq.*
### (Against Distributor Defendants for Deceptive Business Practices)

798.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

799.    This Count is brought by the Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, as the State's Attorney has reason to believe that each of the Defendants named herein is in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), 815 ILCS 505/1 *et seq.*, and further that this action is in the public interest of the Plaintiffs. Count IV is brought pursuant to Section 7 of the Fraud Act, 815 ILCS 505/7.

800.    The Illinois Consumer Fraud and Deceptive Business Practices Act makes unlawful, among other things, "[u]nfair or deceptive acts or practices, including but not limited to

the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact" in the conduct of any trade or commerce." 815 ILCS 505/2. The Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/2, also makes unlawful "the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act."

801.     The Distributor Defendants have engaged in unlawful and deceptive business practices in violation of Fraud as set forth above.

802.     As evidenced by the conduct detailed above, the Distributor Defendants have violated Section 2 of the Fraud Act, 815 ILCS 505/2, by engaging in one or more of the following deceptive methods, acts and practices:

   a.   The method, act or practice of not monitoring for suspicious orders of prescription opioids;

   b.   The method, act or practice of not detecting suspicious orders of prescription opioids;

   c.   The method, act or practice of not investigating suspicious orders of prescription opioids;

   d.   The method, act or practice of filling, or failing to refuse fulfillment of, suspicious orders of prescription opioids;

   e.   The method, act or practice of not reporting suspicious orders of prescription opioids;

   f.   The method, act or practice of rewarding increases in prescription opioid sales; and/or

   g.   The method, act or practice of falsely misrepresenting to the public that Defendants were complying with their legal obligations.

232

803.     As evidenced by the deceptive conduct detailed in the Amended Complaint, the

Distributor Defendants, violated the ICFA by engaging in the following deceptive trade practices

prohibited by Section 2 of the UDTPA, including:

    a.  Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

    b.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; and/or

    c.  Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

804.     All of Defendants' deceptive methods, acts or practices were conducted with the

intent on Defendants' part that persons in the State and The County, the Department of Financial

and Professional Regulation, and The County itself rely on the deception.

805.     All of Defendants' deceptive methods, acts or practices occurred in the course of

conduct involving trade or commerce.

806.     All of Defendants' deceptive methods, acts or practices harmed or damaged

Plaintiffs.

807.     Some or all of Defendants' violations of the Fraud Act were committed with the

intent to defraud, and many or all violations were continuous in nature.

808.     Many of Defendants' violations of the Fraud Act were committed against persons

65 years of age or older.

809.     Absent injunctive relief by this Court, Defendants are likely to continue to harm

and injure Plaintiffs, reap unjust enrichment, and harm the public interest.

810.     Section 7 of the Fraud Act, 815 ILCS 505/7, empowers this Court to grant injunctive and such other relief as it may find appropriate to halt and redress violations of the Fraud Act, including restitution, civil penalties, and costs.

811.     Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, payment of all civil penalties permissible under 815 ILCS 505/7(b) and (c), compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest, and awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

### COUNT V – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1 *et seq.*
### (Against Manufacturer Defendants for Unfair Acts and Practices)

812.     Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

813.     This Count is brought by the Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, as the State's Attorney, has reason to believe that each of the Defendants named herein is in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), 815 ILCS 505/1 *et seq.*, and further that this action is in the public interest of the Plaintiffs. Count V is brought pursuant to Section 7 of the Fraud Act, 815 ILCS 505/7.

814.     The Illinois Consumer Fraud and Deceptive Business Practices Act makes unlawful, among other things, "[u]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or

the concealment, suppression or omission of such material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact" in the conduct of any trade or commerce." 815 ILCS 505/2. The Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/2, also makes unlawful "the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act."

815.     As evidenced by the conduct detailed above, at all times relevant to this Amended Complaint, the Manufacturer Defendants, directly, through their control of third parties, and/or by aiding and abetting third parties, and/or in civil conspiracy with third parties, violated Section 2 of the Fraud Act, 815 ILCS 505/2, by engaging in unfair acts or practices to promote the sale and use of opioids to treat chronic pain. These acts or practices are unfair in that they offend public policy; are immoral, unethical, oppressive, or unscrupulous; and have resulted in substantial injury to the Plaintiffs that is not outweighed by any countervailing benefits to consumers or competition.

816.     As described in detail above, the Manufacturer Defendants' unfair acts and deceptive practices include, but are not limited to:

    a.   Targeting a vulnerable population – the elderly – for promotion of opioids to treat chronic pain in the face of the known, heightened risks of opioid use to that population, including risks of addiction, adverse effects, hospitalizations, and death;

    b.   Targeting a vulnerable population – veterans- for promotion of opioids to treat chronic pain in the face of the known, heightened risks of opioid use to that population, including risks of addiction, overdose, and self-inflicted or accidental injury;

    c.   Engaging in untrue, false, unsubstantiated and misleading marketing, directly and with and through third parties in violation of 21 C.F.R. § 202.1(e), thereby causing their drugs to be misbranded;

    d.   Promoting other purported advantages of their opioid products including but not limited to decreased risk of abuse, addiction, or withdrawal symptoms or their superiority to NSAIDS, without substantial scientific evidence to support their claims, in violations of FDA regulations, including 21 C.F.R. § 202.1(e);

e. Failing, despite the known serious risks of addiction and adverse effects posed by opioids, to present a fair balance of benefit and risk information in their promotion of opioids, in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

f. Deliberately using unbranded marketing to evade FDA oversight and rules prohibiting deceptive marketing; and

g. Promoting their opioids for off-label uses in the case of Cephalon, by marketing Actiq and Fentora for treatment of non-cancer pain and/or use in non-opioid-tolerant patients.

817. The Manufacturer Defendants engaged in these practices both directly and through the KOLs and Front Groups that they controlled and/or which they aided and abetted. The Manufacturer Defendants were aware of the unfair conduct of the KOLs and Front Groups, and yet Defendants provided them substantial assistance and encouragement by helping them engage in the unfair practices. The Manufacturer Defendants also substantially encouraged the unfair practices by providing the Front Groups and KOLs with funding and technical support for the shared purpose of issuing unfair, pro-opioid messaging.

818. The Manufacturer Defendants' promotional practices, as described above, offend deep-seated public policies under both federal law (21 U.S.C. § 823, 21 U.S.C. § 801; 21 C.F.R. 1301.74) and Illinois law (*e.g.* 225 ILCS 120/40; Ill. Admin. Code Title 68,§ 1510.50), to maintain effective controls against diversion. Nevertheless, by engaging in the conduct alleged above, Manufacturer Defendants actively worked to conceal the risk of addiction related to opioids from Illinois patients and prescribers in the hopes of selling greater quantities of their dangerous drugs. Manufacturer Defendants also worked to undermine public policy, enshrined by regulations contained in state and federal law, that is aimed at ensuring honest marketing and safe and appropriate use of pharmaceutical drugs.

819. Manufacturer Defendants' conduct also was oppressive to both patients and prescribers. Patients are laypersons who put their trust in physicians to appropriately convey and

balance the risks and benefits of various treatment options. Physicians, in turn, are inclined to trust the advice of KOLs, Front Groups, and other seemingly independent sources of objective medical information. By engaging in the conduct described above, Manufacturer Defendants co-opted the sources reasonable physicians relied upon to convince those physicians that the risks related to opioids were minimal, that the benefits were substantial, and – as a result – that opioids were medically necessary to treat their patients' chronic pain. Manufacturer Defendants deliberately targeted non-specialist physicians and non-physician prescribers, who lacked the time and expertise to evaluate their deceptive claims. This is even more true of the patients who were both the subject and object of Manufacturer Defendants' marketing; patients have little ability to independently evaluate the medical necessity of the treatments they are prescribed and rely on the judgment of their physicians instead – the same judgment that was compromised by Manufacturer Defendants' unlawful conduct.

820.    Manufacturer Defendants' conduct has caused substantial, indeed grievous, injury to the consumer residents of the State and The County. The staggering rates of opioid use, abuse, and addiction resulting from Manufacturer Defendants' marketing efforts have caused substantial injury to residents of the State and The County, including, but not limited to:

a. Upwards of 30% of all adults have used opioids, with the vast majority of the use stemming from prescribing for chronic pain conditions;

b. A substantial number of residents of the State and The County prescribed opioids long-term for chronic pain have experienced the life-upending effects of addiction, abuse, misuse, overdose, and death. For those who can stop taking narcotic opioid, there are years of struggling with the pull of the drugs and the fear of relapse (and often relapse itself), counseling sessions, or lining up each morning for daily maintenance drugs. And those who cannot overcome the need for opioids must deal with the compulsive use of and need for opioids, the haziness when they are on the drugs, and the nearly constant struggle to maintain their supplies of the drugs, whatever the cost. Both groups face a dramatically heightened risk of serious injury or death and sometimes an unrecoverable toll on their health, work, and family.

c. Elderly residents of the State and The County and Community veterans are particularly vulnerable to serious adverse outcomes, including overdose, injury and death;

d. Residents of the State and The County who have never taken opioids also have been injured. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids. Infants born to mothers who abuse opioids have suffered neonatal abstinence syndrome.

e. Residents of the State and The County have incurred health care costs due to the prescription of opioids for chronic pain and the treatment of opioids' adverse effects, including addiction and overdoses.

f. Defendants' success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. Defendants' scheme created both ends of a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them.

g. This demand also has created additional illicit markets in other opiates, particularly heroin. Patients addicted to opioids frequently migrate to lower-cost heroin, with the serious personal costs that accompany their use of unlawful drugs.

h. All of this has caused substantial injuries to consumers – in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken lives, families, and homes.

821. The profound injuries to residents of the State and The County are substantial and not outweighed by any countervailing benefits to consumers or competition since there is no benefit from the deceptive marketing of these narcotic drugs. Moreover, no public policy justifies the Manufacturer Defendants' conduct in overstating the benefits, denying or downplaying the risks, and misrepresenting the superiority of opioids for chronic pain, which deprived the residents, patients, and doctors of the State and The County of the hones and complete information they need to make informed choices about their treatment. In light of this campaign of misinformation (and especially given the addictive nature of these drugs), the consumer residents of the State and The County could not reasonably have avoided their injuries.

822.    By reason of the Manufacturer Defendants unlawful acts, the consumer residents of the State and The County have been damaged and continue to be damaged, in a substantial amount to be determined at trial.

823.    Plaintiffs seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, payment of all civil penalties permissible under 815 ILCS 505/7(b) and (c), compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest, and awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

### COUNT VI – CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1 *et seq.*
### (Against Distributor Defendants for Unfair Acts and Practices)

824.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

825.    This Count is brought by the Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, as the State's Attorney has reason to believe that each of the Defendants named herein is in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Fraud Act"), 815 ILCS 505/1 *et seq.*, and further that this action is in the public interest of the Plaintiffs. Count VI is brought pursuant to Section 7 of the Fraud Act, 815 ILCS 505/7.

826.    The Illinois Consumer Fraud and Deceptive Business Practices Act makes unlawful, among other things, "[u]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, with the intent that others rely

upon the concealment, suppression or omission of such material fact" in the conduct of any trade or commerce." 815 ILCS 505/2. The Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILCS 505/2, also makes unlawful "the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act."

827.    As evidenced by the conduct detailed above, at all times relevant to this Amended Complaint, the Distributor Defendants, directly, through their control of third parties, and/or by aiding and abetting third parties, and/or in civil conspiracy with third parties, violated Section 2 of the Fraud Act, 815 ILCS 505/2, by engaging in unfair acts or practices to promote the sale and use of opioids to treat chronic pain. These acts or practices are unfair in that they offend public policy; are immoral, unethical, oppressive, or unscrupulous; and have resulted in substantial injury to the Plaintiffs that are not outweighed by any countervailing benefits to consumers or competition.

828.    As described in detail above, the Distributor Defendants' unfair acts and deceptive practices include, but are not limited to failure to:

   a.  The method, act or practice of not monitoring for suspicious orders of prescription opioids;

   b.  The method, act or practice of not detecting suspicious orders of prescription opioids;

   c.  The method, act or practice of not investigating suspicious orders of prescription opioids;

   d.  The method, act or practice of filling, or failing to refuse fulfillment of, suspicious orders of prescription opioids;

   e.  The method, act or practice of not reporting suspicious orders of prescription opioids;

   f.  The method, act or practice of rewarding increases in prescription opioid sales; and/or

   g.  The method, act or practice of falsely misrepresenting to the public that Defendants were complying with their legal obligations.

829.    The Distributor Defendants' unfair practices, as described above, offend deep-seated public policies under both federal law (21 U.S.C. § 823, 21 U.S.C. § 801; 21 C.F.R. 1301.74) and Illinois law (*e.g.* 225 ILCS 120/40; Ill. Admin. Code Title 68,§ 1510.50), to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from the State and The County as well as those orders which Defendants knew or should have known were likely to be diverted into the State and The County. Nevertheless, by engaging in the conduct alleged above, Distributor Defendants actively worked to conceal the risk of addiction related to opioids from Illinois patients and prescribers in the hopes of selling greater quantities of their dangerous drugs. Distributor Defendants also worked to undermine public policy, enshrined by regulations contained in state and federal law, that is aimed at ensuring honest marketing and safe and appropriate use of pharmaceutical drugs.

830.    Distributor Defendants' conduct has caused substantial, indeed grievous, injury to the consumer residents of the State and The County. The staggering rates of opioid use, abuse, and addiction resulting from Distributor Defendants' above described conduct have caused substantial injury to residents of the State and The County, including, but not limited to:

a.    Upwards of 30% of all adults have used opioids, with the vast majority of the use stemming from prescribing for chronic pain conditions;

b.    A substantial number of residents of the State and The County prescribed opioids long-term for chronic pain have experienced the life-upending effects of addiction, abuse, misuse, overdose, and death. For those who can stop taking narcotic opioid, there are years of struggling with the pull of the drugs and the fear of relapse (and often relapse itself), counseling sessions, or lining up each morning for daily maintenance drugs. And those who cannot overcome the need for opioids must deal with the compulsive use of and need for opioids, the haziness when they are on the drugs, and the nearly constant struggle to maintain their supplies of the drugs, whatever the cost. Both groups face a dramatically heightened risk of serious injury or death and sometimes an unrecoverable toll on their health, work, and family.

c.    Elderly residents of the State and The County and Community veterans are particularly vulnerable to serious adverse outcomes, including overdose, injury and death;

d.  Residents of the State and The County who have never taken opioids also have been injured. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids. Infants born to mothers who abuse opioids have suffered neonatal abstinence syndrome.

e.  Residents of the State and The County have incurred health care costs due to the prescription of opioids for chronic pain and the treatment of opioids' adverse effects, including addiction and overdoses.

f.  Defendants' success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. Defendants' scheme created both ends of a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them.

g.  This demand also has created additional illicit markets in other opiates, particularly heroin. Patients addicted to opioids frequently migrate to lower-cost heroin, with the serious personal costs that accompany their use of unlawful drugs.

h.  All of this has caused substantial injuries to consumers – in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken lives, families, and homes.

831.  The profound injuries to residents of the State and The County are substantial and not outweighed by any countervailing benefits to consumers or competition since there is no benefit from the deceptive marketing of these narcotic drugs. Moreover, no public policy justifies the Distributor Defendants' conduct in failing to comply with both federal and state law. In light of this conduct, the consumer residents of the State and The County could not reasonably have avoided their injuries.

832.  By reason of the Distributor Defendants unlawful acts, the consumer residents of the State and The County have been damaged and continue to be damaged, in a substantial amount to be determined at trial.

833.  Plaintiffs seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of

profits, payment of all civil penalties permissible under 815 ILCS 505/7(b) and (c), compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest, and awarding the Plaintiffs such other, further, and different relief as this Honorable Court may deem just.

**COUNT VII – UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**815 ILCS 510/1 *et seq.***
**(Against All Defendants)**

834.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

835.    This Count is brought by the State's Attorney under the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1 *et seq.*, as the Plaintiffs are "government[s] or governmental subdivision[s]" and are therefore "person[s]" under the definitions of the UDTPA. *See* 815 ILCS 510/1(5). The State's Attorney and legal representative of the Plaintiffs is empowered to bring Count VII of this action on behalf of the Plaintiffs, The County, the People of The County, and the People of the State, pursuant to the powers and duties vested to the State's Attorney by 55 ILCS 5/3-9005(a) and the doctrine of *parens patriae*.

836.    As evidenced by the conduct detailed above, Manufacturer Defendants have violated Section 2 of the UDTPA, 815 ILCS 510/2, by engaging in one or more of the following deceptive trade practices in their business, vocation, or occupation:

   a. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

   b. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

   c. Representing that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

   d. Disparaging the goods, services, or business of another by false or misleading representations of fact; and

243

    e.   Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

837.    As evidenced by the conduct detailed above, Distributor Defendants have violated Section 2 of the UDTPA, 815 ILCS 510/2, by engaging in one or more of the following deceptive trade practices in their business, vocation, or occupation:

    a.   Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

    b.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; and/or

    c.   Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

838.    As also described in greater detail above, Distributor Defendants' deceptive trade practices specifically include, but are not necessarily limited to, the following:

    a.   The practice of not monitoring for suspicious orders of prescription opioids;

    b.   The practice of not detecting suspicious orders of prescription opioids

    c.   The practice of not investigating suspicious orders of prescription opioids;

    d.   The practice of filling, or failing to refuse fulfillment of, suspicious orders of prescription opioids;

    e.   The practice of not reporting suspicious orders of prescription opioids;

    f.   The practice of rewarding increases in prescription opioid sales; and/or

    g.   The practice of falsely misrepresenting to the public that Defendants were complying with their legal obligations.

839.    Plaintiffs have been damaged, and are likely to be further damaged in the future, by the deceptive trade practices described herein.

840.    Defendants egregiously and willfully engaged in the deceptive trade practices described herein.

841.     Section 3 of the UDTPA, 815 ILCS 510/3, empowers this Court to grant injunctive relief upon terms it considers reasonable, as well as costs and attorneys' fees against Defendants if the Court finds that Defendants willfully engaged in a deceptive trade practice.

842.     Plaintiffs, The County, People of The County, and People of the State, by and through the State's Attorney, seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, attorney fees and costs, and pre- and post-judgment interest.

## COUNT VIII – NEGLIGENCE AND NEGLIGENT MISREPRESENTATION – ILLINOIS COMMON LAW
### (Against All Defendants)

843.     Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

844.     This Count for common law negligence and negligent misrepresentation is brought by the Plaintiffs against all Defendants.

845.     "To state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1096 (Ill. 2012) (quot. & cit. om.). All such essential elements exist here.

846.     To state a cause of action for negligent misrepresentation, a complaint "need allege only that the defendant was careless or negligent in ascertaining the truth of the statement, and that the defendant had a duty to convey accurate information to the plaintiff." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 424 (Ill. App. 2015) (quot. & cit. om.). All such essential elements exist here.

847.     Each Defendant had an obligation to exercise due care in marketing, selling, and distributing highly dangerous opioid drugs in the State and The County.

245

848.     Each Defendant had an obligation to exercise due care in manufacturing, marketing, selling, and distributing highly dangerous opioid drugs in the State and The County.

849.     If a course of action creates a foreseeable risk of injury, the individual engaged in that course of action has a duty to protect others from such injury. *Simpkins*, 965 N.E.2d at 1097. Each Defendant owed a duty to the Plaintiffs, and to the public health and safety in The County, because the injury was foreseeable, and in fact foreseen, by the Defendants.

850.     In addition, each Defendant owed a duty to the Plaintiffs, the People of the State, the People of The County, and The County, because the injury was likely.  Each Defendant was required to guard against the injury as a requirement for the licenses each Defendant maintains, and the burden of guarding against the injury was voluntarily assumed and not unduly onerous. The burden of guarding against the injury is properly placed upon each Defendant, and indeed, federal and state licensing and registration requirements required that each Defendant guard against the diversion of dangerously addictive opioids for illicit purposes.

851.     Reasonably prudent manufacturers and distributors would have anticipated that the scourge of opioid addiction would wreak havoc on communities. As explained above, the system whereby manufacturers and distributors are the gatekeepers between manufacturers and pharmacies exists ***for the purpose*** of controlling dangerous substances such as opioids. Defendants were repeatedly warned by law enforcement. The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

852.     The existence of a duty depends on the foreseeability of the injury.  Each Defendant owed a duty to the Plaintiffs, the People of the State, the People of The County, and The County, because the injuries alleged herein was foreseeable, and in fact foreseen, by the Defendants.

853.     Reasonably prudent manufacturers and distributors of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities. The closed system of opioid distribution whereby wholesale distributors are the gatekeepers between manufacturers and pharmacies, and wherein all links in the chain have a duty to prevent diversion, exists for the purpose of controlling dangerous substances such as opioids and preventing diversion and abuse.

854.     Reasonably prudent manufacturers of pharmaceutical products would know that aggressively pushing highly addictive opioids for chronic pain would result in the severe harm of addiction, foreseeably causing patients to seek increasing levels of opioids, frequently turning to the illegal drug market as a result of a drug addiction that was foreseeable to the Manufacturer Defendants.

855.     Moreover, Defendants were repeatedly warned by law enforcement of the unlawfulness and consequences of their actions and omissions.

856.     The escalating amounts of addictive drugs flowing through Defendants' businesses, and the sheer volume of these prescription opioids, further alerted Defendants that addiction was fueling increased consumption and that legitimate medical purposes were not being served.

857.     As described above in language expressly incorporated herein, Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances, by failing to monitor for, failing

247

to report, and filling highly suspicious orders time and again. Because the very purpose of these duties was to prevent the resulting harm – diversion of highly addictive drugs for non-medical purposes – the causal connection between Defendants' breach of duties and the ensuing harm was entirely foreseeable.

858.    As described elsewhere in the Complaint in language expressly incorporated herein, Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids to the State and The County and destinations from which they knew opioids were likely to be diverted into the State and The County, in addition to other misrepresentations alleged and incorporated herein.

859.    As described elsewhere in the Complaint in language expressly incorporated herein, Manufacturer Defendants breached their duties to exercise due care in the business of pharmaceutical manufacturers of dangerous opioids, which are Schedule II Controlled Substances, and by misrepresenting the nature of the drugs and aggressively promoting them for chronic pain for which they knew the drug were not safe or suitable.

860.    The Manufacturer Defendants misrepresented and concealed the addictive nature of prescription opioids and its lack of suitability for chronic pain, in addition to other misrepresentations alleged and incorporated herein.

861.    All Defendants breached their duties to prevent diversion and report and halt suspicious orders, and all Defendants misrepresented their compliance with their legal duties.

862.    Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

863.    The causal connection between Defendants' breaches of duties and misrepresentations and the ensuing harm was entirely foreseeable.

864.    As described above in language expressly incorporated herein, Defendants' breaches of duty and misrepresentations caused, bears a causal connection with, and/or proximately resulted in the damages sought herein.

865.    Defendants were selling dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Defendants' knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than medical, scientific, or industrial channels. However, Defendants breached their duties to monitor for, report, and halt suspicious orders, breached their duties to prevent diversion, and, further, misrepresented what their duties were and their compliance with their legal duties.

866.    Defendants' unlawful and/or intentional actions create a rebuttable presumption of negligence under State law.

867.    Plaintiffs seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' actions and omissions.  Plaintiffs do not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

868.    Plaintiffs seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT IX – NEGLIGENCE PER SE
### (Against All Defendants)

869.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

870.    The Illinois and federal laws set out in 720 ILCS 570/205; 225 ILCS 120/40; Ill. Admin. Code Title 68, § 1510.50; 21 U.S.C. §§ 812, 823; 21 C.F.R. § 1301.74; 28 C.F.R. § 0.100,

are public safety laws. Each Defendant had a duty under, *inter alia,* these laws maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids. *See, e.g.,* 720 ILCS 570/201(h); Ill. Admin. Code Title 68, § 1510.50(b)(3).

871. Defendants' actions and omissions in violation of the law constitute negligence per se.

872. Defendants' actions and omissions were intentional and/or unlawful, and Defendants acted with actual malice.

873. It was foreseeable that the breach of duty described herein would result in the economic damages for which Plaintiffs seek recovery.

874. As described above in language expressly incorporated herein, Defendants breached their duties to maintain effective controls against diversion of dangerously addictive opioids, including violating public safety statutes requiring that as wholesale drug distributors, Defendants could only distribute these dangerous drugs under a closed system – a system Defendants were responsible for guarding.

875. As described above in language expressly incorporated herein, Defendants' breach of statutory and regulatory duties caused, bears a causal connection with, and proximately resulted in, harm and damages sought by the Plaintiffs.

876. Plaintiffs seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' negligence per se. Plaintiffs do not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

877. Plaintiffs seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits,

compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT X – CIVIL CONSPIRACY
### (Against All Defendants)

878.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

879.    Defendants engaged in a civil conspiracy in their unlawful and tortious marketing of opioids and/or distribution of opioids into Illinois and Plaintiffs' Community as set forth herein.

880.    Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful marketing of opioids and/or distribution of opioids into Illinois and Plaintiffs' Community.

881.    Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

882.    Defendants Cephalon, Endo, Janssen, and Purdue each conspired with various KOLs and Front Groups to commit unlawful acts or lawful acts in an unlawful manner. Defendants Cephalon, Endo, Janssen, and Purdue, and the various KOLs and Front Groups with which each of them was allied, knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote the use of opioids for the treatment of chronic pain by making and disseminating false, unsubstantiated, and misleading statements and misrepresentations to prescribers and consumers. Defendants Cephalon, Endo, Janssen, and Purdue enlisted various KOLs and Front Groups to make and disseminate these statements in furtherance of their common strategy to increase opioid sales, and Defendants Cephalon, Endo, Janssen, and Purdue – along with the KOLs and Front Groups with whom each of them conspired – knew that the statements they made and disseminated served this purpose.

251

883.    By engaging in the conduct described in this Complaint, Defendant Cephalon agreed with Front Groups FSMB and APF that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with FSMB and APF, Cephalon provided support for FSMB's and APF's deceptive statements promoting opioids and FSMB and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Cephalon's drugs. As set forth above, *Responsible Opioid Prescribing* (Cephalon and FSMB) and *Treatment Options: A Guide for People Living with Pain* (Cephalon and APF) are publications that contained a number of deceptive statements about opioids. They are products of these conspiracies, and the collaboration between Cephalon and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

884.    By engaging in the conduct described in this Complaint, Defendant Endo agreed with Front Groups, APF, NIPC, AGS, and FSMB that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with APF, NIPC, AGS, and FSMB, Endo provided support for APF, NIPC, AGS and FSMB's deceptive statements promoting opioids and APF, NIPC, AGS, and FSMB used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Endo's drugs. *Persistent Pain in the Older Adult* (Endo, APF, and NIPC), *Painknowledge.com* (Endo, APF, NPIC), *Exit Wounds* (Endo and APF); *Pharmacological Management of Persistent Pain in Older Persons* (Endo and AGS), and *Responsible Opioid Prescribing* (Endo and FSMB) are publications, CMEs, and websites that contained a number of deceptive statements about opioids as outlined above. They are products of these conspiracies, and the collaboration between Endo and each of these entities in creating and disseminating these publications, CMEs, and websites is further evidence of each conspiracy's existence.

885.    By engaging in the conduct described in this Complaint, Defendant Janssen agreed with Front Groups AAPM, AGS, and APF that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with AAPM, AGS, APF, Janssen provided support for AAPM, AGS, and APF's deceptive statements promoting opioids and Conrad & Associates LLC, Medical Writer X, AAPM, AGS, and APF used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Janssen's drugs. *Finding Relief: Pain Management for Older Adults* (Janssen, AAPM, and AGS), a CME promoting the *Pharmacological Management of Persistent Pain in Older Persons* (Janssen and AGS); the *Let's Talk Pain* website (Janssen and APF), and *Exit Wounds* (Janssen and APF) are publications, CMEs, and websites that contained a number of deceptive statements about opioids, as outlined above. They are products of these conspiracies and the collaboration between Janssen and each of these entities in creating and disseminating these publications is further evidence of each conspiracy's existence.

886.    By engaging in the conduct described in this Complaint, Defendant Purdue agreed with Front Groups APF, FSMB, and AGS that they would deceptively promote the risks, benefits, and superiority of opioid therapy. As part of its agreements with APF, FSMB, and AGS, Purdue provided support for APF, FSMB, and AGS's deceptive statements promoting opioids and APF, FSMB, and AGS used that support to more broadly disseminate deceptive messaging promoting opioids, which would benefit Purdue's drugs. The *Partners Against Pain* website (Purdue and APF), *A Policymaker's Guide to Understanding Pain & Its Management* (Purdue and APF), *Treatment Options: A Guide for People Living with Pain* (Purdue and APF); *Exit Wounds* (Purdue

and APF),[261] *Responsible Opioid Prescribing* (Purdue and FSMB), and a CME promoting the *Pharmacological Management of Persistent Pain in Older Persons* (Purdue and AGS) are publications, CMEs, and websites that contained a number of deceptive statements about opioids, as outlined above. They are products of these conspiracies, and the collaboration between Purdue and each of these entities in creating and disseminating these publications, CMEs and websites is further evidence of each conspiracy's existence.

887.    Each of the participants to the conspiracies outlined above was aware of the misleading nature of the statements they planned to issue and of the role they played in each scheme to deceptively promote opioids as appropriate for the treatment of chronic pain. These Defendants and third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using opioids to the residents, patients, and prescribers of the State and The County in return for increased pharmaceutical sales, financial contributions, reputational enhancements, and other benefits.

888.    As outlined in this Complaint, Defendants Cephalon, Endo, Janssen, and Purdue played an active role in determining the substance of the misleading messages issued by KOLs and Front Groups, including by providing content themselves, editing and approving content developed by their co-conspirators, and providing slide decks for speaking engagements. Defendants further ensured that these misstatements were widely disseminated, by both distributing the misstatements themselves and providing their co-conspirators with funding and other assistance with distribution. The result was an unrelenting stream of misleading information about the risks, benefits, and superiority of using opioids to treat chronic pain from sources

---

[261] Purdue's collaborations with APF through APF's "Corporate Roundtable" and Purdue and APF's active collaboration in running PCF constitute additional evidence of the conspiracy between Purdue and APF to deceptively promote opioids.

Defendants knew were trusted by prescribers. Defendants exercised direct editorial control over most of these statements. However, even if Defendants did not directly disseminate or control the content of these misleading statements, they are liable for conspiring with the third parties who did.

889.    As set forth herein, Defendants engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful distribution and diversion of opioids into the State and The County.

890.    As set forth herein, Distributor and Manufacturer Defendants unlawfully failed to act to prevent diversion and failed to monitor for, report, and prevent suspicious orders of opioids.

891.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

892.    The Manufacturer Defendants further unlawfully marketed opioids in the State and The County in furtherance of that conspiracy.

893.    Defendants' conduct in furtherance of the conspiracy described herein was not mere parallel conduct because each Defendant acted directly against their commercial interests in not reporting the unlawful distribution practices of their competitors to the authorities, which they had a legal duty to do. Each Defendant acted against its commercial interests in this regard due to an actual or tacit agreement between the Defendants that they would not report each other to the authorities so they could all continue engaging in their unlawful conduct.

894.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, to create the injuries alleged herein.

895.     Defendants participated in unlawful acts or lawful acts in an unlawful manner and in furtherance of a civil conspiracy by, among other unlawful conduct:

a.   Violating, aiding and abetting in the violation, or causing the violation of 720 ILCS § 5/17-10.5;

b.   Violating 21 U.S.C. § 331(a);

c.   Violating the Consumer Fraud Act and violating the UDTPA; and

d.   Committing common law unjust enrichment.

896.     Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonably or lawful excuse.

897.      Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

898.     By reasons of Defendants' unlawful acts, the Plaintiffs have been damaged and continue to be damaged by paying for the costs of opioid prescriptions for chronic pain and has suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain.

899.     Because Defendants' marketing caused doctors and other health care providers to prescribe and The County to pay for long-term opioid treatment using opioids manufactured or distributed by other drug makers, Defendants caused and are responsible for those costs and claims, as well.

900.     Plaintiffs seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' civil conspiracy. Plaintiffs do not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

901.     Plaintiffs seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits,

compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor

Defendants, attorney fees and costs, and pre- and post-judgment interest.

## COUNT XI – FRAUD AND FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

902.    Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and

allegations of this Complaint as if fully set forth herein, and further allege as follows:

903.    Defendants violated their general duty not to actively deceive, and have made

knowingly false statements and have omitted and/or concealed information which made statements

Defendants did make knowingly false.  Defendants acted intentionally and/or unlawfully.

904.    In Illinois, the elements to state a cause of action for common law fraud are: "(1) a

statement by defendant; (2) of a material nature as opposed to opinion; (3) that was untrue; (4) that

was known or believed by the speaker to be untrue or made in culpable ignorance of its truth or

falsity; (5) that was relied on by the plaintiff to his detriment; (6) made for the purpose of inducing

reliance; and (7) such reliance led to the plaintiff's injury. *Olendorf v. General Motors Corp.*, 322

Ill.App.3d 825, 831 (Ill. App. 2001). All such essential elements exist here.

905.    Similarly, to state a cause of action for fraudulent misrepresentation in Illinois, the

elements are: "(1) a false statement of material fact; (2) knowledge or belief of the falsity by the

person making it; (3) intention to induce the other party to act; (4) action by the other party in

reliance on the truth of the statements; and (5) damage to the other party resulting from such

reliance." *Guvenoz v. Target Corp.*, 30 N.E.3d 404, 423 (Ill. App. 2015). All such essential

elements exist here.

906.    As alleged herein, Defendants made false statements regarding their compliance

with state and law regarding their duties to prevent diversion, their duties to monitor, report and

halt suspicious orders, and/or concealed their noncompliance with these requirements.

907.    As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

908.    As alleged herein, Defendants knowingly and/or intentionally made representations that were false. Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiffs, the State and The County, the public, and persons on whom Plaintiffs relied.

909.    These false representations and concealments were reasonably calculated to deceive Plaintiffs, the State and The County, and the physicians who prescribed opioids for persons in the State and The County, were  made with the intent to deceive, and did in fact deceive these persons, Plaintiffs, and The County.

910.    Plaintiffs, including the residents of The County, and the physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

911.    Plaintiffs justifiably relied on Defendants' representations and/or concealments, both directly and indirectly.  Plaintiffs' injuries were proximately caused by this reliance.

912.    The injuries alleged by Plaintiffs herein were sustained as a direct and proximate cause of Defendants' fraudulent conduct.

913.    Plaintiffs seek economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment.  Plaintiffs do not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

914.     Plaintiffs seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre- and post-judgment interest.

## PUNITIVE DAMAGES

915.     Plaintiffs repeat, re-allege, and incorporate by reference all other paragraphs and allegations of this Complaint as if fully set forth herein, and further allege as follows:

916.     By engaging in the above-described unfair acts or practices, Defendants acted with actual malice, wantonly, and oppressively. Defendants acted with conscious disregard to the rights of others and/or in a reckless, wanton, willful, or gross manner.  Defendants acted with a prolonged indifference to the adverse consequences of their actions and/or omissions.  Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm.

917.     Here, Defendants were selling, manufacturing, and/or distributing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the State and The County by, these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence, and the safety of the community, and an award of punitive damages is appropriate, as punishment and a deterrence.

918.     By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs respectfully pray that this Court enter an order of judgment granting all relief requested in this Complaint, and/or allowed at law or in equity, including:

1. Enter Judgment in favor of the Plaintiffs in a final order against each of the Defendants;

2. Abatement of the nuisance;

3. Actual Damages;

4. Enjoin the Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in unlawful sales of prescription opioid pills and ordering temporary, preliminary or permanent injunction;

5. Allocate monetary damages attributable to each Defendant for each Count pled above;

6. Order that Defendants compensate the State and The County for its past and future damages and costs to abate the ongoing public nuisance caused by the opioid epidemic;

7. Impose an award of actual and triple the actual damages the Plaintiffs sustained as a result of each Defendant's violation of the Narcotics Profit Forfeiture Act;

8. Order that each Defendant pay restitution;

9. Order that each Defendant disgorge profits;

10. Order that each Defendant is liable for civil penalties under Illinois law;

11. Treble or multiple damages and civil penalties as allowed by statute;

12. Allocate monetary damages attributable to each Defendant to compensate the Plaintiffs for the expenses and costs that it bears as a result of the public nuisance, including without limitation (A) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments/services for patients suffering from

opioid-related addiction or disease, including overdoses and deaths; (B) costs for providing treatment, counseling, rehabilitation services; (C) costs for providing treatment of infants born with opioid-related medical conditions; (D) costs associated with law enforcement and public safety relating to the opioid epidemic, including without limitation first responders and ambulance services; and (E) any other expenses or damages caused by the Defendants' diversion of opioids;

13. Award judgment against the Defendants requiring Defendants to pay punitive and exemplary damages;

14. The cost of investigation, reasonable attorneys' fees, and all costs and expenses;

15. Pre-judgment and post-judgment interest; and

16. All other and further relief as this Court deems appropriate and just.


PLAINTIFFS DEMAND A TRIAL BY JURY.


Dated: 9/10/2018

THE PEOPLE OF THE STATE OF ILLINOIS, THE PEOPLE OF UNION COUNTY, COUNTY OF UNION

By Tyler R. Edmonds, the STATE'S ATTORNEY of UNION COUNTY,

*/s/ Thomas J. Lech*

Thomas J. Lech #6256261
Ann E. Callis #6203933
Gregory R. Jones #6325696
**Goldenberg Heller & Antognoli, P.C.**
2227 South State Route 157
Edwardsville, IL 62025
Tel.: 618-656-5150
Fax: 618-656-6230
tlech@ghalaw.com
acallis@ghalaw.com
gjones@ghalaw.com

Paul T. Farrell, Jr.
**Greene, Ketchum, Farrell, Bailey & Tweel, LLP**
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Tel.: 800.479.0053 or 304.525.9115
Fax: 304.529.3284
paul@greeneketchum.com

261

James M. "Mike" Papantonio (*Motion to Admit* pending)
Peter J. Mougey (*Motion to Admit* pending)
Page A. Poerschke (*Motion to Admit* pending)
Laura S. Dunning (*Motion to Admit* pending)
Archie C. Lamb, Jr. (*Motion to Admit* pending)
Jeffrey Gaddy (*Motion to Admit* pending)
Neil E. "Ned" McWilliams, Jr. (*Motion to Admit* pending)
**Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
850.435.7068 (office)
850.436.6068 (fax)
mpapantonio@levinlaw.com
pmougey@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
alamb@levinlaw.com
jgaddy@levinlaw.com
nmcwilliams@levinlaw.com

Russell W. Budd
J. Burton LeBlanc, IV
Laura J. Baughman
S. Ann Saucer
**Baron & Budd, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Tel.: 214-521-3605
Fax: 214-520-1181
rbudd@baronbudd.com
bleblanc@baronbudd.com
lbaughman@baronbudd.com
asaucer@baronbudd.com

Roland K. Tellis (*Motion to Admit* pending)
Mark P. Pifko (*Motion to Admit* pending)
**Baron & Budd, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Tel.: 818-839-2333
Fax: 818-986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

James C. Peterson (*Motion to Admit* pending)
R. Edison Hill (*Motion to Admit* pending)
**Hill, Peterson, Carper,
   Bee & Deitzler, PLLC**
NorthGate Business Park
500 Tracy Way
Charleston, WV  25311
Tel.: 304-345-5667
Fax: 304-345-1519
jcpeterson@hpcdb.com
rehill@hpcbd.com

Michael J. Fuller, Jr., (*Motion to Admit* pending)
Amy Quezon, (*Motion to Admit* pending)
**McHugh Fuller Law Group, PLLC**
97 Elias Whiddon Rd.
Hattiesburg, MS  39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com

Anthony J. Majestro, Esq. (Motion to Admit pending)
**Powell & Majestro, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

David Cates
**Cates Mahoney, LLC**
216 West Pointe Drive, Suite A
Swansea, IL 62226
Tel.: 618-277-3644
Fax: 618-277-7882
dcates@cateslaw.com

Eric D. Holland
R. Seth Crompton
**Holland Law Firm**
300 North Tucker, Suite 801
St. Louis, MO 63101
Tel.: 314-241-8111
Fax: 314-241-5554
eholland@allfela.com
scrompton@allfela.com